**UNITED STATES COURT OF APPEALS**

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

JAWAN N. TARQUINII,

        Plaintiff - Appellant,

    v.

JOHN PHELAN,
Secretary, U.S. Dept. of the Navy,

        Defendant - Appellee.

Appeal No. 24-5243

# APPELLANT BRIEF SUBMISSION

1

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................4

**SUMMARY ADDENDUM – MOST COMPELLING ERRORS FOR THE COURT** ........................6

**JURISDICTIONAL STATEMENT** .......................................................................................10

**STATEMENT OF THE ISSUES** ..........................................................................................11

**SUMMARY OF THE CASE**................................................................................................14

**STATEMENT OF FACTS**...................................................................................................16

**SUMMARY OF THE ARGUMENT**......................................................................................19

**STANDARD OF REVIEW** .................................................................................................22

**ARGUMENT I - PROCEDURAL VIOLATIONS** ...................................................................23

**I. INTRODUCTION** ..........................................................................................................23
**II. DISTRICT COURT PREJUDMENT AND DUE PROCESS DENIAL** ...........................................25
**III. CONFLICTED OFFICIALS AND BIASED INVESTIGATION**..................................................27
**IV. MCCS WITHHELD AND MANIPULATED EVIDENCE TO SHAPE OUTCOME** ....................31
**V. MCCS EVOLVING JUSTIFICATIONS REVEAL PROCEDURAL MISUSE**.............................33
**VI. PREMATURE SEPARATION AS RETALIATORY INDICATOR**................................................38
**VII. EVIDENCE SUPPRESSION, SPOLIATION, AND INVESTIGATIVE MISCONDUCT** ............42
**VIII. RETALIATORY MOTIVE AND PROTECTED ACTIVITY** ....................................................45
**IX. PREJUDICIAL NEW EVIDENCE SUBMITTED AFTER RECORD CLOSURE** ......................49
**X. TIMELINE OF SHIFTING JUSTIFICATIONS** ......................................................................53
**XI. EVIDENCE CONNECTING TERMINATION TO RETALIATION**.............................................56
**XII. CONCLUSION PART I**................................................................................................60

**ARGUMENT II —RETALIATION & PRETEXT** ....................................................................62

**I. PERFORMANCE RATINGS MANIPULATED AFTER PROTECTED ACTIVITY** ......................62
**II. PLAINTIFF ENGAGED IN PROTECTED ACTIVITY**..............................................................64
**III. PLAINTIFF SUFFERED AN ADVERSE EMPLOYMENT ACTION** .........................................67
**IV. RETALIATION, SHIFTING JUSTIFICATIONS, AND PRETEXT** .............................................70
**V. CORRUPTED APPEAL PROCESS AND STRUCTURAL BIAS**...............................................73

**VI. DISCRIMINATORY TERMINATION BASED ON DISABILITY** ...............................................**74**
**VII. CONCLUSION PART II** ................................................................................**76**

**CONCLUSION AND RELIEF REQUESTED** ........................................................................**78**

**I. JUDICIAL FAILURES AND GROUNDS FOR REVERSAL** .........................................**78**
**II. PROCEDURAL ANOMALIES & DENIAL OF DUE PROCESS** ...................................**79**
**III. IGNORED EVIDENCE OF DISABILITY DISCRIMINATION AND RETALIATION** ..............**82**
**IV. THE COURT'S LEGAL ERRORS REQUIRE REVERSAL** ...........................................**83**
**V. REMEDIES AND RELIEF REQUESTED** .................................................................**85**
**VI. CONCLUSION OF LEGAL CLAIMS (TOTALITY OF CIRCUMSTANCES)** ...........................**87**

**CERTIFICATE OF SERVICE** ................................................................................**90**

**APPENDIX A – COMPARATOR DISCIPLINE SUMMARY** ............................................**91**

**APPENDIX B – FAMILY CARE REPORT TIMELINE** ...............................................**93**

**APPENDIX C — FAMILY HIRING & RECUSAL SUMMARY** .......................................**95**

**APPENDIX D – PROCEDURAL IRREGULARITIES & DUE PROCESS FAILURES** ...................**97**

**APPENDIX E – AGENCY NARRATIVE CONTRADICTIONS** .......................................**102**

**APPENDIX F – TIMELINE OF PROTECTED DISCLOSURES & RETALIATORY ACTION** ....**108**

**APPENDIX G – DUE PROCESS FAILURES & PROCEDURAL IRREGULARITIES** .................**114**

**APPENDIX H — IMPACT OF OVERSEAS TERMINATION** .........................................**118**

**APPENDIX I – NEUTRALITY FAILURES & PROCEDURAL VIOLATIONS** ............................**121**

**APPENDIX J – RETALIATION FALLOUT SUMMARY** ..............................................**127**

**APPENDIX K – NOTICE OF REPRISAL, DISCRIMINATION, & RELIGIOUS BIAS PRIOR TO TERMINATION** .............................................................................................**130**

**APPENDIX L – DOCKET REFERENCE TABLE AND EVIDENTIARY SUMMARY** ..................**133**

# TABLE OF AUTHORITIES

**Cases**

- Adeyemi v. District of Columbia, 525 F.3d 1222 (D.C. Cir. 2008)
- Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)
- Baird v. Gotbaum, 792 F.3d 166 (D.C. Cir. 2015)
- Barth v. Gelb, 2 F.3d 1180 (D.C. Cir. 1993)
- Brady v. Office of Sergeant at Arms, 520 F.3d 490 (D.C. Cir. 2008)
- Broderick v. Donaldson, 437 F.3d 1226 (D.C. Cir. 2006)
- Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)
- Celotex Corp. v. Catrett, 477 U.S. 317 (1986)
- Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)
- Figueroa v. Pompeo, 923 F.3d 1078 (D.C. Cir. 2019)
- Ginger v. District of Columbia, 527 F.3d 1340 (D.C. Cir. 2008)
- Goldberg v. Kelly, 397 U.S. 254 (1970)
- Hamilton v. Geithner, 666 F.3d 1344 (D.C. Cir. 2012)
- Holcomb v. Iona College, 521 F.3d 130 (2d Cir. 2008)
- Jones v. Bernanke, 557 F.3d 670 (D.C. Cir. 2009)
- Koch v. White, 134 F. Supp. 3d 158 (D.D.C. 2015)
- McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)
- Morgan v. FHLMC, 172 F. Supp. 2d 98 (D.D.C. 2001)
- Porter v. Shah, 606 F.3d 809 (D.C. Cir. 2010)
- Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)
- Rochon v. Gonzales, 438 F.3d 1211 (D.C. Cir. 2006)
- Smith v. Chrysler Corp., 155 F.3d 799, 806 (6th Cir. 1998)
- Steele v. Schafer, 535 F.3d 689 (D.C. Cir. 2008)
- Stone v. FDIC, 179 F.3d 1368 (Fed. Cir. 1999)
- Talavera v. Shah, 638 F.3d 303 (D.C. Cir. 2011)
- Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981)
- Thompson v. North Am. Stainless, LP, 562 U.S. 170 (2011)
- Tolan v. Cotton, 572 U.S. 650, 657 (2014)
- Tyler v. Unocal Oil Co., 304 F.3d 379, 398 (5th Cir. 2002)
- Withrow v. Larkin, 421 U.S. 35 (1975)
- Woodruff v. Peters, 482 F.3d 521 (D.C. Cir. 2007)

**Statutes**

- Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
- Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq.

- 28 U.S.C. § 1291
- 28 U.S.C. § 1331
- 5 U.S.C. § 7513(b)

## Regulations
- Marine Corps NAF Personnel Policy Manual P.12000 11A - § 5007-5011

## Rules
- Fed. R. Civ. P. 56(a)
- Fed. R. Civ. P. 56(d)

## Guidance & Governmental Sources

- U.S. Department of Defense, *Annual Suicide Prevention Reports* (latest as of 2015)
- U.S. Department of Defense Instruction (DoDI) 6490.08, *Commander's Tools for Suicide Prevention, Notification Requirements to Dispel Stigma in Providing Mental Health Care to Service Members*, U.S. Department of Defense, August 17, 2011.
- Substance Abuse and Mental Health Services Administration (SAMHSA), *Holiday Stress and Suicide Trends* (2014–2016)
- Marine Corps Community Services (MCCS) internal policy: *Holiday Disciplinary Hold Guidance* (institutional knowledge, widely known among HR chiefs as standard protocol)
- DoD Instruction 1400.25, Volume 1407, *DoD Civilian Personnel Management System: Nonappropriated Fund (NAF) Employee Grievances*, U.S. Department of Defense, April 10, 2009 (Incorporating Change 1, Effective March 20, 2017).

*(Addendum: A concise outline of the most glaring errors, for quick reference by the*

*panel. This is a reader roadmap, not counted toward word limit.)*

• **Due Process Denied:** Plaintiff was not provided with specific notice of

the charges that formed the basis for her removal. MCCS withheld the very materials

it cited—including undisclosed IG attachments—until after the final decision. No

portion of the IG report was identified as actionable, nor was Plaintiff allowed to

challenge the evidence being used against her. This deprived Plaintiff of any

meaningful opportunity to respond, constituting a core due process failure under

*Loudermill* and *Stone v. FDIC*.

• **Conflicted Investigators & Advisors:** MCCS officials named in

Plaintiff's EEO and misconduct complaints directly led and advised every level of

the removal process. Carlos Saldana, formally accused of discrimination and

retaliation, conducted the investigation and drafted the proposal, inserting himself

into every role. LtCol Manning, who had already endorsed the IG findings, later

served as "neutral legal advisor" to the appeal reviewer. These dual-role conflicts

violated basic fairness and NAF procedural safeguards, irreparably tainting the

process from start to finish.

- **Suppression and Destruction of Evidence** MCCS revoked Plaintiff's email access immediately after proposing removal, deleted or "lost" key records (including messages from Saldana), and wiped her government phone while the appeal was pending. These actions obstructed Plaintiff's ability to defend herself, eliminated access to exculpatory evidence, and suggest intentional spoliation—undermining the integrity of the entire proceeding.

- **Procedural Corruption of the Internal Appeal:** The agency bypassed established safeguards in the appeal process. MCCS secretly submitted a new "Statement of Matters" with multiple exhibits *after* the appeal hearing had closed – without ever notifying Plaintiff or the Hearing Officer. Plaintiff had no opportunity to respond. MCCS also denied her opportunity to cross-examine key witnesses, despite prior assurances. The final decisions by Boucher and Cindy Whitman-Lacy contained no findings, legal reasoning, or reference to rebuttal arguments—demonstrating a rubber-stamped outcome in violation of the governing NAF appeal rules.

- **Premature Expulsion and Prejudgment:** As soon as the termination was proposed – long before any final decision or due process – MCCS took the

**unprecedented step of issuing base expulsion and a "checkout sheet" immediately upon proposing removal**. This expulsion from an overseas base meant Plaintiff immediately lost medical care,  access to vital services, and access to defense materials. No comparable employee, despite worse misconduct, received this treatment. MCCS's conduct demonstrated prejudgment and discriminatory intent, as well as an effort to coerce settlement and sabotage Plaintiff's defense.

- **District Court's Summary Judgment Errors:** The District Court granted summary judgment despite the glaring factual disputes. It did so with an *incomplete record* while unresolved discovery remained pending—including the complete IG file and deleted communications—and improperly resolved credibility issues in MCCS's favor. The court also improperly weighed credibility and segmented the claims, rather than viewing the totality of retaliation evidence and pretext in its totality, narrowly segmenting claims. These legal errors violate Rule 56 and deprived Plaintiff of her right to jury resolution on genuine issues of material fact.

- **Withholding of Critical IG Material**: Although a 220-page redacted version of the IG Report was filed as Ex. 9 (ECF 65-45), MCCS withheld the full 392-page file—including critical enclosures and pre-decisional endorsements—until litigation, nearly nine years later. The complete report reveals Manning's early

endorsement of termination and additional conflicts that were concealed during the

agency process. This independent due process violation alone warrants reversal.[1]


*(Each of the above points is supported by the record; full **citations and exhibit***

***references** are detailed in the body of the brief. This addendum is a quick-reference*

*tool highlighting the most egregious errors that justify reversal.)*[2]

---

[1] There were three separate IG versions relevant to this case: (1) a heavily redacted excerpt post- proposal (Ex. 14); (2) a 220-page partial version referenced post-termination and prior to the administrative appeal (Ex. 9); and (3) the full 392-page IG version—with enclosures and undisclosed endorsements—provided for the first time in discovery, years after removal.

[2] Exhibits cited herein (Ex. 1 through Ex. 46) refer to materials filed at ECF 65 through 65-46, all of which are incorporated in full in the Joint Appendix.

## JURISDICTIONAL STATEMENT

District Court had jurisdiction under **28 U.S.C. § 1331**, this case arises under **Title VII of the Civil Rights Act of 1964** and the **Rehabilitation Act of 1973**.

The court entered final judgment on **September 26, 2024** (ECF No. 73), and Plaintiff was a federal employee and filed a timely notice of appeal on **October 16, 2024** (ECF No. 75).

This Court has appellate jurisdiction under **28 U.S.C. § 1291**.

# STATEMENT OF THE ISSUES

1.  Whether the District Court erred in granting summary judgment despite record evidence of retaliatory motive—including shifting justifications, selective exclusion of evidence, and adverse actions closely following Plaintiff's protected activity—under Title VII.

2.  Whether Plaintiff's termination was procedurally invalid where Carlos Saldana, an official she accused of misconduct, led the investigation, and LtCol Manning, who endorsed that investigation, later advised the appeal as a purported neutral.

3.  Whether the District Court improperly resolved factual disputes and credibility issues—issues that should be decided by a jury under Rule 56.

4.  Whether MCCS's refusal to implement Plaintiff's approved disability accommodations while assigning decision-makers she had previously accused of misconduct constituted unlawful disability discrimination under the

Rehabilitation Act.

5.      Whether more favorable treatment of similarly situated white, male

employees, despite more severe misconduct, raises a triable issue of race and

gender discrimination.

6.      Whether MCCS denied due process by revoking Plaintiff's access to systems,

healthcare, and services before her appeal concluded, functionally finalizing

her removal in advance.

7.      Whether MCCS's deletion of Plaintiff's records—while selectively retaining

fragments used against her—violated due process by denying her access to

exculpatory evidence.

8.      Whether the District Court failed to assess the cumulative impact of Plaintiff's

protected activity and intersecting statuses—race, sex, religion, and

disability—when evaluating pretext and motive.

9.      Whether MCCS's submission of post-record evidence to the appeal reviewer,

without notifying Plaintiff or allowing rebuttal, violated due process.

10. Whether MCCS's failure to disclose the full 392-page IG report during the agency process—while withholding critical investigative material and denying Plaintiff any opportunity to review or respond—violated due process and rendered the termination process fundamentally unfair.

11. Whether escalating actions following Plaintiff's protected disclosures— LOC, access revocation, and early removal—support an inference of retaliation under Title VII and the Rehabilitation Act.

12. Whether MCCS's violations of its own NAF Personnel Manual —including missed deadlines, routing appeals through biased officials, and denying recusal requests—support reversal.

13. Whether MCCS's submission of undisclosed materials to Col. Boucher after the record closed, without notice to Plaintiff, and his reliance on them in the final removal decision, violated Plaintiff's procedural rights and supports reversal.

## SUMMARY OF THE CASE

Plaintiff, a federal employee and Human Resources Branch Head for Marine Corps Community Services (MCCS) in Iwakuni, Japan, filed suit under **Title VII** and the **Rehabilitation Act**, alleging discrimination, retaliation, and procedural due process violations related to her removal. After receiving consistent "Outstanding" evaluations, Plaintiff disclosed misconduct, requested accommodations, and engaged in protected EEO activity. The retaliation escalated rapidly. (Appendix K)

MCCS downgraded Plaintiff's performance without cause, initiated an investigation led by conflicted officials, and began relying on a 392-page IG Report and 36 enclosures that it never disclosed. Plaintiff had no access to these records during the disciplinary process—only receiving them years later in litigation. MCCS submitted new materials after the appeal record had closed, then denied Plaintiff any opportunity to respond. No specific regulation was cited to justify the proposed removal.

Before a decision on her appeal, MCCS revoked Plaintiff's base access, housing, healthcare, email, and employment systems—effectively removing her from

federal service. This left Plaintiff and her family in a foreign country with no income, no medical care, and no legal ability to remain. The removal caused not only reputational and career damage, but real and lasting personal harm. Plaintiff filed suit.

The district court granted summary judgment, resolving factual disputes and ignoring direct evidence of retaliation, discrimination, and procedural misconduct.

## STATEMENT OF FACTS

Plaintiff served as Human Resources Branch Head for MCCS at MCAS Iwakuni, Japan, consistently receiving "Outstanding" ratings. After reporting workplace discrimination, participating in protected EEO activity, and requesting accommodations, Plaintiff became the target of escalating retaliation.

In 2015, MCCS initiated an internal investigation led by **Carlos Saldana**—a named subject of Plaintiff's complaints. Saldana served as lead investigator, authored the findings, and later advised on Plaintiffs removal. MCCS's stated justifications shifted repeatedly, beginning with the unfounded claim that Plaintiff had "facilitated the hire" of her spouse and brother. Multiple HR officials and selecting authorities confirmed Plaintiff had properly recused herself and played no role.

In November 2015, MCCS proposed Plaintiff's removal. MCCS deleted and withheld critical records.

> *Her email history is largely deleted.*
> — Devine, Ex. 14 at 000179

Yet MCCS selectively retrieved fragments and used them in the removal process without notifying Plaintiff or allowing her to respond. (See Ex. 35)

Plaintiff was denied access to records necessary for her defense. MCCS locked her out of her email account, withheld the IG report and enclosures during the disciplinary process, and submitted new evidence to the appellate reviewer after the record had closed. Plaintiff was not notified and had no opportunity to rebut these materials. (Ex. 14, 28)

Additionally, MCCS prematurely her base access, phone, email, government systems, housing eligibility, and medical access—cutting off Plaintiff and her family in a foreign country from essential services and functionally executing the removal prior to any decision. Her request for recusal of conflicted officials was denied. The full IG Report, which MCCS relied upon in its removal decision, was not disclosed until years later during litigation. The attached enclosures revealed inconsistencies and undisclosed conflicts that undermined MCCS's asserted justification.[3]

Five weeks after the administrative appeal record had closed, MCCS submitted new evidence (Ex. 35) directly to Col. Boucher, bypassing the hearing officer entirely. Despite acknowledging that Plaintiff never saw the evidence, Boucher relied

---

[3] See *Koch v. White*, 134 F. Supp. 3d 158, 173 (D.D.C. 2015) (holding that pretext can be shown through the cumulative weight of retaliatory acts and atmosphere).

on it. MCCS rejected Plaintiff's request for a neutral adjudicator, allowing LtCol Manning—who had signed off on Saldana's findings—to advise Boucher in a purportedly neutral role.

At every stage, MCCS controlled the narrative and access to evidence. MCCS cited a 220-page version of the IG Report during its process but never disclosed it. Only during litigation did MCCS release the full 392-page report and 36 attached enclosures—revealing inconsistencies and undisclosed conflicts central to the removal.

## SUMMARY OF THE ARGUMENT

This case presents material factual disputes involving retaliation, discrimination, and due process violations—each independently warranting reversal under binding Supreme Court and D.C. Circuit precedent. The district court erred by granting summary judgment despite unresolved factual conflicts, shifting justifications, and direct evidence of retaliatory motive, all of which must be weighed by a jury under *Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000), and *Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006).

MCCS subjected Plaintiff—a highly rated civilian employee—to sudden performance downgrades, extreme reporting demands, and ultimate removal following protected disclosures. The stated basis for her removal shifted repeatedly, from allegations of "hire" to "employment" to vague misconduct—none of which were ever supported by policy citations or instructions to correct. (Exs. 2, 2.5, 10, 14, Appendix D)

Officials with conflicts of interest directed both the investigation and appeal process, despite Plaintiff's objections and requests for recusal. Key

decisionmakers—including LtCol Manning and Carlos Saldana—were directly implicated in Plaintiff's protected activity, yet failed to recuse themselves from the investigative or disciplinary process.

MCCS violated its own regulatory procedures by revoking Plaintiff's access to base systems, housing, and healthcare the same day the proposal was issued [Ex. 28], functionally terminating her before her appeal was heard. MCCS later submitted new **materially different evidence directly to the deciding official**—after the record had closed and without notifying Plaintiff's (Exs. 28, 32–35). These facts reflect **core due process violations** under *Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999) and *McGrath v. Clinton*, 666 F.3d 1377 (D.C. Cir. 2012).

The district court accepted MCCS's narrative uncritically, despite its reliance on internal hearsay, contradictions, and suppressed exculpatory evidence. MCCS's justification ignored its own admission that Plaintiff's "Outstanding" performance only came under scrutiny after her protected EEO, IG, and ADA activity. No specific policy violation was ever identified or ordered to cease. (Exs. 2, 3.5, 5, 6, 10, 14)

Because the record supports a reasonable inference of retaliation, discriminatory termination, and procedural misconduct, summary judgment must be reversed for trial. Taken together, these errors demonstrate pretext, retaliation, and

denial of due process. A jury must be allowed to assess the timeline, credibility conflicts, and the agency's post-hoc explanations in light of the full record.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo, applying the same standard as the District Court. See Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1113 (D.C. Cir. 2016). Summary judgment is appropriate only if the moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In discrimination and retaliation cases, summary judgment should be denied where the plaintiff presents circumstantial or direct evidence sufficient to raise an inference of pretext or retaliatory motive. See Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). Courts must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in their favor. Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).

# ARGUMENT

## ARGUMENT I - PROCEDURAL VIOLATIONS

## I. INTRODUCTION

This case is about what happens when a federal employee who engages in protected activity is met not with protection—but with retaliation orchestrated by those she reported. Plaintiff, a high-performing HR executive, faced a coordinated effort by MCCS leadership—including Carlos Saldana, John Iwaniec, Jody Devine, and others—to silence her through exclusion, process manipulation, and eventual termination.

MCCS's conduct reflects systemic due process violations: the destruction of key evidence, conflicts of interest with investigators acting as witnesses and advisors, obstruction of cross-examination, concealment of critical investigative materials, shifting post hoc justifications, and premature punitive actions— **including the unprecedented revocation of Plaintiff's base access while serving overseas**, functionally exiling her and her family homeless, without medical access, in a foreign country before any appeal decision.

Plaintiff was denied specific notice of the allegations and access to the evidence used against her, rendering her response ineffective and undermining the fairness of the process. (Exs. 2.5, 5, 14)[4]

These were not isolated errors. They were the culmination of a deliberate campaign to retaliate against, discriminate against, and remove Plaintiff for engaging in protected EEO activity and exposing misconduct.

The District Court granted summary judgment by improperly weighing evidence and disregarding material factual disputes. The order erroneously resolved credibility disputes in MCCS's favor, notwithstanding clear conflicts. In doing so the governing standard requiring all factual inferences to favor the non-Movant.

From the start, Plaintiff was denied the ability to respond meaningfully to the allegations. Even the proposal official, Johnston, couldn't explain what regulation had been violated and failed to respond to Plaintiff's clarification request (Ex. 23). This silence at the heart of the removal process confirms it lacked both fairness and legal sufficiency. This appeal presents the Court with both the opportunity and the duty to correct these legal errors, enforce statutory protections, and restore the due process rights federal law demands.

---

[4] See Ex. 2.5 (Plaintiff testified she never received specific charges or full evidence) and Ex. 14 (MCCS deleted records and withheld materials submitted to deciding official).

## II. DISTRICT COURT PREJUDMENT AND DUE PROCESS DENIAL

The District Court granted summary judgment while **material discovery remained incomplete**, unresolved motions were pending, and key factual disputes were decided in the Court's own narrative—rather than reserved for a jury as required under *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–52 (1986), and *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016). (ECF 73-74)

Plaintiff's *Rule 56(d)* filing specifically identified **missing categories of evidence**, including comparator discipline records, withheld call logs and emails from Plaintiff's confiscated government-issued devices, and disciplinary justification files. MCCS was compelled to produce but did not (*ECF No. 56, 65-46*; *Ex. 2.5*; *Ex. 14*).

Despite preservation of objections, the Court treated discovery issues as resolved, ignoring their direct bearing on Plaintiff's active claims. **MCCS deleted Plaintiff's email**, submitted **Exhibit 35** after the appeal record closed and unilaterally revised its Statement of Matters after receiving Plaintiff's rebuttal— without timely disclosure or procedural notice (Ex. 32-35). The Court failed to address these cumulative violations.

While MCCS now claims Douglas did not apply due to Plaintiff's NAF status, Saldana—the removal reviewer—testified a Douglas analysis was required. MCCS

performed none (*Ex. 6*, 62:8–63:7). No aggravating or mitigating factors, was ever conducted, contradicting MCCS's internal norms, exposing the arbitrary pretextual nature of its process.

MCCS violated its own **neutrality requirements** when Saldana—both previously reported by Plaintiff and lead investigator—consulted with Johnston, Iwaniec, and Manning before initiating the proposed removal. Saldana admitted under oath he offered disciplinary input without verifying key documentation (*Ex. 6*).

These errors were compounded by the District Court's failure to apply the **summary judgment standard** correctly under *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court resolved credibility disputes that belonged to a jury, disregarded Plaintiff's evidentiary objections, and issued dispositive relief without a complete record.

Finally, Plaintiff's **formal EEO complaint** explicitly alleged disability discrimination, retaliatory motive, and disparate treatment based on protected status—mirroring the claims here. Dismissing the Rehabilitation Act claim for non-exhaustion was clear error (*Ex. 21*).

## III. CONFLICTED OFFICIALS AND BIASED INVESTIGATION

The District Court found no retaliatory motive and credited MCCS with an "honest belief" in its actions. But MCCS assigned control over Plaintiff's investigation, termination proposal, and appeal to individuals she had formally accused of discrimination.

That is not honest belief—it is structural retaliation. Carlos Saldana and LtCol Scott Manning, both named in EEO complaints, embedded themselves in key decision points and coordinated a procedurally biased outcome. (Exs. 2, 2.5, 21) The District Court failed to address these conflicts or their legal significance—warranting reversal.

### A. Carlos Saldana: From Accused to Architect

Saldana, accused in protected activity, exercised total control over the discipline process. He:

- Led the investigation;
- Shaped interview content and evidence inclusion;
- Advised and directed decisionmakers;

- Authored the Notice of Proposed Termination;

- Served as a witness;

- Submitted his own documentation as evidence;

- Misrepresented himself as both legal counsel and Investigating Officer—while exercising unchecked control over the outcome, directing decisionmakers, submitting his own evidence, and concealing that he was under active investigation stemming from Plaintiff's protected disclosures. (Exs. 2.5, 5, 21)

His deposition confirms he coordinated with Johnston and Manning despite being involved in the IG investigation. (Ex. 6) Saldana reinterpreted neutral policy clarifications as misconduct—even though HQ HR validated Plaintiff's interpretation. No documents supported the charge—only Saldana's assertion. (Exs. 3, 3.5, 29) He admitted his recommendation was "just my opinion," confirming the absence of any neutral or evidentiary basis violating MCO 5300.17. (Ex. 6)

Yet Iwaniec, who enforced the recommendation, later issued Plaintiff a positive DOJ reference—undercutting MCCS's rationale and reinforcing pretext. Johnston, meanwhile, publicly endorsed her on LinkedIn (Ex. 3-3.6, Ex. 2 at 369)

**The record demonstrates Saldana did not act neutrally**—he directed outcomes, shaped leadership perceptions, and accessed Plaintiff's medical records to restrict previously approved accommodations. (Exs. 2–4, 9, 14)

Notably, just a year prior, Saldana signed an investigation certifying full departmental compliance (Ex.10). Nothing had changed—except Plaintiff's protected disclosures naming him.

Col. Boucher confirmed Saldana misrepresented himself as legal counsel while serving as investigator. (Ex. 5) Saldana admitted under oath that he was neither, further confirming deception and compromised process. (Ex. 6)

**B. LtCol Scott Manning: Endorser and Advisor**

Manning endorsed the IG report before the proposal—then later advised Col. Boucher on appeal, despite never disclosing this dual role. [5](Ex. 5).

**Manning**:

- Endorsed findings pre-disciplinary action;
- Advised on the appeal outcome;
- Imposed severe access restrictions by monitoring Plaintiff's IG file review under armed escort in police station;
- Barred her from copying the investigative materials, withheld critical enclosures—violating foundational due process protections (Ex. 2.5, 10, 14)

---

[5] Manning's endorsement appears in the full IG report, which was produced during litigation. See Appendix D (Due Process Violations).

These actions denied Plaintiff due process. Manning's coordination with Saldana shaped the very rationale for removal. Saldana testified he worked "alongside legal"—specifically Manning. (Ex. 6)

Saldana and Manning improperly served as both investigator and legal advisor, contaminating the appeal process.[6]

## C. Structural Bias Refutes Honest Belief

MCCS assigned two accused officials—Saldana and Manning—to direct the investigation, draft the charges, and advise on the appeal. They endorsed conclusions before any charge was filed, controlled access to evidence, and held roles prohibited by law and policy. (Appendix I)

The District Court never acknowledged these facts, yet they dismantle any claim of good faith. When the accused serve as investigators, legal advisors, and final decision influencers, the process is not neutral—it's retaliatory. (Appendix G)

---

[6] See Withrow v. Larkin, 421 U.S. 35, 47 (1975) (holding due process is violated when investigatory and adjudicative roles are improperly merged).

No reasonable jury could view this as lawful discipline. The Court's failure to recognize this systemic conflict—central to motive and credibility—was reversible error. (Exs. 10, 14)

## IV. MCCS WITHHELD AND MANIPULATED EVIDENCE TO SHAPE OUTCOME

MCCS denied Plaintiff meaningful access to the evidence used to justify her removal— throughout the investigative, decision, appeal, and litigation phases. These actions were not procedural oversights. They were deliberate choices that tainted the process and prevented Plaintiff from challenging the allegations against her.

**Before the appeal, during the proposal and termination phases, MCCS withheld the full investigative file and submitted undisclosed materials directly to Col. Boucher.** Exhibit 35—a revised Statement of Matters—was sent outside the record, never shared with Plaintiff. She was neither informed of its existence nor given a chance to respond, receiving it only after termination. (Ex. 2.5) Boucher later confirmed he relied on these materials in making his decision. (Ex. 5, 37)

Plaintiff's access to the IG file was timed, restricted, and surveilled. She was denied a copy and permitted to view only redacted portions—under armed escort at

the base police station with Manning. Key enclosures were withheld entirely (Exs. 2.5, 14). Manning and Saldana imposed these restrictions while simultaneously shaping and advising the termination rationale. (Ex. 6)

At the time of her proposed removal, Plaintiff was locked out of her government-issued email and phone. MCCS accessed both accounts and deleted their contents while the disciplinary process was still ongoing. When Plaintiff later requested recovery of these records for her defense, MCCS claimed they had already been deleted and no longer available. The loss of these communications—many involving protected activity and relevant context—deprived Plaintiff of key exculpatory evidence. (Ex. 14 at 000179, Ex. 2.5)

This misconduct extended into litigation. MCCS violated court deadlines, withheld full discovery, and failed to produce the records that were used against Plaintiff at the time of her termination. Plaintiff filed a formal opposition to the late filings and incomplete disclosures, including the backdated production of critical exhibits. The District Court never ruled on that motion. (ECF 56)

By supplementing the record in secret, restricting access to exculpatory materials, and then deleting Plaintiff's communications before she could respond, MCCS ensured that the disciplinary process was not only biased—but

unchallengeable. The District Court treated this as immaterial. It was not. It was the mechanism through which retaliation was carried out and concealed.

## V. MCCS EVOLVING JUSTIFICATIONS REVEAL PROCEDURAL MISUSE

The District Court credited MCCS with an "honest belief" in its decision to remove Plaintiff. But the record demonstrates a pattern of shifting, unsupported, and conflicting justifications—each offered only after Plaintiff engaged in protected activity, and none supported by contemporaneous evidence.

The IG file does not cite any specific violation or action justifying removal. It was only through discovery—nearly a decade later—that Plaintiff gained access to portions of the underlying file. Even today, the actual cause of removal remains unclear. In contrast, the comparators had clear findings of policy violations and losses in the record yet remained employed. This selective ambiguity confirms that the agency's asserted justification cannot withstand scrutiny (Appendix A, Exs. 2-2.5, 9-10, 13–15, 21).

Although the IG found no rule or policy violations, MCCS leadership shifted to reframe Plaintiff's protected disclosures as misconduct—confirming retaliatory

motive and pretext. (Exs. 10, 14, 2.5) The ROI sustained no charges, and no violation was ever cited. (Exs. 9, 10, 14) This was not clarification. It was retribution disguised as process.

## A. Initial Claim: Improper Involvement in Hiring

MCCS initially claimed Plaintiff was under investigation for the hiring of her husband and brother. But Plaintiff had formally recused herself from all family related decisions, a fact MCCS never disputed. No supervisor, including Courtemanche, Johnston, or Harkness, contradicted the recusal (Appendix C). Saldana never even attempted to verify it with Iwaniec or Johnston.

Her brother's hiring was one of 24 routine HR actions. MCCS offered no evidence of Plaintiff's involvement and ultimately admitted no policy was violated. Yet despite abandoning these claims entirely, MCCS never issued a new proposal— only a final decision letter citing an unrelated rationale never previously alleged. This undisclosed shift confirms the original claim was pretextual and the process fatally defective. (Ex. 28)

## B. Second Shifting Justification: Undefined "Employment" Violation

When the hiring theory collapsed, MCCS pivoted to a vague claim that Plaintiff violated a six-month "employment" rule—though it never cited a policy, regulation, or definition to support this charge. (Ex. 14)

Headquarters HR had previously confirmed the six-month rule as a longstanding, lawful practice, and HR—not Plaintiff—handled its application in her husband's case. (Ex. 29) MCCS never identified how Plaintiff's conduct violated any written rule, nor did it explain what "employment" entailed in this context.

Saldana reframed Plaintiff's efforts to clarify the rule as "advocacy," then labeled that advocacy misconduct—despite never addressing her rebuttal or identifying a policy breach. (Ex. 6)

The 220+ page investigative file failed to cite a single sustained violation. The final removal letter omitted any legal basis. Boucher later admitted under oath that neither the hiring nor employment issue justified Plaintiff's removal. MCCS relied instead on a statement from Cheryl Harkness—who was under IG investigation herself—with no supporting documentation. (Ex. 5)

**C. Third Shift: Unsubstantiated Performance Concerns**

After the policy justifications failed, MCCS shifted to claiming performance deficiencies—despite Plaintiff's consistent "Outstanding" ratings and no documented

coaching or warnings. The Letter of Caution remained in place even after her performance was rated as meeting expectations, in violation of standard policy. (Ex. 7 at 31:1 – 17)

Following removal, Iwaniec provided a strong DOJ reference for Plaintiff in a Senior-Supervisory HR role—further undercutting MCCS's credibility and confirming performance was never a legitimate concern. (Ex. 3.5 at 000459-60)

**D. Final Justification: Undefined Misconduct Untethered to Policy**

MCCS ultimately removed Plaintiff citing vague allegations of "loss of confidence," "advocacy," and "judgment"—language authored entirely by Saldana. He admitted under oath that he had no direct knowledge and relied on unverified third-party accounts. (Ex. 6) No policy was cited. No rule was breached. No misconduct was defined. (Ex. 14)

**To this day, Plaintiff does not know the exact basis for her removal**. Her deposition reflects sustained confusion years later about what rule she allegedly violated or what conduct triggered termination (Ex. 2.5). That ambiguity is not a procedural flaw; it's a constitutional one.

MCCS never identified a single policy Plaintiff violated. Communications with Headquarters confirmed there was no rule supported her removal. Yet officials pursued discipline based on shifting justifications disconnected from any enforceable standard. Contemporaneous records reflect retaliation, not rule enforcement (Ex. 22).

Plaintiff submitted the interpretation of the six-month rule at Saldana's request—fully aligned with agency practice. That same interpretation, allegedly deleted and excluded from the IG file, was later reframed as misconduct. Plaintiff canceled the hearing only after learning that critical documents and emails had been removed—depriving her fair chance to respond. (Exs. 2–2.5) This post hoc rebranding of compliant conduct underscores not enforcement, but manipulation. (Ex. 29)

Plaintiff had no prior discipline, performance publicly praised. Yet MCCS removed her based solely on the word of a conflicted official—without documentation, without due process, and without citing a single governing policy.

**E. Legal Significance: Pretext Replaces Honest Belief**

The District Court failed to address the legal consequence of MCCS's shifting justifications. Each rationale was either contradicted, unsupported, or quietly abandoned. No consistent or credible basis for Plaintiff's removal exists.

The hiring claim was dropped. The employment rule was confirmed valid. The performance critique was manufactured. The final decision cited no rule or policy violation. These are not administrative lapses—they are classic hallmarks of retaliatory pretext.

Under Title VII and Rehabilitation Act, evolving and inconsistent explanations—especially following protected activity—require reversal. *Smith v. Chrysler Corp.*, affirms that credibility is central to the pretext analysis. The District Court's acceptance of MCCS's final justification, while ignoring the internal contradictions, constitutes clear legal error. (Appendix E)

## VI. PREMATURE SEPARATION AS RETALIATORY INDICATOR

MCCS began implementing Plaintiff's removal before the disciplinary process had concluded. On the same day Plaintiff received her Notice of Proposed Termination—which alleged, without substantiation, that she facilitated the hire of family members—LtCol Manning and Johnston issued a formal checkout sheet reserved for finalized separations. (Exs. 2.5, 10, 28; Appendix G)

MCCS stripped Plaintiff's access to government systems, facilities, healthcare, and essential records was revoked despite her ongoing appeal rights and the absence of any final decision. (Exs. 2, 2.5, 18)  No comparator was treated this way during active proceedings. (Appendix A, H, I)

Manning—named in Plaintiff's contemporaneous EEO complaints—restricted her access to the IG file, withheld critical evidence, and then advised the appeal as a purported neutral. (Exs. 14, 21; Appendix H, I) These overlapping roles and concealed actions reflect serious procedural bias and deliberate circumvention of due process.

At the time, Plaintiff had no prior discipline and had recently been rated "Outstanding." (Ex. 1) MCCS's actions were not neutral administrative steps—they were punitive measures taken in anticipation of removal. Officials then pressured Plaintiff to accept a settlement banning future rehire, without offering any real benefit. (Exs. 24–26)

No comparator received such treatment. (Exs. 13, 14.1, 15, 21; Appendix A, H)

This sequence of premature separation, denial of access, and retaliatory coordination—particularly by conflicted officials—demonstrates not just flawed process but unlawful reprisal.

**A. Locked Out Before Appeal: Medical, Parental, and Legal Harm**

Before any final decision was issued—and while Plaintiff's appeal rights, protected disclosures, and accommodation requests were still active—MCCS preemptively revoked.

- **Base access**, barring Plaintiff from transporting her children to on-base school and accessing military housing and family support facilities);

- **Common Access Card (CAC)**, rendering her legally unable to enter the installation;

- **Government email and phone**, severing all digital access to evidence and legal records; and

- **All case-related materials**, stored exclusively on those accounts and devices. (Exs. 2, 2.5, 14, 18)

This was not administrative housekeeping—it was **punitive isolation**. Plaintiff was overseas, dependent on base infrastructure for **healthcare, transportation, and family support**. Revoking her access cut her off from the **base hospital, clinic, pharmacy**, and life-critical disability services, despite MCCS's documented knowledge of her medical condition and approved accommodations. (Ex. 14)

Compounding the harm, MCCS **deleted the contents of her email and phone**—then later retrieved selective fragments to use against her, without notice or opportunity to respond. (Ex. 14 at 000179; Ex. 35).

This treatment was **not applied to any comparator**, including those with substantiated misconduct. Plaintiff was **functionally removed**—stripped of rights and access—**before any decision had been issued**, in what can only be described as retaliatory punishment.

**B. Coercive Leverage and Retaliatory Fallout**

While Plaintiff's appeal remained pending, MCCS forcibly separated her—not just from the workplace, but from **essential access to U.S. services and legal resources abroad**. Stationed overseas, she was abruptly cut off from healthcare, communications, evidence, and even access to her children's school. MCCS continued building its case using records she could no longer view or rebut. (Ex. 2.5, 14, 18)

In this isolated and vulnerable position—during the Thanksgiving and Christmas holidays—Plaintiff was presented with a **so-called "settlement"** (Ex. 26) offering **nothing beyond what she was already legally entitled to**, while demanding a **permanent federal rehire ban**. This pressure, applied while Plaintiff

was **geographically and legally constrained**, underscores MCCS's coercive leverage. No comparator was treated this way. (Ex. 21; Appendix A, H)

Saldana's description of her conduct as **"Iwakuni fatigue"** (Ex. 6) exposes **subjective bias**, not lawful reasoning. The District Court failed to address these irregularities or the **retaliatory trajectory** MCCS pursued.

These acts **violated due process**, deprived Plaintiff of equal protection, and reflect retaliatory manipulation—not neutral discipline. Reversal is warranted.[7]

## VII. EVIDENCE SUPPRESSION, SPOLIATION, AND INVESTIGATIVE MISCONDUCT

MCCS actively concealed evidence, destroyed records, and obstructed Plaintiff's ability to defend herself. (Exs. 2.5, 10, 14, 23) These actions violated investigative and legal standards, and independently support a finding of retaliatory motive and procedural misconduct.

**After Plaintiff engaged in protected disclosures, MCCS officials deleted and withheld critical records tied to her defense. Emails and phone data from**

---

[7] *Thompson v. N. Am. Stainless*, 562 U.S. 170, 174 (2011), reinforces that retaliation protections extend broadly to those within the zone of interest.

**her government-issued accounts-containing key HR documents, protected disclosures, and communications with supervisors were permanently erased (Ex. 14).** MCCS claimed a routine "90-day auto-deletion policy," yet retained records for other separated employees and produced no evidence of any preservation efforts despite active investigations, litigation holds, and formal requests.

Plaintiff requested her records **immediately after the proposal**—yet as MCCS's own admissions confirm, the data was "largely deleted" **before her appeal**. (Ex. 14 at 000179) The selective loss of evidence, in the face of known legal obligations and pending claims, reflects not inadvertence—but deliberate destruction that obstructed Plaintiff's ability to mount a defense

**The deciding official, Col. Boucher, testified he reviewed "all of the relevant evidence," yet relied heavily on new exhibits secretly submitted by Saldana—none of which were disclosed to Plaintiff before her removal.** These post-hoc materials—including selective summaries, revised statements, and curated excerpts—were never part of the original investigative file. (Boucher Dep., Ex. 5, Exs. 32-37).

Saldana admitted his recommendation was based on personal opinion, not verified facts—yet it shaped the command's decision. (Ex. 6) The ROI further failed

to document investigative steps taken after Plaintiff's removal and omitted critical materials MCCS only disclosed during litigation. These omissions violated core disclosure obligations and tainted the integrity of the process.

**Plaintiff was categorically denied access to the full investigative record.** Key enclosures were withheld entirely; she was barred from taking notes and forced to conduct a monitored, time-limited review in a locked room under the armed supervision of LtCol. Manning—an official directly implicated in her complaints. (Exs. 2.5, 14, 21) MCCS simultaneously retained and relied on these same concealed materials to justify her removal, creating an irreparable asymmetry that stripped Plaintiff of any meaningful opportunity to respond.

Although the governing MCO expressly permits cross-examination of witnesses in adverse action proceedings, Plaintiff's requests were flatly denied. (Ex. 10) The Hearing Officer confirmed he had no prior involvement in the matter— unlike Manning, who advised the appeal despite his deep entanglement in both the investigation and initial allegations. (Ex. 9, 32) This concealment of roles, compounded by Manning's undisclosed participation, directly undermines the transparency, fairness, and legal integrity of the process—raising grave due process violations that independently warrant reversal.

These actions align with *Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999), which holds that an agency violates due process when it withholds aggravating materials

from an employee while relying on them in a removal decision. MCCS's reliance on undisclosed materials and its refusal to produce evidence plainly meets that standard.

The suppression of evidence and deletion of records reflect not only procedural misconduct, but proximity-based retaliation. Iwaniec, who directly witnessed Plaintiff's protected disclosures, later admitted procedural irregularities and confirmed her HR actions were proper. (Ex. 3, Iwaniec Dep.) Plaintiff's sworn declaration details the timing and nature of the deleted or withheld records, reinforcing a deliberate pattern of obstruction. (Ex. 2)

Viewed collectively—MCCS's deletion of exculpatory records, refusal to allow access, reliance on undisclosed exhibits, and disregard for investigative standards—demonstrate intentional misconduct, not administrative oversight.

The totality confirms MCCS subverted fair process to support a predetermined outcome. This alone warrants reversal.

## VIII. RETALIATORY MOTIVE AND PROTECTED ACTIVITY

The District Court erred by disregarding direct and circumstantial evidence that Plaintiff's termination was retaliatory. Plaintiff received an "Outstanding" performance appraisal just weeks prior (Ex. 1), and MCCS identified no prior warnings, coaching, or performance issues. Despite this, disciplinary action escalated

abruptly—timed immediately after Plaintiff engaged in protected activity and directed by officials she had formally named in complaints.

MCCS's shifting justifications, post hoc performance claims, and selective concealment of evidence expose a retaliatory motive. The agency's failure to follow standard procedures, its refusal to disclose key documents, and its unequal treatment of similarly situated employees further reinforce this conclusion. Retaliation was not incidental—it was the driving force behind Plaintiff's removal.

**A. Protected Activity Was Known and Documented**

Plaintiff raised EEO complaints with Headquarters, engaged in protected EEO activity, and raised ADA accommodations well before her removal. MCCS records confirm internal receipt acknowledgment. Her appeal to Col. Boucher cited protected disclosures and alleged retaliation motive—yet his decision ignored both Title VII and the Rehabilitation Act, omitting any mention of protected activity. (Ex. 10).

Saldana and Manning—both named in Plaintiff's protected activity—remained actively involved in the investigation, proposal, and appeal, undermining any claim of neutrality.

The investigative record confirmed procedural irregularities and mishandling of Plaintiff's disclosures and appeals (Exs. 9, 14), showing that MCCS officials were not impartial observers but central actors in the retaliatory process.

## B. Timing and Treatment Support Inference of Retaliation

Plaintiff's protected activity was immediately followed by escalating adverse action: her performance rating was downgraded, access revoked, and MCCS moved toward removal—without citing a specific policy violation. These events occurred in close proximity to Plaintiff's EEO-related communications and ADA accommodation requests, strongly supporting retaliatory inference.

Although MCCS acknowledged Plaintiff's disclosures and failed to identify any rule violations, it reframed those protected acts as misconduct. Each rationale contradicted the last: hiring was abandoned, the employment rule was validated, and no performance issue was documented. This pattern reflects shifting justifications and retaliatory pretext, not legitimate discipline. (*Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009)).

Other employees with substantiated misconduct—including contract violations, financial mismanagement, and subordinate abuse—were not isolated or

removed. These comparators, predominantly white, male, and non-disabled, were treated with procedural leniency and often retained leadership roles. In contrast, Plaintiff—a Black woman with a disability and no disciplinary history—was locked out, erased from internal systems, and presented with a coercive "settlement" during the holidays. (Exs. 21, 25–26)

Plaintiff warned of this disparity in a 2014 email to LtCol Manning, naming comparators and describing concerns about unequal enforcement. (Ex. 27) Manning later advised the appeal process without disclosing his prior involvement—undermining neutrality.

This progression of punitive acts—initiated by officials aware of her protected activity, and absent a valid rule violation—confirms retaliatory motive. MCCS's narrative of neutrality collapses under its own inconsistencies. (Exs. 2.5, 9, 14)

Specific comparator data is set forth in Addendum A.

## C. Legal Significance

Comparators who committed serious misconduct were not terminated, and MCCS offers no credible explanation for this disparity (Appendix A, Exs. 2–2.5, 13–15). Plaintiff alone was subjected to withheld records, procedural irregularities, and selective enforcement. MCCS denied her access to evidence it later used to justify

removal (Ex. 2, 10). Iwaniec—who directly witnessed Plaintiff's protected disclosures—testified to the irregular handling and departure from standard disciplinary protocol, shaped by considerations outside normal practice (Ex. 3).

The totality of the record—unequal treatment, timing, concealment, direct involvement of named officials, and shifting justifications—meets and exceeds the threshold for unlawful retaliation under Title VII and the Rehabilitation Act.

**The inference of retaliatory motive is not merely reasonable—it is inescapable. Reversal is required.**

## IX. PREJUDICIAL NEW EVIDENCE SUBMITTED AFTER RECORD CLOSURE

MCCS invalidated Plaintiff's appeal by introducing new, undisclosed evidence after the record had closed—materials Plaintiff never saw, could not rebut, and was denied the opportunity to challenge. This post-hoc evidentiary stacking confirms the outcome was predetermined.

**A. MCCS Submitted Revised Materials and New Evidence After the Record Closed**

On February 6, 2016, MCCS was ordered to submit its Statement of Matters by a fixed deadline. Yet, on March 14—after the hearing officer closed the record and after reviewing Plaintiff's rebuttal— MCCS submitted a revised Statement of Matters and expanded package, including new Exhibits, directly to Col. Boucher. Plaintiff was never notified, never received these materials, and had no opportunity to respond. This direct submission bypassed the hearing officer in violation of NAF Manual §5011(3), which mandates transparent routing through the designated review process. (Ex. 32–36, App. D)

The March 14 submission included new claims, selectively excerpted emails, and post hoc interpretations never disclosed in the original proposal, termination memo, or investigative file. Boucher, Saldana, and Johnston confirmed the IG relied solely on statements from Harkness—herself under investigation—and that MCCS's late submission was outside standard protocol and excluded Plaintiff. (Ex. 5, 6, 22)

**B. Boucher Relied on Unseen Evidence Plaintiff Could Not Challenge**

Boucher admitted he reviewed and relied on the March 14 materials in deciding the appeal, unaware Plaintiff had never been given access. These documents were not part of the investigation, were not subject to cross-examination, and were

never disclosed until after final removal.[8] He confirmed he didn't independently verify the facts but relied on materials curated and submitted. (Ex. 5) The formal appeal process, Col. Boucher made no mention of the hearing officer's findings. Instead, he reviewed materials submitted directly to him after the deadline, bypassing proper procedure. (Ex. 37)

The IG file confirms that key accusations relied on secondhand and conflicting accounts. Several witness claims were later contradicted, and no direct evidence of misconduct was established. Nonetheless, leadership acted on unsupported assumptions and subjective characterizations and fails to explain inconsistencies or contradictory statements. (Ex. 9, 10, 14) This selective evidentiary framing undermines the credibility of MCCS's purported justifications. (*Figueroa v. Pompeo*).

Boucher's decision memo includes no factual findings, legal discussion, or rebuttal to Plaintiff's due process concerns. The absence of rationale confirms no independent judgment was exercised (Ex. 37). This undermines MCCS's assertion

---

[8] MCCS relied on an internal 392-page IG report that Plaintiff was never permitted to access or review prior to her termination. Plaintiff received only limited excerpts referenced in the ROI (Ex. 14). A partially redacted 220-page version was provided after the termination but before the appeal (Ex. 9). The complete 392-page file—including LtCol Manning's October 30, 2015 endorsement of removal, predating the official proposal—was not disclosed until nearly a decade later through litigation.

that Plaintiff received a full and fair review—and nullifies the District Court's

assumption that the record was complete.

## C. MCCS Mined and Deleted Plaintiff's Records to Justify a Pre-Decided Outcome

After revoking Plaintiff's access, MCCS combed through her government

accounts selectively extracted content to support post hoc allegations. Materials were

submitted directly to Boucher, without ever being disclosed to Plaintiff for review or

response. MCCS then deleted her accounts, Devine confirmed email content had

already been purged before the appeal hearing despite Plaintiff's pending requests.

(Ex. 2.5, 34-35, 14)

This sequence—extraction, concealment, deletion—proves the appeal process

was not used to evaluate the proposal, but to retrofit justification for a predetermined

removal.

## D. Legal Significance

Submitting evidence outside the record, bypassing procedural safeguards, and

denying rebuttal rights violated policy and due process. They exist to prevent

unilateral influence and manipulation. The District Court's failure to address these

violations—despite clear testimony and documentation—was legal error. Reversal is warranted.

## X. TIMELINE OF SHIFTING JUSTIFICATIONS

MCCS's rationale for terminating Plaintiff changed repeatedly—each time without new evidence, contradicted by MCCS's own records and sworn testimony. This evolving pattern confirms strong inference of retaliatory pretext. [9]

### A. From "Hiring" To Vague "Employment" Claims

The November 2015 proposal accused Plaintiff of "facilitating the hire" of husband and brother. (Ex. 28) When Plaintiff requested clarification and submitted rebuttal evidence, MCCS shifted the rationale in the final decision to undefined "employment actions"—without introducing new facts, citing specific misconduct, or referencing violated policy.

Multiple agency officials—including Boucher, Courtemanche, and Plump—testified under oath that Plaintiff played no role in hiring decisions. The investigative

---

[9] Under *Texas Dep't of Community Affairs v. Burdine*, the burden shifts to the employer to offer legitimate explanation.

file, termination documents, and IG materials failed to identify any regulatory breach or prohibited conduct (Ex. 9-10, 23).

Plaintiff's contemporaneous records document her legal concerns, objections to process irregularities, and attempts to consult counsel before acting (Ex. 19, 24–25). These good faith efforts were ignored. Johnston merely forwarded Plaintiff's materials without independent assessment. (Ex. 23) MCCS's quiet abandonment of the original charge—without acknowledging Plaintiff's rebuttal—reflects shifting justification, suppressed exculpatory evidence, and a predetermined outcome.

## B. Performance Claims Added After the Fact

Only after the hiring rationale collapsed did MCCS raise performance. Yet Plaintiff's last appraisal rated her "Outstanding" (Ex. 1). Iwaniec admitted her downgrade followed from the IG complaint, not any performance deficiency. MCCS still cited the downgrade externally, even as it offered a positive DOJ reference. (Ex. 3.5).

## C. MCCS Officials Contradicted Their Own Decision

MCCS cited no specifics. Boucher admitted the removal "wasn't about" hiring, contradicting MCCS's formal justification (Ex. 5). The agency relied on

altered claims from Cheryl Harkness—herself under investigation—while ignoring neutral exculpatory statements (Exs. 6, 9, 10, 14, 34). [10]

The IG identified no established process governing adverse actions, and MCCS withheld documents later used against Plaintiff. This undercuts MCCS's fairness claim and evidences deliberate concealment (Exs. 10,14).

**D. Post-Hoc Evidence and Procedural Misconduct**

Boucher's final decision (Ex. 37) failed to specify what was sustained or rejected contrary to MCO P12000.11A 5011(3)(a)(2). Though it cited the hearing record while relying on MCCS's March 14 submission (Ex. 35), which bypassed that process. Plaintiff was never given the opportunity to review or challenge it (Ex. 2, 2.5, 14).

These actions violated MCCS policy and due process. Senior officials perpetrated internal narratives about Plaintiff's "Iwakuni fatigue" (Ex. 7). MCCS then coordinated rescinded job offers across multiple federal agencies—despite no misconduct findings (Ex. 18).

---

[10] See *Steele v. Schafer* (finding for plaintiff where prima facie case was strong and agency's rebuttal lacked specificity).

Each failed justification gave way to another—none supported by policy, all later discredited. The absence of rebuttal, analysis, shifting narratives and procedural misconduct, establish pretext under Title VII and the Rehabilitation Act[11].

## XI. EVIDENCE CONNECTING TERMINATION TO RETALIATION

Plaintiff's removal was not based on a policy violation or objective review. It stemmed from escalating retaliation in direct response to her protected disclosures—evidenced by shifting justifications, procedural violations, and contradictions by MCCS officials. Appendix E & Ex. 2.5 (Appellant's Deposition) for direct testimony describing discriminatory targeting, post-complaint retaliation, and inconsistencies in MCCS's narrative. Saldana admitted he "led the review" while advising command—a breach of neutrality and window into retaliatory bias. (Ex. 6; Appendix I)

Plaintiff's appeal documented procedural violations: denial of access to the full investigative file, failure to apply progressive discipline, and reliance on hearsay. Boucher ignored these objections, relied on prior assumptions, and failed to conduct any independent inquiry—undermining MCCS's claim of honest belief. (Ex. 5) MCCS reassigned Saldana—who had recently cleared Plaintiff—to re-investigate overlapping issues, showing institutional bias. (Ex. 10) Boucher issued no written

---

[11] *Tyler v. Unocal Oil Co.* held that internal inconsistency can cast doubt on employer credibility.

findings, evaluated no rebuttal, and performed no inquiry of his own—further supporting a preordained outcome.

Plaintiff engaged in protected activity: EEO filings, IG disclosures, and ADA accommodation requests. The IG confirmed her disclosures addressed improper hiring and retaliation risks. (Ex. 9, 14) Her internal complaints qualify as protected under Title VII. *Hamilton v. Geithner* (recognizing informal internal protests). Meanwhile, employees with substantiated misconduct retained access or were promoted. Plaintiff—who exposed that misconduct—was removed. This contrast confirms retaliatory enforcement. (Exs. 13–15; Appendix A)

Plaintiff's disclosures were traceable and attributed to her—establishing whistleblower status under Title VII and the Rehabilitation Act. (Exs. 2, 2.5, 9) MCCS later reframed those same disclosures as misconduct—further proof of pretext. (Ex. 14)

Ray confirmed Plaintiff reported threats from leadership—coded warnings like "going against the wave and being drowned" and "cannons against her"—which she perceived as retaliatory. Ray advised IG escalation, validating her concern. (Ex. 7 at 18:6 -19:9)

Tashema Haynes submitted a sworn declaration attesting to bias from Boucher and Manning after Plaintiffs complaints. She described racial remarks by Boucher,

retaliatory tone by Iwaniec, and Plaintiff's consistent professionalism. Haynes concluded the removal was retaliatory, not performance-based (Ex. 20).

Within weeks, MCCS downgraded Plaintiff's rating, proposed her removal, revoked access, and blocked appeal rights—all directed by those named in her complaints. MCCS cited no consistent rationale and never identified a chargeable violation. In contrast, comparators with known infractions were retained. MCCS's vague and shifting narrative confirms retaliatory motive. (Exs. 1–2.5, 10, 13–15, 38). MCCS's failure to address this disparity or apply policy standards equitably reveals selective enforcement and institutional bias.

The November 2015 proposal cited "hiring." The final decision letter shifted to "employment actions." Later, MCCS argued "performance"—a claim raised only post-IG. (Exs. 3–6) Saldana admitted no rule supported removal and performance was not originally cited. Boucher relied on post-record exhibits submitted directly to him—bypassing Plaintiff and process. (Ex. 5) These evolving claims confirm textbook pretext under McDonnell.

MCCS's own officials undermined its rationale: Boucher denied the case was about hiring or employment; Johnston confirmed Plaintiff had no hiring role; and Iwaniec admitted Saldana pursued removal for unrelated reasons. (Exs. 4, 5, 6) Saldana maintained influence throughout. (Ex. 38)

On the proposal day, MCCS revoked Plaintiff's CAC, phone, and email. It then extracted Exhibit O from her deleted account—used as evidence, never disclosed to Plaintiff. She was denied rebuttal and witness cross-examination. (Exs. 28, 32–37)

The 200+ page IG file with 36 enclosures was selectively disclosed. Plaintiff's access was restricted and supervised; key attachments were withheld. The ROI relied on selective summaries—not evidentiary fact. (Exs. 9, 10, 14)

Performance concerns only surfaced after MCCS's earlier claims failed. Plaintiff received no warnings, counseling, or PIP—just "Outstanding" appraisals and DOJ recommendations. (Exs. 1, 3.5)

White male comparators committed serious misconduct yet were retained or reassigned. Plaintiff—a woman of color with a disability—was removed, denied due process, and assigned responsibilities (like LQA oversight) for which others evaded accountability. This disparate discipline confirms pretext. (Appendix A; Exs. 2–2.5, 13–15)

Later, Plaintiff was denied federal employment due to an "Improvement Desired" rating—reversed on appeal. (Ex. 41) This outcome reflects lasting harm from MCCS's retaliation and contradicts the District Court's harmless error presumption. (Appendix H, J)

MCCS's rationale mutated with each failed claim. Its officials contradicted its story. Evidence was suppressed. Comparators were treated better. These are textbook markers of pretext under *McDonnell Douglas* and *Brady*.

Pretext, motive, and credibility are jury questions—not for summary judgment. The sequence of protected disclosures, procedural violations, and evolving justifications meets the threshold for retaliation under Title VII and the Rehabilitation Act. Reversal is not optional—it is legally required. (Appendix E)

## XII. CONCLUSION PART I

MCCS's justification for Plaintiff's removal collapsed under its contradiction. The shifted rationales—from "hiring," to vague "employment actions," to post-hoc "performance" critiques—each surfacing only after the prior failed (Exs. 10, 14, 28) all while denying specific notice of charge and access to documents relied-upon materials. At each step, MCCS contradicted their own records, withheld evidence, and blocked Plaintiff from reviewing submissions provided directly to the deciding official after the record had closed (Exs. 2.5, 32–36; App. E).

MCCS bypassed mandated procedures, routed decisions through conflicted officials named in Plaintiff's EEO filings, and revoked access to systems, records, and medical care while continuing to build its case (Ex. 14; App. H, J).

At no point did MCCS cite a specific rule or policy Plaintiff violated. No findings were issued, no progressive discipline applied, and no neutral reviewer permitted rebuttal or cross-examination. MCCS's own witnesses admitted the removal lacked evidentiary basis (Exs. 4–6).

The record shows Plaintiff was targeted after reporting discrimination, engaging in protected activity, and requesting accommodations (Exs. 2, 2.5, 9, 21). The timing of adverse actions—paired with access revocation, coercive settlement pressure (Ex. 26), and comparator disparities—confirms retaliatory motive (App. A; Exs. 13–15, 27).

Plaintiff's sworn declaration, deposition, HQ communications (Exs. 2-2.5, 22), and later federal employment denial (Ex. 41) confirm MCCS's action was not lawful discipline—it was retaliation by actors with motive.

This case is not about managerial discretion. It is textbook pretext, discrimination, and due process failure. Genuine disputes of material fact exist.

**Summary judgment was not just premature—it was legal error. Reversal is required.[12]**

---

[12] See **Appendix D** (Procedural Errors), **Appendix G** (Due Process Failures), and **Appendix I** (Neutrality Violations), which detail ex parte communications, improper endorsements, and record withholding. See also **Appendix H** on the impact of overseas termination. Supporting exhibits: **Exs. 5, 9, 10, 14, 37**.

## ARGUMENT II —RETALIATION & PRETEXT

## I. PERFORMANCE RATINGS MANIPULATED AFTER PROTECTED ACTIVITY

The District Court erred in crediting MCCS's post-hoc performance justification while disregarding contemporaneous evidence that Plaintiff's evaluation was downgraded in retaliation for protected activity—then later reversed. Under *McDonnell and Brady*, the burden shifts to the employer to offer a legitimate, non-retaliatory reason. If that reason is pretextual, summary judgment is improper. That standard was not met here.

Plaintiff received "Outstanding" evaluations throughout her tenure, including immediately before engaging in protected EEO activity, cooperating with the IG, and requesting accommodations under the ADA. (Exs. 1, 2, 2.5) MCCS initiated no counseling, corrective action, or performance review before those activities.

After her disclosures, MCCS abruptly downgraded her rating and issued a Letter of Caution—without citing any deficiencies. MCCS later admitted it lacked any contemporaneous justification. Headquarters confirmed the Letter was

procedurally improper, as such warnings only apply to employees rated "Unsatisfactory," which Plaintiff was not. (Exs. 7, 21)

**Johnston admitted Plaintiff was placed on a PIP solely due to the investigation—not her performance, which was rated "Outstanding."** MCCS imposed excessive reporting demands, requiring 40–50 page weekly reports while assigning Plaintiff work from multiple male colleagues—without support or training. No other employee was treated similarly. (Ex. 2.5 at 87:7–99:9; Appendix A; Exs. 4, 13–15)

Plaintiff reported the retaliation to HQ leadership, and Ray corroborated her account. MCCS ultimately reversed the evaluation—but left the Letter of Caution in place, despite acknowledging its procedural violation. This discipline remained in her record without justification.

Later, MCCS issued Plaintiff a favorable DOJ reference, affirming her qualifications and undermining its litigation-driven claim of poor performance. (Ex. 3.5) Critically, neither the proposal nor final removal cited performance as a basis. MCCS first invoked performance only after litigation began—confirming it as pretext.

Plaintiff's deposition (Ex. 2.5) and appeal documents (Ex. 10, Appendix F) clearly establish the timeline: protected activity, sudden downgrade, invented

performance claims, and denial of neutral review. MCCS's narrative contradicts its own records and procedures.

Despite this, the District Court failed to apply the credibility test required under *Brady*, overlooked MCCS's shifting justifications, and disregarded evidence of pretext. Its ruling resolved factual disputes and misapplied the governing legal standards.  Reversal is warranted.

## II. PLAINTIFF ENGAGED IN PROTECTED ACTIVITY

The District Court failed to credit the scope, timing, and legal implications of Plaintiff's protected activity under Title VII and Rehabilitation Act. The record reflects Plaintiff made multiple protected disclosures—internally and externally—before MCCS initiated adverse actions.

Plaintiff filed detailed complaints, sought disability accommodations, and participated in a protected IG investigation. She identified Saldana, Manning, and Iwaniec—each directly implicated in discriminatory, retaliatory, or harassing conduct. Rather than removing them from the process, MCCS allowed them to steer the investigation, shape perceptions, and suppress counterevidence. Iwaniec threatened Plaintiff and engaged in unchecked discriminatory and sexually harassing

64

behavior. MCCS never cited any ethics safeguards or explained how such individuals remained in positions to influence the outcome. (Exs. 2, 19, 21, 23)

Dennis Ray, HQ policy SME, acknowledged both the protected disclosures and the ethical concerns Plaintiff raised, later recusing himself from further involvement. In contrast, MCCS installed Saldana—despite prior involvement—as investigator, legal advisor, and fact witness. He lacked neutrality and shaped the removal rationale and appeal response. (Ex. 7, Appendix I)

Communications with Ray (Ex. 22) confirm MCCS leadership mischaracterized the IG report, falsely claiming it mandated removal. Ray explicitly confirmed that adverse action was discretionary and that internal officials advanced it due to political and internal pressure—despite their private disagreement. This evidences retaliatory bias and a failure of process.

Saldana had dismissed similar allegations months earlier, yet was reappointed to lead the same matter—undermining neutrality and exposing MCCS's process manipulation (Exs. 10, 14; App. G). Plaintiff was denied notice of key decisionmakers and barred from rebutting new evidence, compounding due process violations.

Plaintiff submitted supported disability requests, including telework and reduced workload accommodations. MCCS initially approved them but failed to

implement, then required resubmission—only to remove her before review. These protected actions were disregarded in violation of federal law (Exs. 2, 2.5, 18).

Despite raising procedural and retaliation concerns, MCCS never screened the officials she named. Saldana, Manning, Iwaniec, and Johnston maintained full control of her case—even after protected disclosures inherent in EEO and IG filings—confirming the lack of a neutral process (Appendix I).

Iwaniec's conduct was particularly egregious. After Plaintiff challenged her downgraded evaluation, he issued explicit threats—warning her not to "swim against the wave and drown," referring to "Iwakuni fatigue," and stating that "people have ways of retaliating." He falsely linked her to unrelated investigations against him, made repeated sex-based remarks—calling her "girl", "sweetheart", and commenting on "dating many black girls"—and did so publicly. These threats were immediately reported to HQ (Exs. 2, 3.5, 7, 14).

**MCCS took no corrective action**. Instead, Iwaniec—despite being a central subject of Plaintiff's complaints—remained in charge of her evaluation and removal.  MCCS refusal to disqualify a named retaliator from the disciplinary chain underscores procedural bias and confirms retaliatory motive (Appendix G, I).

MCCS later reframed Plaintiff's protected disclosures as misconduct. The IG report acknowledged there was no clear process for disciplinary decisions (Ex. 14),

and MCCS officials admitted under oath that no policy was violated (Exs. 9, 10, 23, 38). Nonetheless, MCCS pursued removal—while comparators who committed clear infractions faced no discipline.

This pattern of escalating discipline—immediately following protected activity, directed by named actors, and lacking neutral oversight—satisfies the causal link under *McDonnell Douglas*. The District Court erred by discounting this protected activity and its direct connection to Plaintiff's removal.

## III. PLAINTIFF SUFFERED AN ADVERSE EMPLOYMENT ACTION

MCCS took a series of escalating, retaliatory actions that altered Plaintiff's employment status, reputation, and prospects—well beyond ordinary workplace discipline. These actions qualify as adverse under *Burlington* and support a prima facie case of retaliation. (Appendix J)

After engaging in protected activity, Plaintiff was immediately subjected to unprecedented treatment. Her first-ever downgrade followed her refusal to alter language in a hostile work environment report involving a white male manager. MCCS counsel Jody Devine demanded the report be softened; Plaintiff refused. Director Johnston admitted this refusal was "the straw that broke the camel's back,"

triggering a PIP with no prior notice, justification, or documentation—violating internal procedures (Ex. 14; Ex. 2.5 at 100:17–122:11; Appendix B).

Even after MCCS corrected her rating to "Meets Expectations," they refused to remove her from the PIP—an action not taken against similarly situated male employees. MCCS then imposed excessive burdens: forcing her to submit 40–50 page weekly reports (Ex. 2.5, Ex. 14 at 000330-340, Ex.21), while simultaneously managing her own responsibilities and those reassigned from male colleagues— treatment that reflects retaliation, not remediation.

Additional retaliatory acts included:

- Stripping her of supervisory duties and removing her from leadership meetings, effectively signaling demotion (Exs. 2.5, 10).
- Termination on November 23, 2015 by Iwaniec—a supervisor she had reported for misconduct—who mocked her emotional state as "grieving like a little girl" (Ex. 2.5; ECF 65-46 ¶32, 184).
- Immediate revocation of base access, CAC, government email and phone, and denial of access to on-base school and medical care, despite active disability accommodations (Exs. 14, 2.5, 28).
- Selective sharing of derogatory documents while withholding the full IG report—contributing to reputational damage (Exs. 2, 21).

Despite later claiming performance deficiencies, MCCS issued Plaintiff a strong reference for a senior HR DOJ position post-termination, confirming that performance was never a legitimate basis for removal (Ex. 3.5; Ex. 3 at 84:10-25, ECF 65-46 ¶135).

The consequences of MCCS's actions extended beyond termination:

- DOJ, Navy, BEP, and Commerce rescinded job offers based on MCCS's disputed allegations. DOJ withdrew after direct contact with MCCS. Navy cited "unsuitability," and Commerce dropped the offer after EEO history was disclosed. These rejections occurred despite Plaintiff's qualifications, prior clearances, and positive references (Exs. 2, 14, 18, 41; ECF 65-46 ¶134–141, 167-176).

These outcomes were not incidental—they reflect the foreseeable and intended consequence of MCCS's retaliation. Plaintiff lost federal employment opportunities, suffered professional blacklisting, and faced reputational harm stemming directly from MCCS's actions. No other comparator endured similar treatment for equivalent or worse conduct.

The District Court failed to evaluate the full scope and legal significance of this cumulative harm, especially considering *Burlington*, *Ginger v. D.C.*, and applicable retaliation precedent. Reversal is warranted.

## IV. RETALIATION, SHIFTING JUSTIFICATIONS, AND PRETEXT

MCCS's shifting rationales—none tied to a policy violation—reflect pretext, not honest belief. As *McDonnell* requires, credibility conflicts and inconsistent justifications must be resolved by a jury.

### A. Timeline and Direct Retaliatory Motive

Within weeks of protected disclosures—including IG cooperation, EEO complaints, and ADA accommodation requests—MCCS downgraded Plaintiff's performance, imposed a Letter of Caution, escalated workload demands, and ultimately removed her (Exs. 2, 3.6, 14, 21). Iwaniec, Johnston, and Saldana admitted awareness of her protected activity. (Exs. 3–4, 6)

Johnston admitted Plaintiff's refusal to change hostile work environment findings was "the straw that broke the camel's back." Iwaniec stated MCCS was "tired of the complaints" (Exs. 3.5, 6, Appendix F). MCCS then rejected settlement, revoked access, and interfered with DOJ, BEP, and Commerce offers—acts that followed protected activity in close succession (Exs. 14, 18, Appendix J).

### B. Inconsistent and Contradictory Justifications

MCCS revised its explanation repeatedly:

- **Proposal**: "Hiring" of relatives;

- **Decision**: undefined "employment actions";

- **Appeal**: undocumented performance concerns;

- **Litigation**: vague "management style" and demeanor.

None were supported by policy, the IG report, or neutral witnesses (Exs. 9–10, 14). HQ Ray confirmed Plaintiff complied with recusal obligations under 5 C.F.R. §2635.502 (Ex. 7). Multiple MCCS officials, including Courtemanche, Johnston, and Plump, affirmed she had no hiring role (Exs. 3–4, 6–7). Boucher testified the removal "wasn't about hiring" at all (Ex. 5).

## C. Comparator Disparities

Plaintiff, a woman of color with a disability and no prior discipline, was removed and denied access to base, health care, and employment prospects. In contrast, white, male, and non-disabled employees with verified misconduct—LQA fraud, sexual harassment, and contract violations—were retained, reassigned, or referenced positively (Exs. 13–15, 38; Appendix A). MCCS provided no explanation for these disparities, confirming selective enforcement.

## D. Procedural Misconduct Confirms Pretext

MCCS submitted a revised Statement of Matters—including new summaries, exhibits, curated excerpts—**directly to Col. Boucher after the appeal record had**

**closed, bypassing the hearing officer, denying Plaintiff any opportunity to review or respond** (Exs. 32–34, Appendix D). This included materials selectively extracted from Plaintiff's purged government email, which MCCS previously claimed was "largely deleted" before the appeal (Exs. 2.5, 14, 38). MCCS then denied deposition rights, cross-examination, and full access to the IG record, relying instead on unsworn declarations from conflicted officials whose credibility was never tested (Exs. 5, 10).

**Boucher relied solely on Cheryl Harkness's statement—despite her involvement and IG scrutiny—without assessing credibility or conflict. This confirms MCCS manipulated the appeal to justify a preordained outcome.** (ECF 65)

### E. Legal Conclusion

MCCS's shifting rationales mirrored Plaintiff's protected activity, contradicted its own witnesses, and lacked any cited policy violation. The record reflects not procedural missteps, but deliberate misconduct—concealment of evidence, comparator disparities, and structural bias.

Under *McDonnell*, credibility disputes bar summary judgment. The removal wasn't discipline, but retaliation executed through a tainted process. A jury must

resolve these contested facts.

## V. CORRUPTED APPEAL PROCESS AND STRUCTURAL BIAS

MCCS's appeal process was structurally compromised and constitutionally infirm. Decisionmakers—including Col. Boucher and later Whitman-Lacy—relied on undisclosed, post-record submissions and speculative hearsay, bypassed neutral review channels, and failed to screen known conflicted officials. These are not harmless errors—they warrant reversal under *Ward* and *Stone* (Appendix I).

Despite ongoing requests, MCCS denied Plaintiff access to the full investigative file and withheld key materials used to justify her removal. (Exs. 2.5, 10, 14) After the record closed, MCCS submitted a revised Statement of Matters—along with curated summaries and information extracted from her purged accounts—directly to Boucher, violating NAF procedures and due process safeguards. (Exs. 32–37; Appendix D)

Boucher testified he relied on Cheryl Harkness's unsworn statement—submitted without Plaintiff's knowledge—despite her being under IG review. He also consulted Manning and Saldana, both named in Plaintiff's complaints, without disclosing or assessing their conflicts. (Exs. 5, 14)

MCCS revoked Plaintiff's access, confiscated devices, and cut off communication prior to any final decision. She was denied cross-examination and blocked from rebutting the evidence used against her, while similarly situated white, male, and non-disabled comparators retained full access and procedural protection. (Exs. 2.5, 13–15)

Whitman-Lacy's affirmance relied on the same undisclosed materials. MCCS refused to produce the full IG file or permit deposition testimony—denying Plaintiff a meaningful opportunity to respond. (Exs. 14, 2.5)

This was not an error of form—it was institutional retaliation disguised as process. Due process was subverted at every stage. Reversal is not only justified—it is required.

## VI. DISCRIMINATORY TERMINATION BASED ON DISABILITY

This is not a denial-of-accommodation case—it is a discriminatory termination. MCCS removed Plaintiff because of her known disability, then exploited her medical needs to justify the outcome. The district court erred in mischaracterizing the claim, ignoring direct evidence of **retaliation, misuse of protected health information, and discriminatory motive** under the *Rehabilitation Act*.

Plaintiff had approved accommodations on record in 2015 (Ex. 2.5). When her physician extended medical restrictions, MCCS dismissed the extension and treated

her disclosures as misconduct. Without notice, MCCS officials accessed her confidential medical file—then revoked her base access, CAC, email, and phone—cutting her off from treatment and dependent care while she remained employed (Exs. 14, 28). This was **not policy—it was reprisal through medical exclusion**.

Carlos Saldana, lacking medical authority, reviewed and incorporated Plaintiff's health records into the removal discussion (Ex. 14). Manning and Iwaniec—named in formal EEO complaints—participated in the adverse action without recusal (Exs. 3, 5). MCCS refused to reevaluate accommodations, ignored the interactive process, and offered no procedural protections.

Plaintiff had no disciplinary history, no cited policy violation, and consistent "Outstanding" evaluations (Ex. 1). Yet MCCS imposed escalating restrictions after she disclosed medical limitations—while others with confirmed violations retained access and roles (Exs. 13–15, Add. A). This disparate treatment aligns with textbook disability-based pretext under *Brady* and *Calero-Cerezo*.

The agency's reliance on vague "employment concerns" was a **mask for animus**—retaliation cloaked in administrative discretion. MCCS used Plaintiff's disability not as a reason to support, but as a **basis to punish**, deny access, and justify separation—confirming discriminatory discharge.

Summary judgment was improper. The record reflects retaliation tied to medical status, procedural manipulation, and post-hoc rationales unsupported by fact. The court's failure to recognize this as a disability-based termination was legal error.

## VII. CONCLUSION PART II

The record confirms MCCS officials responded to Plaintiff's protected activity and disability with escalating retaliation, shifting justifications, and targeted exclusion—hallmarks of pretext. Subjective rationales are legally insufficient under *Figueroa v. Pompeo*. Each adverse action was closely timed, unsupported by any policy, and contradicted by MCCS's own statements. Officials named in Plaintiff's complaints controlled every phase of the investigation, discipline, and appeal.

MCCS did not follow process—it manipulated it: suppressing exculpatory evidence, blocking rebuttal, and manufacturing legitimacy for a predetermined outcome.

This was not lawful removal. It was retaliation for protected activity—and discrimination rooted in Plaintiff's identity and disclosures.

The District Court ignored this evidentiary record. Under binding precedent, these credibility disputes must be heard by a jury. Reversal is not just warranted—it is required.[13]

---

[13] See **Appendix K** (Notice of Reprisal), **Appendix A** (Comparator Discipline), **Appendix E** (Agency Contradictions), and **Appendix J** (Retaliation Fallout). These support Plaintiff's protected disclosures and MCCS's retaliatory motive. Supporting exhibits: **Exs. 1, 2, 2.5, 3.5, 4, 7, 13–15, 21**.

## CONCLUSION AND RELIEF REQUESTED

## I. JUDICIAL FAILURES AND GROUNDS FOR REVERSAL

The District Court erred by fragmenting Plaintiff's claims, disregarding material factual disputes, and failing to assess the record's cumulative weight. This analytical flaw violates settled precedent requiring contextual evaluation of retaliation and discrimination under Title VII and the Rehabilitation Act. *Baird v. Gotbaum*, *Burlington N. & Santa Fe Ry. Co. v. White*. Plaintiff's sworn declaration (Ex. 2) and direct testimony provide first-hand evidence of pretext, animus, and discriminatory targeting.

Instead of recognizing MCCS's escalating pattern of reprisal, the Court artificially siloed performance downgrades, denial of medical care, and procedural obstruction—errors that concealed the direct causal link between Plaintiff's protected activity, disability disclosures, and termination.

MCCS's rationale shifted—from "hiring," to vague "employment," to baseless performance claims—none supported by contemporaneous evidence or cited policy (Ex. 10 at p. 4-21; Ex. 37). Key officials, including Col. Boucher and John Iwaniec,

later disavowed these reasons under oath—confirming pretext. *Brady v. Office of the Sergeant at Arms*. The District Court's erred by disregarding this credibility conflict.

## II. PROCEDURAL ANOMALIES & DENIAL OF DUE PROCESS

MCCS's retaliatory campaign was executed through **systemic procedural violations** that rendered the investigation and appeal process fundamentally biased:

- **Evidence Suppression & Access Denial:** Plaintiff's government email and phone access were revoked upon issuance of the termination proposal, depriving her of critical records needed to defend herself. (Ex. 14). The full IG report and its 36 referenced enclosures were withheld, obstructing her ability to review or rebut key allegations. (Exs. 2.5, 21).

- **Violation of Required Procedures and Introduction of Unvetted Evidence:** MCCS bypassed mandatory disciplinary procedures by submitting a materially altered Statement of Matters directly to the Deciding Official—five weeks after the rebuttal deadline—without routing it through the neutral Hearing Officer. (Ex. 35, Appendix D) The Deciding Official falsely claimed to rely only on materials submitted through formal channels but cited new, undisclosed documents that Plaintiff never had the opportunity to see or contest. (Ex. 35 (Ref. J)) MCCS then relied on these unvetted submissions—while simultaneously denying Plaintiff access to exhibits, rebuttal rights, and the full IG file—in violation of MCO P12000.11A ¶

5011(3)(a). These irregularities deprived Plaintiff of basic due process and independently warrant reversal. (Exs. 2.5, 14, 35, 37)

- **Conflicted Officials Dictated Outcomes:** Carlos Saldana—explicitly named in Plaintiff's EEO complaints—simultaneously acted as investigator, witness, legal advisor, and drafter of the removal documents. He concealed these overlapping roles from the deciding official, falsely presenting himself as legal counsel. LtCol Manning, also named in Plaintiff's filings, endorsed Saldana's findings and then advised Col. Boucher on appeal, despite clear conflicts. These overlapping roles violated the core principle of impartial adjudication, reflected in DoD Instruction 1400.25, Vol. 1407, ¶ 3.2(c)(1), which discourages combining investigatory and advisory roles with final decision-making authority. (Ex. 5; Ex. 6)[14]

- **Refusal of Neutral Appeal Review:** Plaintiff formally requested independent review, but MCCS denied that request. Officials named in Plaintiff's complaints—Saldana, Manning, Johnston, and Iwaniec—retained full control over the investigative, disciplinary, and appellate processes, rendering the outcome structurally biased. (Ex. 10).

- **Revocation of Base Access as Retaliatory Coercion:** MCCS prematurely issued a checkout sheet and revoked Plaintiff's base access—**cutting off**

---

[14] See also Withrow v. Larkin (noting constitutional concerns when the same officials investigate and adjudicate).

**her and her dependents' access to food, housing, school, and medical care**—

while her appeal was still pending. In an overseas military setting, this constituted an

**extreme punitive act** that far exceeded any comparable stateside measure. (Ex. 14).

•        **Failure to Articulate Sustained Charges:** Neither Col. Boucher nor

Whitman-Lacy identified which charges were sustained or what evidence supported

their conclusions. MCCS reiterated vague generalities without linking findings to

specific facts—violating NAF Personnel Policy Manual §5011(3)(a)(2), which

requires that disciplinary decisions clearly identify sustained charges and the basis

for each.

•        **Failure to Engage with the Appeal:** MCCS did not respond to

Plaintiff's detailed appeal outlining procedural violations, discrimination, and

retaliation. This failure underscores that the decision lacked good faith review and

was not grounded in honest belief. (Ex. 10).

Under the Marine Corps NAF Personnel Policy Manual, MCCS was required

to:

•        **Route all appeal materials through the Hearing Officer—not

directly to the Deciding Official**—to preserve procedural neutrality (**§

5011(3)(a)(1)**);

- **Ensure the employee was afforded full review and rebuttal rights**, including access to materials, the ability to respond to evidence, and challenge witness credibility (**§ 5011(3)(a)(2)**);

- Exclude officials named in protected complaints from investigatory and advisory roles pursuant to federal neutrality standards under *EEOC MD-110* and *DoDI 1400.25*

MCCS violated these protections. These violations are not procedural technicalities—they represent systemic denial of due process, suppression of evidence, and a breakdown of lawful adjudication. Reversal is not only warranted—it is legally required.

## III. IGNORED EVIDENCE OF DISABILITY DISCRIMINATION AND RETALIATION

Plaintiff's claims of **disability discrimination**—specifically MCCS's refusal to implement approved accommodations and **misuse of protected medical information**—were fully preserved in her **formal EEO complaints** and documented throughout the Record of Investigation. (Ex. 14). MCCS's claim that these issues were "unexhausted" is **flatly contradicted by the record**.

The District Court's dismissal of these claims reflects **clear error of fact and law**. It overlooked Plaintiff's evidence showing she was:

- Denied accommodations already approved for her disability,

- Subjected to review by officials she had named in prior EEO complaints,

- Forced to resubmit requests under fabricated "policy changes,"

- And ultimately terminated just days after seeking a medical extension.

Meanwhile, **non-disabled comparators** like Jody Devine received flexible telework with no scrutiny. MCCS's selective enforcement underscores the **intersectional bias at play**—targeting Plaintiff for her protected activity and **status as a disabled woman of color**.

## IV. THE COURT'S LEGAL ERRORS REQUIRE REVERSAL

The District Court improperly resolved genuine factual disputes and failed to draw all reasonable inferences in Plaintiff's favor, in violation of *Reeves* and *Tolan*. It credited MCCS's shifting rationale despite record contradictions (*Brady*), and disregarded comparator disparities, due process violations, and direct evidence of retaliatory motive (*McGrath*).

The Court gave undue deference to MCCS's IG findings—relying solely on a truncated ROI (Ex. 14) that excluded attachments, altered timelines, and exculpatory materials. Plaintiff was denied access to the full IG file during the administrative process and only received it for the first time during litigation—long after her removal and appeal concluded—further confirmed in her deposition (Ex. 2.5). The Court ignored this critical procedural deprivation and accepted MCCS's untested assertions while dismissing Plaintiff's rebuttals (Ex. 10) and neutral HQ testimony by Dennis Ray (Ex. 7).

MCCS decision makers invoked post hoc justifications that were not raised in the proposal or final removal decision—violating the *McDonnell* burden-shifting standard. Conflicted actors—including Saldana and Manning—remained central to the process (Ex. 2.5; Ex. 6; Ex. 10; Ex. 14). MCCS submitted untimely evidence directly to Col. Boucher after the record closed, bypassing the hearing officer and denying Plaintiff rebuttal rights (Exs. 32–36; Ex. 14; Ex. 29). Witness statements used by Iwaniec and Johnston were never disclosed to Plaintiff, and MCCS wiped her phone and email during the appeal, destroying key rebuttal materials (Ex. 3.6; Ex. 4; Ex. 5; Ex. 2.5).

Plaintiff was escorted from base and denied access to medical services for her dependent children—before any final decision (Ex. 2.5; Ex. 28; Ex. 14)—while similarly situated comparators with documented violations retained full access (Exs.

13–15). These are not mere technical errors; they show retaliatory animus and structural bias, which courts must not overlook under *Ward* and *Stone*.

This was not an honest mistake. MCCS manipulated the process, suppressed evidence, and advanced contradictory claims—all refuted by the full IG record and deposition testimony. Reversal is required under *Adeyemi v. District of Columbia*.

## V. REMEDIES AND RELIEF REQUESTED

For the reasons detailed, the District Court's **grant of summary judgment must be reversed**.

Plaintiff has established **multiple genuine disputes of material fact**— spanning her performance, disability status, protected activity, and MCCS's shifting, contradictory, and procedurally compromised actions. MCCS's refusal to implement approved accommodations, exploitation of confidential medical information, and suppression of appeal evidence were not benign oversights—they were targeted acts of discrimination and retaliation, in direct violation of the Rehabilitation Act and Title VII. As *Brady* and *Figueroa*, make clear, such inconsistencies and credibility conflicts demand jury resolution—not summary judgment.

The adverse actions against Plaintiff—manipulated ratings, revoked accommodations, procedural exclusion, and removal—did not occur in a vacuum. They followed closely on the heels of protected disclosures and targeted Plaintiff's identity as a Black woman, disabled veteran, and religious minority. MCCS's conduct was not a series of isolated missteps; it formed a deliberate pattern of retaliation and exclusion.

Despite overwhelming record evidence—including withheld IG materials, shifting rationales, comparator disparities, and post-hoc fabrication—the District Court segmented Plaintiff's claims and ignored the totality of harm. This violated settled precedent requiring holistic analysis of retaliation and discrimination under Title VII and the Rehabilitation Act (*Baird*, 792 F.3d 166; *Burlington*, 548 U.S. 53).

The agency's explanations collapsed under their own contradictions: it cited no sustained charge, never identified a policy violation, and relied on unsworn statements, deleted records, and conflicted actors. Procedural safeguards were bypassed; Plaintiff was denied access to evidence, witnesses, and a neutral review process.

These are not minor procedural errors—they are substantive due process violations and direct evidence of discriminatory motive and pretext. Under *Reeves*, 530 U.S. 133 and *Anderson*, credibility, intent, and retaliatory motive are jury

questions. MCCS's shifting justifications and exclusionary conduct render summary judgment improper. Reversal is not just warranted—it is required.

**Accordingly, Plaintiff respectfully requests that this Court:**

1. **Reverse** the District Court's judgment;

2. **Remand** for trial on claims under Title VII and the Rehabilitation Act;

3. **Award** appellate costs and attorney's fees under **Title VII**, the **Rehabilitation Act**, and any other applicable law; and

4. **Preserve all remedies** necessary to redress MCCS's unlawful conduct.

## VI. CONCLUSION OF LEGAL CLAIMS (TOTALITY OF CIRCUMSTANCES)

This case is not about administrative missteps—it is about systemic failure. MCCS officials retaliated against protected disclosures, ignored their own rules, and silenced a disabled Black woman who dared to speak up. When confronted with oversight, they changed rationales, erased evidence, and left a trail of contradictions that no court can lawfully ignore.

The District Court erred by fragmenting Plaintiff's claims, isolating incidents that reveal their true meaning in full context and resolving disputed facts against the non-moving party. That violated the core tenets of Rule 56 and binding precedent

requiring a holistic view of discrimination and retaliation. *Reeves*, 530 U.S.

133; *Anderson*, 477 U.S. 242; *Baird*, 792 F.3d 166.

Plaintiff presented direct and circumstantial evidence of retaliatory motive, discriminatory animus, procedural misconduct, and comparator disparities. MCCS offered no coherent, policy-based rationale—only evolving narratives, omissions, and legally unsupported claims. Its reliance on conflicted officials, suppression of material evidence, and refusal to follow its own procedures strip away any presumption of regularity.

This is not a close call on the facts. It is a textbook case of pretext and protected activity met with institutional reprisal. The sequence of events, the shifting narratives, the erased digital records, and the disabled veteran escorted off a military base —without notice, without process, and without cause— represent not administrative error, but a breach of constitutional and statutory protections. This is retaliation.

Plaintiff brought this case not only to vindicate her rights but assert that accountability cannot be optional in federal employment—especially for those who report misconduct, seek accommodations, or challenge bias. As a pro se litigant, she stood alone against a federally represented agency, armed only with the record, the law, and the truth. This Court stands as the final safeguard.

Plaintiff seeks reversal to restore her right to fair process and allow a jury to weigh the evidence of retaliation and discrimination. Reversal is not merely justified—it is necessary to reaffirm that no one is above accountability, and that due process, equal protection, and lawful governance must apply within every institution, including the federal government itself.

**Accordingly, Plaintiff respectfully asks this Court to reverse the judgment and remand for trial. Justice—long delayed—demands it.**

Respectfully submitted,

JaWan N. Tarquinii

15004 Running Park Ct.

Bowie, MD. 20715

Noel_bma@yahoo.com

# CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing contains 12,977 words (excluding the parts exempted by Federal Rule of Appellate Procedure 32(f)). It was prepared in a proportionally-spaced typeface using Times New Roman 14-point font. It was served to the following party by means indicated below, on the date of signature below:

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
333 Constitution Avenue, NW
Washington, DC. 20001-2866

And

JOHN PHELAN, (Defendant - Appellee)
Secretary of the Navy
Jane Lyons
Assistant Attorney

      Via CM/ECF System

Date: July 9, 2025

JaWan N. Tarquinii

15004 Running Park Ct.
Bowie, MD. 20715
Noel_bma@yahoo.com

Comparator discipline is relevant under *McDonnell Douglas* to show disparate treatment and pretext.

This table summarizes similarly situated MCCS employees who engaged in substantiated or repeated misconduct yet were retained, promoted, or exited with benefits—unlike Plaintiff, who was terminated despite a clean disciplinary record. MCCS applied disparate standards, underscoring pretext, selective enforcement, and unlawful motive.

MCCS extended favorable exits to others (e.g., Gardiner, Wallace), yet Plaintiff—after her protected activity—was offered only what she was already legally entitled to, coupled with demands for silence and waivers. (Ex. 26) Unlike others, she was not afforded the chance to negotiate, consult counsel, or exit with parity. (Ex. 24–25)

These disparities reflect discriminatory treatment under *Morgan v. FHLMC*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001), and support pretext under *Barth v. Gelb*, where comparator evidence was decisive in proving disability discrimination.

MCCS also denied Plaintiff's disability accommodation requests, altered the rationale for her removal mid-process, and failed to articulate any sustained violation—factors absent in the treatment of White, male comparators. Comparator disparities need not be identical; only relevantly similar. *Holcomb v. Iona College*, 521 F.3d 130, 139 (2d Cir. 2008).

The following chart summarizes key differences in treatment:

| Name | Misconduct / Issue | Disciplinary Outcome | Contrast with Plaintiff |
|---|---|---|---|
| Matthew Niedszeiecki | Repeated LQA violations | Letter of Warning; full process before separation | Plaintiff was removed faster and without full procedure |
| Jason Gardiner | $300,000+ overpayment due to negligence | Six months' pay, base access, neutral reference | Denied severance, access, and stigmatized |

| | | | |
|---|---|---|---|
| Gary Holsopple | Oversight failures in child care, improper hiring | Improper hiring, child care oversight | Terminated for unsubstantiated claims |
| Dave Atkins | Terminated for unsuitability | Received reference and maintained access | Denied both despite no misconduct |
| Andrew Chung | Caused $175,000 in losses | Letter of Reprimand | Plaintiff removed without causing losses |
| Marty Carter | Supervisor during Chung's losses | No discipline | Held accountable for others' actions |
| Richard Courtemanche | Contracting violations, $14,357 deficit | Five-day suspension | No cited violation for Plaintiff's removal |
| Vince Endresen | Oversight failures | No discipline | Plaintiff held to higher standard |
| Tony Taylor | Relationship with subordinate | No discipline; received Employee of the Year | Plaintiff vilified after protected disclosures |
| Sue Campbell | Mishandled harassment claims | Suspension only after HQ intervention | Removed on disputed allegations |

15

These discrepancies support a compelling inference of pretext, retaliation, and discriminatory animus. MCCS consistently granted more favorable treatment to similarly situated, White, male, or non-disabled employees—none of whom had protected activity pending at the time of review.

---

[15] *See also Exhibits 2-2.5, 13, 14, 14.1, 15, 21, and 27 for source documentation referenced in this summary. These comparators are cited in the brief and appendix to establish material similarity, disparate outcomes, and pretext under controlling law.*

While not all date stamps and records were preserved due to deletion and access restrictions imposed on Plaintiff, the sequence of events leading to her discipline is corroborated by testimony and internal documentation.

In **August 2015**, Plaintiff conducted a formal Family Care climate review that substantiated hostile workplace behavior by a white male manager. This was a routine duty, but it triggered severe backlash because of what she uncovered—and who it involved.

- MCCS counsel **Jody Devine** demanded that Plaintiff "soften" or revise her findings.
- Plaintiff refused to manipulate the conclusions, citing her ethical obligation and the factual integrity of the report.
- Devine escalated the matter internally, and MCCS leadership— including **Johnston** and **Iwaniec**—immediately initiated adverse action.
- Despite pressure, Plaintiff submitted the unaltered findings, maintaining her professional duty.

**Following this refusal:**

- Plaintiff was **immediately downgraded** from her prior "Outstanding" performance rating.
- She was **placed on a PIP** without justification or prior counseling.
- MCCS began describing her conduct as "problematic," despite no record of prior performance issues.

These events were not isolated. Plaintiff **escalated the matter to Marine Corps Headquarters**, specifically reporting:

- Improper pressure from MCCS officials to alter official investigative findings;
- That she, as the investigating officer, was being coerced to misrepresent facts;
- That retaliation was escalating following her refusal.

Headquarters officials, including **Dennis Ray**, confirmed Plaintiff's position was **ethically and procedurally correct**, and agreed that the conduct of local leadership was inappropriate.

**In retaliation**, MCCS officials escalated hostile behavior:

- **Iwaniec** repeatedly threatened Plaintiff, telling her not to "air dirty laundry to HQ," to "shut up and color," and warned her leadership had "Iwakuni fatigue" from her disclosures.
- He told her **they couldn't protect her anymore** and referred to "cleaning house" and "getting rid of her."
- These threats directly followed her protected disclosures and refusal to engage in misconduct.

  *"This was the straw that broke the camel's back. They didn't want me speaking up again."*
  — Plaintiff testimony (Ex. 2.5, Ex. 3, Ex. 14)

These threats, aligned with *Porter v. Shah*, 606 F.3d 809, 819 (D.C. Cir. 2010), support an inference of retaliatory motive. The record supports that Plaintiff was disciplined not for performance or policy violations, but because she refused to compromise the integrity of an investigation and disclosed wrongdoing to higher authority—protected acts under *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006).

# APPENDIX C —
# FAMILY HIRING & RECUSAL SUMMARY

This appendix confirms that Plaintiff fully recused herself from any role in the hiring of her relatives, and that MCCS never disputed this or identified a single policy violation—despite later reframing the events post hoc as part of a shifting justification for her removal.

Key Record Facts:

- Prior to any application being submitted, in July 10-11, 2024, Plaintiff **notified supervisors Iwaniec and Johnston, and HR Staff** that family members might apply and **formally recused herself from all matters**. (Ex. 14, at 000060, Ex. 19) This recusal occurred **before** her husband applied, consistent with her ethical obligations under 5 C.F.R. § 2635.502.

- Plaintiff's **husband's hiring** was managed **entirely by Cheryl Harkness**, who coordinated with **HR Specialist Kaori Plump Yanaghihara** —not Plaintiff. Selection was made by Director **Richard Courtemanche**, not Plaintiff. (Ex. 9 at p.149)

- Plaintiff's **brother** was one of **24 candidates** selected during a public MCCS job fair. His hiring was processed directly by **HR**, and Plaintiff had no role. (Ex. 10)

- **Courtemanche later confirmed** that Plaintiff was not involved in either hiring decision and that her recusal was known and acknowledged internally. (Ex. 10)

- MCCS **never cited** a requirement for a written recusal or enforced such a policy for others. The **investigation found no misconduct** in either case. (Ex. 10)

- Critically, MCCS **never sought confirmation** from Iwaniec or Johnston— who had firsthand knowledge of the recusal—during its investigation. (Ex. 10)

- MCCS's **Statement of Matters**, authored by **Jody Devine**, initially framed the issue as related to "hiring." But in the **final removal letter**, MCCS shifted to vague "employment actions"—abandoning its earlier claim entirely, without explanation or policy basis. This shift reflects a **clear change in rationale** to justify Plaintiff's termination after-the-fact. (Ex. 34)

MCCS never challenged the recusal, never cited a policy violation, and never explained how Plaintiff's conduct breached any rule. Yet these events were retroactively reframed and mischaracterized—despite confirmation from multiple witnesses that she complied with all ethical obligations. (Ex. 9 (encl 11 & 15), Ex. 10, Ex. 14)

After Plaintiff timely submitted a formal rebuttal (Ex. 34) to MCCS's Statement of Matters sent to the designated neutral Hearing Officer (Ex. 33), MCCS **violated its own adjudicative procedures** by bypassing that officer and submitting a **materially altered package** (Ex. 35) **directly to the Deciding Official, Col. Boucher**.

**Ex. 35** was not a supplemental filing—it included a newly framed "Statement of Matters" and attached exhibits (informally labeled A–O within that packet) that had **never been shared with Plaintiff**, contained new allegations and terminology, and were submitted over five weeks after the February 6, 2016 rebuttal deadline. Plaintiff had no opportunity to view, rebut, or even become aware of these materials until litigation. This version was strategically timed, crafted after her rebuttal had been filed, and routed around the neutral Hearing Officer—a textbook deprivation of due process. *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970). This is not a harmless procedural error; it is a constructive fraud on the adjudicative process.

The central investigative file reveals selective treatment of witness statements and a failure to investigate key exculpatory facts. Ex. 14. These omissions echo the employer's shifting narratives and reinforce a finding of pretext. *Figueroa v. Pompeo*, 923 F.3d 1078 (D.C. Cir. 2019). Plaintiff's internal appeal challenged procedural irregularities and adjudicator conflicts. Ex. 10. MCCS's failure to address these objections deprived Plaintiff of fair process. *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970).

The record reflects a cascading series of violations:

| Ex. No. | Description | Procedural Issue |
|---|---|---|
| Ex. 32 | Hearing Officer Correspondence (Jan 2016) | Deadline established; neutral officer confirmed |
| Ex. 33 | MCCS's Original Submission to Hearing Officer | Initial version routed through proper channel |
| Ex. 34 | Plaintiff's Rebuttal | Timely rebuttal to |

|  |  | Ex. 33 |
|---|---|---|
| Ex. 35 | Altered Statement of Matters | Post-deadline, bypassed Hearing Officer, introduced new charges and rationale directly to the Deciding Official |

## Specific Due Process Failures:

1. **Conflicted Investigators and Advisors**

- **Carlos Saldana**, the investigator, had **previously cleared Plaintiff** of wrongdoing in his own earlier investigation report. He then reversed course, serving as IG investigator, advisor, recommender, and fact witness—without disclosing that reversal or his direct conflict of interest.
- Saldana misrepresented himself as neutral legal counsel to the Deciding Official, despite being **named in Plaintiff's EEO complaints**, thus violating the required separation of adjudicative and investigative functions.
- **LtCol Manning**—also named in Plaintiff's protected activity—endorsed the original IG findings against Plaintiff.
- He also worked with Johnston to **immediately issue the checkout sheet** upon proposal, revoking Plaintiff's base access, email, CAC card, and phone—well before any final decision.
- Manning personally **timed and monitored** Plaintiff's only opportunity to view the redacted IG file (Ex. 14), a restricted version that itself **differed substantially** from:
  - **Ex. 9** (a more complete summary produced during the appeal), and
  - the **full 390+ page IG investigative file**, which MCCS concealed for nearly a decade and only produced during litigation. That file included **Manning's own signature endorsing the findings**, appearing within the first pages—evidence of pretextual validation and institutional alignment against Plaintiff.

2. **Undisclosed Evidence and Post-Rebuttal Alterations**

- MCCS bypassed neutral review by routing a **new and expanded Statement of Matters (Ex. 35)** directly to Col. Boucher after Plaintiff's rebuttal was submitted.

- These new materials included: previously unseen exhibits, newly framed charges, and altered terminology—none of which had been included in the original package sent to the Hearing Officer (Ex. 33).
- MCCS did not notify Plaintiff, did not serve her with a copy, and did not allow any response—an intentional suppression of rebuttal rights.

## 3. Investigative File Concealment and Evidence Tampering

MCCS further distorted the evidentiary record by limiting access to the investigative file. Plaintiff was only permitted to view a heavily redacted, incomplete version (Ex. 14) under Manning's supervision—who had already co-signed the proposal to remove her. The partial file initially submitted by Plaintiff (Ex. 9) lacked key attachments and did not include the first pages of the full IG file, where Manning endorsed the findings. Critically, **neither party ever submitted the full, unredacted IG report into the District Court record**—it was only disclosed in full during litigation, long after Plaintiff's appeal was denied.

- The full 390+ page IG file was withheld throughout the pre-removal and appeals process.
- The version shared with Plaintiff during the ROI review (Ex. 14) was incomplete, redacted, and lacked core enclosures.
- Ex. 9—produced much later—was still materially different from the final production obtained only through litigation, which revealed contradictory statements, omitted timelines, and suppression of exculpatory witness material.

## 4. Revocation of Access and Information Control

- MCCS **revoked Plaintiff's access to all systems and records** on the day the proposal was issued—before any decision.
- She was denied access to her government email, cell, CAC card, personnel files, and evidence needed for her defense.
- MCCS then extracted materials from her deleted account (Ex. 14 at 000179) and submitted them against her in Ex. 35, without notice or disclosure.

## 5. Appeal Channel Subversion

- Appeal materials were routed directly to the Deciding Official, bypassing the required neutral Hearing Officer and violating both NAF procedures and MCO P12000.11A §5011(3)(a).

- MCCS presented Boucher with a new factual narrative while denying Plaintiff a chance to rebut.

### 6. No Neutral Review or Cross-Examination

- Plaintiff was denied witness lists, deposition access, and cross-examination rights.
- MCCS relied on **unsworn statements from conflicted individuals**—including Harkness and Iwaniec—without disclosing them in advance or permitting rebuttal.
- Boucher admitted he relied solely on Harkness's statement, despite her being under IG scrutiny, and failed to conduct a conflict screening.

### 7. Retaliatory Access Revocation

- Immediately upon issuance of the proposal, Plaintiff was **escorted off base**, denied access to housing, school services, and medical care for her dependent child.
- These actions occurred **prior to any final determination** and far exceed procedural discipline, constituting **retaliatory coercion in an overseas context**.

Legal & Regulatory Violations:

These failures breached binding legal and policy requirements, including:

- **MCO P12000.11A §5011(3)** – requiring all materials be routed through neutral review, with full rebuttal and notice;
- **NAF Manual procedural protections** (§§ 5007 (3), 5008-5011)—mandating exclusion of conflicted officials and transparency of the evidentiary record;
- **Goldberg v. Kelly**, 397 U.S. 254 (1970) – establishing that **notice, rebuttal, and opportunity to respond are constitutional minima**.

These procedural failures are not mere technicalities—they strike at the heart of due process. *"The fundamental requisite of due process of law is the opportunity to be heard... at a meaningful time and in a meaningful manner."* (*Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)). MCCS denied Plaintiff this right by submitting new evidence after the rebuttal deadline, revoking access to critical materials, and routing judgment through officials named in her protected complaints. As the Federal Circuit held, *"The core of due process is the right to notice and a meaningful opportunity to respond."* (*Stone v. FDIC*, 179 F.3d 1368, 1376 (Fed. Cir. 1999)).

A procedurally rigged process that denies rebuttal, suppresses the record, and routes judgment through those under scrutiny does not meet the Constitution's bare minimum. It demands reversal.

**Exhibit 35** refers to the **altered Statement of Matters MCCS submitted directly to Col. Boucher** after Plaintiff's formal rebuttal and *outside* the neutral adjudication process. This submission introduced **new charges, rationale changes, and attachments** that Plaintiff never had the opportunity to review, challenge, or rebut before the final removal decision.

Importantly, the version of **Exhibit 35** filed in this litigation **does not include** the full set of attachments that were provided to the Deciding Official.

Instead, MCCS relied on internal materials—including extracts from Plaintiff's **deleted email account** and post-access summaries—to support its final action, while withholding those same materials from Plaintiff throughout the administrative process. These undisclosed additions were not part of the ROI (Ex. 14), the appeal record, or the official record before the Hearing Officer.

This post-rebuttal submission and record alteration violated Plaintiff's due process rights under **Stone v. FDIC**, 179 F.3d 1368 (Fed. Cir. 1999), which prohibits reliance on ex parte evidence absent notice and opportunity to respond. MCCS's actions also contravened internal policy requiring that the neutral adjudicator—not conflicted agency officials—serve as the channel for all adjudicatory submissions.

**Accordingly, any findings or decisions based on Exhibit 35 must be viewed as procedurally tainted and legally unreliable.**

This constitutes a **textbook due process violation** and a **standalone basis for reversal**.

This appendix details MCCS's evolving and internally inconsistent justifications for Plaintiff's removal. At each stage, the agency's rationale changed—often mid-process—and none were substantiated by contemporaneous evidence, objective policy violations, or credible witness statements. This pattern aligns squarely with established indicators of **pretext and retaliatory motive** under Title VII and the Rehabilitation Act.

## A. Abandoned Allegation: Improper Hiring Involvement

- MCCS initially alleged Plaintiff improperly facilitated the hire of her spouse and brother.
- The undisputed record shows Plaintiff **formally recused herself** from both processes *before* either applied. She notified supervisors Iwaniec and Johnston, HR staff, and the Contracting Department in advance (Ex. 14 at 000060, 000070–080; Ex. 10 at 70–71).
- The hiring was administered independently by Cheryl Harkness and coordinated with Kaori Plump Yanaghihara—**Plaintiff had no access or role (Ex. 9 p. 149).**
- **No written policy** required further recusal, and **MCCS never disputed** Plaintiff's disclosures or actions at the time.
- The allegation was **not cited** in the removal decision but was **used pretextually** to revoke access and initiate adverse action, underscoring retaliatory motive.

## B. Invented Allegation: Vague "Employment Rule" Violation

- MCCS next shifted its rationale to an unspecified "employment rule" that Plaintiff allegedly violated.
- At no point—**in the proposal, final decision, or litigation**—did MCCS define what this "rule" was, where it was located, or how Plaintiff allegedly breached it (Ex. 10, p. 4-21; Ex. 14 at 000056-000062).
- Plaintiff was never told she had violated any rule and has **never been provided** with an explanation of what conduct formed the basis of this claim.
- The agency offered **no citation, no written instruction, and no policy guidance** that Plaintiff failed to follow. It simply invoked the concept post hoc as justification.

- In reality, Plaintiff had submitted a clarification of the hiring timeline **only after being asked to do so by the investigator**—a transparent and accurate statement MCCS later distorted as "advocacy" (Ex. 14 at 000056-61).
- MCCS failed to apply any consistent standard and **never identified** how her actions differed from routine personnel communication.
- As courts have held, "an employer's inability to clearly articulate its reason for an adverse action supports an inference of pretext." *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019).

## C. Fabricated Allegation: Performance Concerns

- Plaintiff's performance evaluations were uniformly "Outstanding," with **no prior discipline or PIP** (Ex. 1).
- MCCS issued a **Letter of Caution** after Plaintiff refused to alter findings in a protected workplace misconduct report. This letter was later reversed following a formal challenge (Ex. 14 at 000024-25, 000092, 000328).
- MCCS downgraded Plaintiff's rating and issued a Letter of Caution in September 2015, despite no prior performance issues. Dennis Ray later confirmed that such action is not allowed under MCCS policy unless the rating is "Unsatisfactory" or "Does Not Meet." MCCS retained the letter even after reversing the rating—continuing to use it to justify adverse action. This contradiction destro*ys* any credible performance rationale. Ex. 7 at 31:1–25; Ex. 14 at 000317–340
- Iwaniec testifies that Carlos Saldana told him to terminate Plaintiff, and that she was terminated because of "poor performance appraisal and the refusal to accept responsibility for her actions and improve her performance." Ex. 3.5 at 000456-000457
- Despite these facts, MCCS began claiming "performance issues" during the appeal—**even though no performance charge appeared in the proposal or final removal**.
- Supervisor Iwaniec later issued Plaintiff a **favorable DOJ reference**, confirming her professional competency and undermining any claim of performance concerns (Ex. 3.5 at 000459–460).

## D.  Final Justification: Undefined "Loss of Confidence"

- **Ex Parte Communications and Shifting Justifications**: John Iwaniec admitted under oath that he provided **post-record "guidance"** to the deciding official, Col. Boucher, recommending Plaintiff's termination based not on any policy violation, but on her alleged "poor performance, inability to accept responsibility for her actions, and poor leadership and management abilities" (Ex. 3.5 at 000461). These **rationales were not cited in either the proposed**

**removal letter or the final decision**, constituting an impermissible **ex parte communication** and further evidence of MCCS's **shifting, post hoc justifications**—a hallmark of pretext under *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495–96 (D.C. Cir. 2008).

- MCCS ultimately removed Plaintiff citing vague concerns about "judgment" and a "loss of confidence," yet the final decision does not identify any specific sustained charge or cite a violated policy. Despite referencing the IG investigation and prior procedural steps, the removal letter failed to articulate how any alleged act met the threshold for misconduct under applicable standards. The deciding official, Col. Boucher, later admitted under oath that the actual rationale diverged from the allegations in the proposal. Ex. 10 at MCCS0000490–0494
- **No specific conduct, rule violation, or substantiating evidence** accompanied this rationale.
- **Col. Boucher conceded in deposition that the IG report "didn't substantiate anything" and confirmed the decision to terminate Plaintiff was not based on any proven hiring violation. Instead, he relied on unsworn statements from Cheryl Harkness—who was under active IG investigation herself at the time.** (Ex. 5 at 60:2–60:9; 69:25–70:21). This reliance on unsupported, non-sworn assertions over formal findings further evidences the absence of legitimate cause and underscores the retaliatory nature of the action.
- Termination documents were drafted by Saldana, who had already cleared Plaintiff in an earlier investigation—creating a clear **conflict of interest** (Ex. 6; Ex. 10). Saldana also admitted relying on hearsay and not reviewing Plaintiff's rebuttal.
- John Iwaniec admitted in sworn deposition that he found Plaintiff's decision to seek clarification from HQ about the hiring policy reasonable, but stated that Jody Devine and Carlos Saldana disagreed with that interpretation and used it as the basis for termination. He acknowledged, "I wouldn't change anything in that document" and that the termination rationale came down to their conflicting interpretation—not any policy violation. (Ex. 3.5 at 67:24 – 69:7)

These highlight material contradictions between MCCS's stated rationale for Plaintiff's removal and the actual evidentiary record. These inconsistencies are a pattern of shifting justifications and procedural missteps that strongly support a finding of pretext under applicable D.C. Circuit standards.

**Contradiction #1: Performance vs. Evaluation History**

MCCS's claim: Plaintiff was removed for poor performance.

The record shows: Plaintiff consistently received "Outstanding" performance evaluations up to and including the period immediately before she engaged in protected activity. No PIP, corrective counseling, or other performance management was initiated until after her disclosures to EEO and IG officials.

Legal impact: Under Brady v. Office of Sergeant at Arms, 520 F.3d 490 (D.C. Cir. 2008), this discrepancy creates a genuine dispute of material fact and precludes summary judgment.

## Contradiction #2: Justification Shift from Conduct to Performance

MCCS's claim: Initially cited conduct violations in the removal proposal.

Later: Performance deficiencies were raised for the first time only after litigation began. Neither the proposal nor final removal notice cited performance as the reason for separation.

Legal impact: Shifting justifications are evidence of pretext under Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248 (1981).

## Contradiction #3: Improper Letter of Caution

MCCS's action: Issued a Letter of Caution to Plaintiff based on a downgraded evaluation.

The problem: MCCS policies permit such letters only for employees rated "Unsatisfactory." Plaintiff was not.

Legal impact: This procedural deviation undermines the legitimacy of MCCS's disciplinary measures.

## Contradiction #4: Reference Letter Undermines Claim of Deficiency

MCCS's action: Issued Plaintiff a favorable DOJ reference letter endorsing her qualifications and work ethic into Senior Supervisory HR position.

Contradiction: This reference was created after her removal process had already started, contradicting MCCS's claim of performance deficiencies.

Legal impact: Undermines MCCS's credibility and reinforces Plaintiff's claim of pretext.

Taken together, these contradictions are not benign. They reflect a shifting and unsupported disciplinary narrative that violates the principles of fairness, transparency, and lawful process. The record shows MCCS failed to maintain a consistent basis for removal, and instead relied on evolving justifications in response to protected disclosures.

**Legal Significance**

This pattern of shifting narratives, unsupported allegations, and silence on governing policy squarely meets and exceeds the legal standard for pretext under *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495–96 (D.C. Cir. 2008), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Courts routinely hold that where an employer cannot maintain a consistent rationale—and where internal contradictions surface in sworn testimony—the credibility of the employer collapses, and summary judgment is improper.

Here, MCCS never identified a specific policy that Plaintiff violated. Col. Boucher admitted under oath that the decision to remove Plaintiff "was not really about the hiring," and could not point to any regulation that had been breached (*Ex. 5 at 70:10–21*). Carlos Saldana testified that he reviewed the IG record and drafted the proposed removal based on internal discussions—not any cited policy violation—and that leadership made the final call. (*Ex. 6 at 62:2-63:7*). The final removal decision failed to cite any sustained allegation or legal basis for termination, a point corroborated by Boucher's own acknowledgment and by the record itself (*Ex. 10; Ex. 14 at 000054–065*).

The IG investigation—submitted as part of MCCS's own record—found no violation, no conflict of interest, and no rule breach. In fact, key enclosures directly refuted MCCS's rationale (*Ex. 10 at p. 6- 30*). Yet MCCS continued to reframe Plaintiff's protected disclosures and accommodation requests as misconduct (*Ex. 14 at 000092–094; Ex. 2.5 at 120:11 – 122:11*), even though no contemporaneous documentation supported those charges.

Despite admitting that no policy violation occurred, MCCS circulated misleading allegations to federal agencies that directly undermined Plaintiff's post-removal employment. These same officials simultaneously issued a favorable DOJ

reference (*Ex. 3.5 at* 000459–460), making clear that the "loss of confidence" cited as justification was neither genuine nor substantiated.

Key officials—including Boucher, Iwaniec, Johnston, and Saldana—contradicted not only one another but also the very record used to justify Plaintiff's termination. Their sworn testimony exposed critical deviations from MCCS's stated rationale, with admissions that the IG report "didn't substantiate anything" (*Ex. 5 at 69:25–70:21*), that performance was not the real issue (*Ex. 3*), and that the decision had been predetermined within days of protected disclosures (*Ex. 6; Ex. 2.5*).

These contradictions—when paired with the shifting rationale, post hoc justifications, and absence of a cited policy—constitute textbook pretext under *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008). This was not a good-faith error or evidentiary ambiguity. It was a procedurally manipulated effort to remove a whistleblower under the guise of neutral process.

This is not a case of poor communication or isolated managerial error. It is a case where **institutional power was weaponized** to remove a whistleblower under false pretenses. The agency's inability to maintain a stable rationale, combined with overt procedural violations, renders its asserted justification not just implausible, but unlawful.

The record, taken as a whole, reflects **a retaliatory and discriminatory termination pretextually disguised as a personnel action**.

This appendix presents a chronological, evidence-based timeline of protected activity, discriminatory actions, procedural misconduct, and retaliation. This timeline outlines a fact-supported sequence of events showing that MCCS's adverse actions were not isolated incidents, but part of a coordinated and escalating campaign of retaliation and discrimination. Each event is supported by record citations and demonstrates a clear causal connection. The progression below satisfies the **temporal proximity, casual inference, escalation**, and **pretext** prongs under *McDonnell Douglas* and related precedent (*Burlington*, *Figueroa*, *Brady*).

| Date | Event | Citation(s) |
|---|---|---|
| Nov 2014 | Carlos Saldana clears Plaintiff of alleged misconduct after an investigation—**the same conduct later cited in the 2015 removal letter**. | Ex. 10 at 0000538-542 |
| Feb 2015 | Plaintiff engages in **protected EEO activity**, filing verbal and written complaints against Iwaniec and Boucher. | Ex. 2 at ¶115 |
| May–July 2015 | Plaintiff submitted a written request for disability accommodation related to a documented medical condition. MCCS not only failed to implement the accommodation, but | Ex. 3 at 60:4 – 64:21 |

| | also breached confidentiality: John Iwaniec testified under oath that he discussed Plaintiff's medical and accommodation details with Carlos Saldana and Lt. Col. Manning—neither of whom held HR authority or privacy training relevant to the request. These disclosures occurred without Plaintiff's knowledge or consent and directly undermined her protected rights. | |
| --- | --- | --- |
| Aug 2015 | Plaintiff investigates hostile work environment involving a white male manager. MCCS officials, including Devine, Iwaniec, and Johnston, pressure her to **soften findings**. Plaintiff refuses. | Ex. 2.5 at 100:17 – 103:24, Ex. 14 at 000092 |
| Sept 2015 | MCCS downgraded Plaintiff's performance rating without justification and issued a Letter of Caution—despite | Ex. 7 at: 31:1 – 15, Ex. 14 at 000317–340 |

|  |  |  |
|---|---|---|
|  | Plaintiff being rated "Meets Expectations." Dennis Ray, the HQ policy authority, later testified that a Letter of Caution may **only** be issued when performance is rated "Does Not Meet" or "Unsatisfactory." MCCS refused to remove the letter even after confirming the improper rating— maintaining it in Plaintiff's record in **clear violation of agency policy.** |  |
| Fall 2015 | Plaintiff submitted a formal rebuttal, explicitly alleging religious discrimination, a hostile work environment, and retaliatory motive. MCCS never addressed these claims. | Ex. 14 at 000056–000062 |
| Oct 2015 | Plaintiff escalates retaliation concerns to Dennis Ray at HQ. HQ confirms her position was proper, but **MCCS takes no corrective action**. | Ex. 7 at 18:6 – 19:8, Ex. 2 at 288 - 307 |

| Nov 2015 | Plaintiff's CAC, email, phone, and access to government services and school facilities are revoked—**prior to any decision** on her proposed removal. | Ex. 14 at 000092-94, Ex. 28 |
|---|---|---|
| Nov 2015 | Johnston and Manning **issue checkout sheet same day as proposal**, treating removal as finalized. Manning oversees Plaintiff's **timed limited, supervised access** to a redacted version of the investigation as included in the ROI Ex. 14. | Ex. 2.5 at 157:11 – 162:21; Ex. 14; Ex. 28; Ex. 2 at 364 - 377 |
| Nov 2015 | Plaintiff is shown only a redacted and incomplete version of the IG report during appeal—under Mannings armed guard watch and denied a copy. The version given excludes Manning's endorsement and 30+ enclosures. | Ex. 14 (ROI) 000473-000490; Ex. 9 (partial IG file); Full IG File (litigation only); Appendix D |

| | | |
|---|---|---|
| Nov 23, 2015 | Removal letter issued by Iwaniec, whom Plaintiff previously named in protected disclosures. The removal **abandons original allegations in favor of vague, undefined rationale**. | Ex. 14 000107 - 109; Ex. 28 |
| Feb 2016 | MCCS **withholds full investigation file**, refuses to allow Plaintiff deposition or cross-examination access, and bypasses neutral adjudicator. | Ex. 2.5 at 166:15 – 169:16; 176:3 – 177:11, Ex. 10; Ex. 2 at 381-382, 496 |
| Feb–Mar 2016 | MCCS submits revised Statement of Matters (SOM) with new charges and new Exhibits A–O after rebuttal. Plaintiff denied right to respond. Decision ratified by Boucher without disclosing basis. | Ex. 32–35; Appendix D; Ex. 10; Ex. 2 at 378 - 393 |
| Apr 2016+ | Multiple federal job offers rescinded as MCCS circulates misleading or disputed termination records. | Ex. 18; Ex. 41 |

| | | |
|---|---|---|
| 2024 | MCCS's full IG file is finally disclosed during litigation, revealing key materials—**including Manning's signed endorsement** of findings—that were **never shared during the removal or appeal process**. | Ex. 2 at 364 -373; Full IG File in discovery (not Ex. 9 or Ex. 14 versions) |

Conclusion:

This timeline establishes a consistent pattern of **protected activity → institutional retaliation → adverse action**, all compounded by procedural suppression and lack of transparency. MCCS failed to follow its own internal rules, obscured key evidence, and engaged conflicted officials throughout the process. These facts support the jury question on **motive**, **pretext**, and **intent**, as required under *Reeves*, *Anderson*, *McGrath*, and *Baird*.

## APPENDIX G –
## DUE PROCESS FAILURES & PROCEDURAL IRREGULARITIES

This appendix outlines a systematic pattern of due process violations and procedural defects that fundamentally compromised the fairness of Plaintiff's termination process. Officials repeatedly disregarded key legal safeguards, failed to disclose material facts, and manipulated the process under color of authority.

These actions undermined the legitimacy of the adverse decision, tainted the record with bias and ex parte input, and violated both agency policy and federal legal standards. They contravene basic constitutional protections under *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), and implicate the standards of impartial adjudication required by *Withrow v. Larkin*, 421 U.S. 35 (1975) and *Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999).

- **Carlos Saldana**, previously involved in reviewing and clearing Plaintiff, improperly re-entered the process as **investigator**, **recommender**, and **legal advisor**, **without recusal** or transparency. Ex. 10.

- **Col. Boucher**, as deciding official, violated **MCO P12000.11A ¶ 5011(3)(a)(2)** by failing to identify which allegations were sustained, omitted explanation of rationale, and failed to advise Plaintiff of appeal rights. Ex. 37

- **Robert Johnston** proposed Plaintiff's removal **within days** of her protected disclosures. **John Iwaniec** later testified:

  > I was told to terminate [her]... it wasn't really about the hiring.
  > – *Ex. 3.5, Iwaniec Deposition,* 000456-000457

- Johnston and **Scott Manning** simultaneously issued a mandatory **separation checkout** directive—implying Plaintiff's removal was **predetermined**, before any adjudication. Ex. 2 at 366 - 368; Ex. 28.

- Saldana misrepresented his authority to Boucher, who lacked legal training and accepted this at face value. Boucher later admitted under oath: Saldana told me he was legal... I relied on him.
  *– Ex. 5, Boucher Deposition, at 14:10-13*

- No **Douglas factors** or comparator analysis were applied, despite assertions otherwise. Saldana testified:

114

"I considered Douglas factors,"
yet **no written application** was included in the record. Ex. 6 at: 62:8 – 63:9, Ex. 10.

- MCCS issued and maintained a Letter of Caution despite rating Plaintiff as "Meets Expectations"—a direct policy violation. Dennis Ray, HQ policy official, confirmed that a Letter of Caution is only authorized for "Does Not Meet" or "Unsatisfactory" ratings (Ex. 7 at 31:1–25). MCCS's refusal to remove the improper letter further tainted the process and added to the retaliatory treatment.

*Record Withholding & Ex Parte Evidence*

- MCCS submitted an altered post-rebuttal package directly to the Deciding Official outside Plaintiff's knowledge or participation. This version, included as **Ex. 35**, contained internal summaries and materials extracted from Plaintiff's revoked email access—none of which were shared with her prior to termination.

- Plaintiff was **denied access to critical records** during the removal process, including:
    o the **full IG investigative file** (produced only during litigation),
    o the **complete internal report** (only excerpts within **Ex. 14** were disclosed at termination),
    o and **numerous internal exhibits** that were considered in the decision but never provided.

- This **post hoc supplementation of the record** violated ex parte evidence safeguards and denied Plaintiff any meaningful opportunity to rebut the allegations.
  **See:** Ex. 2, 2.5, 10, 14, 35.

*Decision-Making Based on Incomplete or Contradictory Grounds*

- **No specific policy or rule violation** was ever identified by MCCS in its final removal decision. Col. Boucher admitted under oath that the termination "was not really about the hiring" and could not cite any breached regulation. (Ex. 5, 10, 14)

- **Key officials repeatedly contradicted themselves under oath**, undermining the legitimacy of the stated rationale. Col. Boucher, John Iwaniec, Robert

Johnston, and Carlos Saldana disavowed the official justification or shifted to entirely different grounds post hoc. Ex. 3, 5, 6, 10.

- MCCS introduced vague **"performance concerns" only after the fact**, never referenced in the proposal or final decision letters. These post hoc claims are **refuted by MCCS's own conduct**, including a positive DOJ reference issued after Plaintiff's termination. Ex. 3.5, 14.

- Plaintiff was **denied any opportunity to review or rebut critical third-party declarations**, including unsworn allegations from Cheryl Harkness and internal summaries submitted directly to Col. Boucher without notice. These materials—**only revealed during litigation**—were included in the altered post-rebuttal package now marked as **Ex. 35**, violating due process safeguards. Ex. 2, 10, 14, 35.

- **Iwaniec provided ex parte "guidance"** to Col. Boucher recommending termination based on alleged poor performance and leadership concerns never cited in the proposal or final removal letter (Ex. 3.5 at 000461). This post-record input violated Plaintiff's right to rebut, compounded procedural bias, and further underscores MCCS's reliance on undisclosed and shifting rationales.

- MCCS constructed a misconduct narrative based on a policy interpretation dispute that Iwaniec himself admitted was "reasonable." Despite no directive or policy barring Plaintiff's clarification with HQ, MCCS recharacterized this as "interference," ignoring Iwaniec's own statement that he "wouldn't change anything" about Plaintiff's inquiry. (Ex. 3.5 at 67:24 – 69:7)

*Compressed Timeline and Retaliatory Inference*

- The timeline from disclosure to removal was **expedited**, while discipline for comparators was delayed or waived. Appendix A; Ex. 14.

- Despite advance requests, Plaintiff was **never given** the **full IG Report** that included signature blocks (e.g., Manning's), only receiving Ex. 9 (a truncated version) during appeal. The **complete file was produced only during litigation** and was **not filed by the agency** in court.

- Plaintiff's appeal rights were rendered meaningless by coercive acts— including threats to forcibly vacate her home prior to the appeal decision. MCCS's conduct reflected not a neutral process, but a coordinated removal strategy executed before any adjudication. Ex. 2 at 373 -377

These documented actions demonstrate clear violations of due process that exceed procedural mishandling and point to intentional disregard of Plaintiff's rights. The record shows conflicted actors making legally deficient decisions based on undisclosed, misleading, or absent evidence—constituting a textbook denial of the constitutional protections owed in employment termination proceedings.

This was not an ordinary removal. It was a coordinated institutional takedown—executed overseas, without lawful cause, against a disabled Black woman who exercised her right to report misconduct. MCCS weaponized the removal process, stacked it with conflicted actors, concealed evidence, and executed its decision in a forum where Plaintiff had no access to neutral oversight, legal assistance, or recourse.

The human cost of this unlawful removal—inflicted thousands of miles from the U.S. mainland, without access to legal counsel, healthcare, or neutral oversight—was profound, compounding, and irreparable.

The result was not just retaliatory—it was devastating.

*1. Professional Destruction Without Cause*

MCCS's action effectively blacklisted Plaintiff from federal service. Multiple job offers were rescinded following the circulation of removal materials, despite the absence of any sustained misconduct finding or policy violation. The ambiguous rationale in the removal decision—devoid of clear charges or findings—left Plaintiff unable to meaningfully defend herself, explain the action, or secure alternative employment.

*2. Loss of Access to Life Essentials*

Plaintiff's removal occurred while stationed in Japan, where base access was necessary for daily living. MCCS revoked her base access, placed her on a no entry list, revoked her Common Access Card (CAC), email, phone, and building access—cutting off her ability to obtain medical care, access her children's schools, or manage basic needs. This was done mid-process, before adjudication, in complete disregard of the isolating and precarious nature of overseas assignments.

*3. Denial of Medical Support*

Plaintiff was managing documented disabling medical conditions and caring for a dependent child with ongoing healthcare needs. Following the proposal to

remove, MCCS cut off her access to treatment facilities, including support for her child's care. No alternative arrangements were provided. These denials placed both Plaintiff and her family at severe medical risk during a vulnerable period.

*4. Psychological and Emotional Harm*

The timing and manner of the removal—including during the Thanksgiving and Christmas winter holiday season, when military and civilian suicide risk is highest—exacerbated emotional trauma. Plaintiff was left isolated in a foreign country, stripped of community, security, and identity, without access to fair process or neutral channels to be heard. The emotional toll of this treatment—while serving as a federal employee overseas—was crushing. [16] *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (denial of professional opportunities constitutes adverse action)

*5. Retaliation with Precision*

This was not merely the loss of a job—it was the loss of safety, stability, and dignity. Plaintiff was removed in a manner designed to cause maximum harm: fast-tracked for separation, cut off from communications, surveilled during evidence access, and deprived of the same humanitarian and procedural considerations regularly afforded to similarly situated employees. She was a disabled military veteran that was escorted off the military installation overseas.

Conclusion:

The impact of MCCS's actions extended far beyond policy missteps. They dismantled Plaintiff's career, endangered her family, severed her access to medical care, and inflicted emotional and psychological harm that continues today. These are not the effects of an administrative dispute—they are the outcomes of targeted retaliation.

The removal process occurred during the holiday season—a time when disciplinary actions are typically held in abeyance due to heightened suicide risk among military and civilian members. MCCS's conscious disregard for this long-standing safeguard underscores the cruelty and precision of its actions.

Plaintiff endured these consequences without the benefit of representation, without access to neutral adjudication, and without the safeguards federal law and

---

[16] See, e.g., DoD Instruction 6490.08; SAMHSA National Suicide Prevention Data (2015); MCCS Disciplinary Delay Protocol, institutional standard (known among HR officers)

common decency require. Any fair system of justice must acknowledge this impact, not just as background—but as central evidence of harm, motive, and unlawfulness.

It was an orchestrated effort to inflict maximum professional, emotional, and physical harm at the most vulnerable moment—reflecting not only pretext but deliberate retaliation. These facts must be weighed not in isolation, but as part of a systemic and calculated campaign to remove a protected employee and whistleblower, punish protected activity, and inflict maximum physical, emotional, and professional harm when Plaintiff was most vulnerable. Taken together, the record supports not just pretext, but deliberate institutional retaliation and a systemic failure of duty, oversight, and justice.

# APPENDIX I –
## NEUTRALITY FAILURES & PROCEDURAL VIOLATIONS

This appendix documents MCCS's systemic breakdown in maintaining neutrality and procedural fairness throughout Plaintiff's disciplinary process. Officials directly implicated in Plaintiff's protected disclosures were allowed to shape the investigation, termination recommendation, and final decision—without recusal or oversight—violating core due process protections and Marine Corps policy.

- **Procedural Error #1: Consolidation of Conflicted Roles**
  Carlos Saldana served simultaneously as investigator, recommending official, and self-appointed legal advisor—fundamentally compromising neutrality. Despite having dismissed similar allegations against Plaintiff in 2014, he was reappointed in 2015 to investigate nearly identical issues, indicating an intentional effort to reverse a prior favorable outcome. (Ex. 6, Ex. 10)

- **Procedural Error #2: Impersonation of Legal Authority**
  Saldana misrepresented himself as legal counsel to Col. Boucher, falsely assuring the legality of the action despite lacking any formal legal authority. Boucher later testified he relied on Saldana's assurances when issuing the removal decision. (Ex. 5, Ex. 10)

- **Procedural Error #3: Undisclosed Prejudgment and Retaliatory Motive**
  Saldana advised Iwaniec to terminate Plaintiff just "a few days" after the proposal, bypassing review and confirming pre-judgment. Iwaniec admitted this occurred despite Plaintiff's performance being described as stellar. (Ex. 3, Ex. 6)

  > *I advised the Command to remove her. I didn't look at any formal documents.*
  > — Carlos Saldana, Ex. 6

- **Procedural Error #4: Undisclosed Legal and Factual Influence**
  Carlos Saldana functioned as the de facto legal and factual advisor during Plaintiff's proposed removal. Despite being directly named in Plaintiff's EEO complaint, Saldana privately guided John Iwaniec—the deciding official—on the rationale for termination. Iwaniec later admitted under oath that Saldana recommended removal based on vague criticisms that were never documented, supported by policy, or disclosed to Plaintiff. This undisclosed advisory role by a conflicted actor subverted procedural neutrality and denied Plaintiff meaningful notice and opportunity to respond. Ex. 3.5 at 000456–000457.

- **Procedural Error #5: Unlawful Pre-Decisional Coordination**
  Johnston and Iwaniec confirmed under oath that they discussed Plaintiff's removal with Saldana in advance of the proposal—constituting impermissible ex parte communications. (Ex. 3, Ex. 4, Ex. 6, Ex. 10). These discussions violate *Stone v. FDIC*, 179 F.3d 1368, which bars adversarial actors from influencing adjudications without disclosure.

  Prior to Plaintiff's formal proposal and final decision, MCCS engaged in a pattern of improper coordination:

  1) Iwaniec admitted in deposition that he spoke with Col. Boucher about termination before the appeal had concluded, influencing the decision-making process before all facts were heard.

  2) Johnston and Iwaniec jointly discussed Plaintiff's removal with Saldana before the issuance of any proposal—constituting undisclosed ex parte influence in violation of fundamental fairness.

     These pre-decisional exchanges circumvented procedural safeguards and violated Plaintiff's right to impartial review. *Withrow v. Larkin*, 421 U.S. 35 (1975) (due process is compromised when accusatory and adjudicatory roles overlap).

- **Procedural Error #6: HQ Warnings Ignored**
  Plaintiff's reports to HQ detailed not just policy concerns but explicit threats by Iwaniec, including "people have ways of retaliating" and references to "Iwakuni fatigue." Despite the severity of these warnings, HQ took no action. MCCS not only failed to investigate the threats, it retained Iwaniec in the disciplinary chain—empowering a named retaliator to shape the final outcome. This constitutes not just a procedural defect but a deliberate indifference to retaliation, contrary to Title VII obligations. Ex. 2, Ex. 7.

- **Procedural Error #7: Improper Use of New Evidence**
  Iwaniec admitted to giving Col. Boucher new, post-rebuttal rationale ("leadership deficiencies") never raised in the original proposal or evidence. (Ex. 3.5 at 000461) MCCS submitted a revised Statement of Matters and attachments (Ex. 35) directly to Col. Boucher after Plaintiff's rebuttal, without disclosing them to Plaintiff or providing an opportunity to respond. These undisclosed materials influenced the outcome and were never vetted by the neutral Hearing Officer.

- **Procedural Error #8: Procedurally Invalid Final Decision**
  Col. Boucher issued a removal decision that cited no policy violation, failed to specify sustained charges, and relied on post-rebuttal exhibits (A–O) submitted outside the formal process via Ex. 35. These materials were withheld from Plaintiff—directly violating MCO P12000.11A and NAF Manual § 5011(3). This requires a reasoned decision and written notice of basis and appeal rights. Ex. 37, Appendix D

- **Procedural Error #9: Douglas Factors Abuse**
  Though MCCS claimed the *Douglas* Factors were considered, no documentation supports this. Saldana testified to their use, but the absence of any matrix or written balancing reinforces the arbitrary nature of the penalty. (Ex. 6 at 62:8–63:7; Ex. 10) Saldana admitted he considered the factors but failed to document any analysis or mitigation—rendering the assertion hollow and unreviewable. The absence of any structured review or mitigation analysis reinforces the arbitrary nature of the decision and underscores the procedural defect.

- **Procedural Error #10: Breach of Privacy and Disability Confidentiality**
  Iwaniec admitted sharing Plaintiff's protected medical and accommodation details with Saldana and Manning—neither of whom had any legitimate role in disability accommodation processing. This breached federal disability.

- **Procedural Error #11: Rejection of All Safeguards**
  Despite multiple requests, MCCS imposed no third-party reviewer, failed to separate functions, and denied Plaintiff access to key materials—cementing procedural asymmetry and retaliation. Ex. 2, Ex. 14

- **Procedural Error #12: Ex Parte Communications After Record Closed**
  MCCS submitted new evidence—including a "Statement of Matters" with multiple exhibits—directly to Col. Boucher **five weeks after** the appeal hearing had closed. This submission bypassed the hearing officer, was never shared with Plaintiff, and was relied upon in the final decision.

  > We submitted a Statement of Matters directly to Col. Boucher after the hearing officer closed the file.
  > — Internal correspondence (Ex. 35)

This off-record communication deprived Plaintiff of any opportunity to respond, contradicting D.C. Circuit precedent in *Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir.

1999), which prohibits decisionmakers from relying on undisclosed, post-record materials in employment actions.

- **Procedural Error #13: Endorsement of Removal Before Neutral Review**

**LtCol Manning was formally appointed as legal advisor to the hearing officer assigned to review Plaintiff's removal appeal—despite having already signed the investigative findings that triggered the proposal to remove her.** His endorsement appears in the full IG file dated **30 October 2015**, predating the **10 November 2015** proposal. This structural overlap between the investigation phase and the appeal phase violated Plaintiff's right to neutral review and tainted the fairness of the process.

The hearing officer confirmation email (Ex. 32) explicitly names Manning as legal advisor. The investigative endorsement itself included in the full IG file was never disclosed to Plaintiff until litigation—making it impossible for her to object at the time. Manning's dual role as investigator-endorser and appeal advisor conflicts with the due process standard requiring **"an impartial tribunal"** as articulated in *Withrow v. Larkin*, 421 U.S. 35 (1975), and affirmed in *Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999).

LtCol Scott Manning—assigned as the neutral legal advisor for Plaintiff's administrative appeal—had already reviewed and formally endorsed the underlying investigation's conclusions **prior to the issuance of the removal proposal**. His legal sufficiency review, signed on **30 October 2015**, predates the 10 November 2015 removal proposal and reflects a pre-decisional endorsement of the adverse findings.

> *"Based on that review I find that the preponderance of the evidence supports the conclusions of this investigation."*
> — LtCol S.D. Manning, Legal Sufficiency Review, 30 Oct 2015

This document was **never disclosed to Plaintiff** during the administrative process and was **not included in the 220-page IG Report** submitted as Exhibit 9. Plaintiff was unaware of its existence and had no opportunity to object to Manning's conflict.

The document only surfaced in **2024**, nearly a decade later, when MCCS produced the full **392+ page version** of the IG file during litigation. This

expanded version contained 36 additional enclosures, including Manning's review. MCCS had previously represented that the 220-page version was complete, further compounding the due process violation.

Manning's dual role—first as an early endorser of the investigation, and later as a "neutral" advisor on appeal—was never disclosed, violating the fundamental fairness requirements articulated in *Withrow v. Larkin*, 421 U.S. 35 (1975), and raising an unrebutted presumption of bias.

This defect is not technical—it is structural. The presence of a previously involved actor in an advisory capacity at the appeal stage nullifies the neutrality of the proceedings and warrants reversal.

- **Procedural Error #14: Suppression of the Full IG Record**

  At each stage of the disciplinary process, MCCS withheld critical portions of the IG investigation—denying Plaintiff a fair opportunity to respond or defend against its findings.[17]

  1) A **redacted version** was given to Plaintiff only **after the removal was proposed**, and without any enclosures.

  2) A **partial 220-page version** was later referenced in the administrative appeal, but was disclosed only **after termination**.

  3) The full **392-page IG file**, which included 36 enclosures and LtCol Manning's legal sufficiency review, was **withheld entirely until litigation in 2024— nearly a decade later**.

     > *"Based on that review I find that the preponderance of the evidence supports the conclusions of this investigation."*
     > — LtCol S.D. Manning, Legal Sufficiency Review, dated 30 Oct 2015 (disclosed 2024)

  MCCS previously represented that the 220-page version was complete (Ex. 9). The concealment of the final IG report, combined with MCCS's shifting justifications and failure to cite a single specific violation of policy, denied Plaintiff

---

[17] This complete IG file was not part of the administrative record and does not appear in Exhibits 9 or 14. It was produced only under discovery obligations in related litigation (2024).

procedural due process under *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) and *Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999).

### Legal Consequences

The legal consequences of these violations are not academic—they strike at the foundation of due process and administrative legitimacy. MCCS violated numerous procedural mandates, including:

- **MCO P12000.11A** ¶ 5011(3)(a)(1)–(2), which requires objective and impartial adjudication;
- The separation-of-function principles outlined in **Withrow v. Larkin**, 421 U.S. 35 (1975);
- The prohibition on reliance on undisclosed, ex parte evidence under **Stone v. FDIC**, 179 F.3d 1368 (Fed. Cir. 1999); and
- The due process guarantees established in **Cleveland Bd. of Educ. v. Loudermill**, 470 U.S. 532 (1985), which entitle employees to notice and a meaningful opportunity to respond.

MCCS's use of **secret post-record submissions**, **conflicted legal advisors**, and the **late suppression of critical evidence** deprived Plaintiff of any fair process. These are not harmless errors—they are structural violations that irreparably tainted the administrative outcome.

**Reversal is compelled** not just by the factual record, but by the government's failure to preserve the constitutional and regulatory safeguards due to all employees— especially where protected activity, disability rights, and retaliatory motive converge.

# APPENDIX J –
# RETALIATION FALLOUT SUMMARY

This appendix summarizes the specific and legally significant consequences stemming directly from MCCS's retaliatory conduct—consequences that severely undermined Plaintiff's employment prospects, health, and security.

These harms are not speculative. They are documented, causally connected to MCCS's actions, and relevant to this Court's review under controlling precedent. *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (retaliation includes adverse professional harm), and *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–70 (2006).

## 1. Termination Under Isolation and Without Safeguards

MCCS removed Plaintiff while she was stationed overseas during a high-risk mental health period (Nov–Dec), revoked her base access, CAC card, email, and government phone, and cut off access to medical and school services for her dependents—all prior to a final decision. No procedural pause or hardship consideration was afforded, in violation of established federal practices regarding discipline near the holidays.

MCCS's failure to pause disciplinary action during the holiday season violated a long-standing awareness of suicide risk during this time, further exacerbating Plaintiff's distress. Research from SAMHSA and DoD guidance indicates this period (November–January) presents heightened risk for suicidal ideation among military-affiliated personnel, and disciplinary action is typically held in abeyance when feasible. [18]

---

[18] *As Chief of Human Resources, Plaintiff was not only aware but responsible for implementing the longstanding institutional practice across MCCS commands of pausing disciplinary actions during the holiday season. This policy was rooted in agency-wide recognition of heightened suicide and mental health risks among both military and civilian employees during this time. It was not discretionary—it was ingrained in operational leadership culture, routinely reinforced by HR leadership briefs, safety stand-downs, and annual DoD policy reviews.*

### 2. Medical Hardship

Despite acknowledging Plaintiff's disability and previously approving accommodations, MCCS severed her access to all base medical care during this period. No alternative was offered. This compounded harm and risk, particularly given her then-active disabling conditions.

In addition to revoking Plaintiff's medical access while overseas, MCCS violated Plaintiff's privacy by improperly disclosing her disability and accommodation request to individuals with no lawful role in handling such matters. These actions exacerbated Plaintiff's distress and further contributed to a hostile environment where confidential health information was mishandled in retaliation for protected activity. Ex. 3 at 60:4–64:21

### 3. Job Offers Rescinded Due to MCCS Communications

Following removal, MCCS circulated disputed records and incomplete information during background investigations. The Department of Justice (DOJ), Navy, BEP, and Department of Commerce rescinded offers citing "suitability concerns," despite Plaintiff's cleared security status and eligibility. MCCS's communications materially interfered with Plaintiff's reemployment.

### 4. Plaintiff's home was targeted for involuntary clearance before any appeal decision

Just days after the removal was issued and before any formal adjudication of Plaintiff's appeal by Col. Boucher, MCCS official Ms. Devine threatened to send movers to Plaintiff's home to remove her belongings. This coercive action—without finality or due process—had **never been applied to any other employee under similar circumstances** and reflected **a retaliatory disregard for Plaintiff's rights, safety, and dignity**. Ex. 2 at 373 -377, Ex. 2.5 at 176:3 – 177:11

---

*MCCS's decision to terminate Plaintiff during this high-risk window—while she was isolated overseas with a documented disability—was not only cruel but a deliberate and unprecedented departure from that institutional safeguard. This decision inflicted maximum psychological and physical harm. The agency's failure to produce requested disciplinary data in discovery—which would have confirmed consistent application of this practice to others—only underscores the selective enforcement and* confirms *finding of retaliatory motive.*

*See* U.S. Department of Defense Suicide Event Reports (DoDSER), *Annual Reports 2012–2015;* SAMHSA "Holiday Stress & Mental Health" Public Guidance, 2014–2016.

## 5. Conflicting Internal vs. External Communications

Despite a positive DOJ reference issued by MCCS after termination (stating Plaintiff's suitability for federal employment), internal communications continued to reference the disputed basis for removal. These contradictions were never corrected and were relied upon in subsequent background checks.

## 6. Severe Housing Instability

Plaintiff's abrupt overseas removal left her without housing, and because most U.S. landlords required active federal employment for lease approval, she was repeatedly denied. This risked homelessness for her and her children during the peak holiday shutdown period, when housing was unavailable—even in emergency contexts.

## 7. Career Stigma and Lasting Harm

The mischaracterizations in MCCS's communications—combined with its silence in correction—created a lasting and self-perpetuating stigma. No federal agency identified misconduct, yet Plaintiff was repeatedly deemed unsuitable solely due to MCCS's omissions or misleading disclosures.

## 8. Emotional and Physical Toll

These events inflicted profound emotional, psychological, and physiological harm. Plaintiff, managing chronic medical conditions and disability, was left without care, isolated from her community, and denied any access to recourse while abroad. Her condition deteriorated as a direct result of MCCS's actions.

Legal Significance:

This Court need not relitigate Plaintiff's removal to find reversible error. The fallout demonstrates MCCS's retaliatory actions produced *real, adverse employment consequences*—the core inquiry under federal retaliation precedent.

These outcomes underscore not only harm, but the foreseeability and intent behind MCCS's actions. No good-faith procedural error explains the scope of damage inflicted.

This was not merely a failure of process; it was a calculated action to inflict maximum harm and stands in direct conflict with both federal law and moral duty of care.

This appendix presents **undisputed evidence** that Plaintiff contemporaneously notified MCCS leadership of **retaliation, religious discrimination,** and related misconduct prior to her termination. Her written appeal to Director John Iwaniec **predated any final agency decision** and satisfies the protected activity prong under **Title VII** and the **Rehabilitation Act**.

This notice was submitted as part of the official record in the **Report of Investigation (ROI), Exhibit 14, pp. 000056–000062**.

The record reflects Plaintiff's **direct internal appeal** explicitly alleging discriminatory bias and retaliation—including:

- **Religious bias** by decision-makers and investigators sharing overlapping religious affiliations;

- **Exclusion from protections** extended to others of different religious or racial backgrounds;

- **Direct conflict of interest** involving Carlos Saldana, who she previously named in formal EEO complaints;

- **Escalating retaliatory actions**, including derogatory remarks, performance downgrades, and improper personnel actions;

- **Procedural irregularities** including lack of neutral oversight and refusal to acknowledge medical documentation;

- **A workplace climate** hostile to her identity as a **disabled Black woman and religious minority**;

> *"I believe my termination is being pursued not for legitimate performance concerns, but because I reported harassment and religious discrimination. My superiors share the same faith and have treated me differently as a result."*
> — Plaintiff's appeal to Iwaniec, Ex. 14 at 000056–000057

In addition to formal appeals, Plaintiff contemporaneously informed HQ official Dennis Ray of the retaliatory and discriminatory treatment via direct

Facebook messages (Ex. 22). These communications occurred in real time during the proposal and removal process and documented Plaintiff's objections, procedural concerns, and emotional distress. Mr. Ray acknowledged the issues raised, reflecting that MCCS leadership had actual knowledge of ongoing retaliation and failed to intervene. This real-time evidence further corroborates Plaintiff's internal reports and supports the retaliation timeline.

She also described the **cumulative effect** of this treatment as **targeted retaliation** in response to protected disclosures.

Despite the clarity of this complaint, MCCS:

- Took no corrective or investigative action;
- Allowed named officials (including Iwaniec and Saldana) to retain decision-making authority;
- Failed to document, assess, or address the substance of her allegations;
- Proceeded with her termination without acknowledging the claims of religious bias.

This contemporaneous, sworn notice is legally significant. It satisfies the protected activity standard under *Broderick v. Donaldson*, 437 F.3d 1226 (D.C. Cir. 2006), which held that internal complaints of discrimination trigger statutory protection—even where not filed as formal EEO charges. MCCS's receipt of this notice **establishes actual knowledge** of protected conduct and forecloses any claim of insufficient notice or causality gap.

Plaintiff submitted this rebuttal during the disciplinary process. It appears in MCCS's own ROI (**Ex. 14, pp. 000056–000062**) and has never been contested for authenticity or substance. Its presence in the record affirms that Plaintiff raised concerns about retaliation and discrimination **clearly, contemporaneously, and in writing**—well before her removal.

Finally, this document underscores that MCCS's actions were not just flawed—they were retaliatory, biased, and in deliberate violation of clearly established rights. The District Court's failure to weigh this critical evidence was error. MCCS's inaction, in the face of direct notice, undermines any claim of neutrality or lawful process.

### Legal Consequences

Plaintiff's internal appeal to Director Iwaniec constitutes **protected activity** under **Title VII** and the **Rehabilitation Act**. She explicitly alleged

retaliation and discrimination prior to her termination. While the District Court declined to advance separate hostile work environment or accommodation claims, the **timing and substance** of this notice remain central to her retaliation theory. MCCS had actual notice of her protected conduct and moved forward with termination shortly thereafter. That causal connection is sufficient to preclude summary judgment and warrants reversal.

## APPENDIX L –
## DOCKET REFERENCE TABLE AND EVIDENTIARY SUMMARY

This appendix provides a complete cross-reference between the exhibit numbers cited throughout the Appellant's Brief and their corresponding docket (ECF) numbers in the District Court record. Given the centrality of documentary evidence to Plaintiff's claims of retaliation, denial of due process, and shifting justifications, this table is provided to facilitate accurate review and reinforce the evidentiary foundation of each argument.

These exhibits are also referenced throughout the brief and Appendix Summaries (A–K), which synthesize their legal impact in context.

**Legal Framework Supporting Exhibit-Based Claims**

The evidentiary and procedural violations established by these exhibits are supported by binding precedent requiring neutral review, complete record disclosure, and protection from retaliatory action. These principles are grounded in:

• *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)
• *Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999)
• *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008)
• *Withrow v. Larkin*, 421 U.S. 35 (1975)
• *Broderick v. Donaldson*, 437 F.3d 1226 (D.C. Cir. 2006)

These precedents collectively bar ex parte submissions, evolving justifications, denial of procedural protections, and retaliatory actions—each of which is documented in the exhibits and appendices cited. Their cumulative effect rendered the proceedings fundamentally unfair and warrants reversal of the District Court's decision.

**Foundational Exhibits Highlighted for Review**
    •     **Ex. 9** (ECF 65-45): Partial 220-page IG Report disclosed post-proposal. MCCS relied on the full 392+ page version, withheld until litigation—9 years post-termination. *Undermines due process and violates the full-record review requirement under Stone v. FDIC.*
    •     **Ex. 10** (ECF 65-12): Plaintiff's formal rebuttal and appeal alleging retaliation and procedural failure. Submitted before removal and ignored by MCCS. *Constitutes protected activity under Broderick v. Donaldson.*
    •     **Ex. 14** (ECF 65-16): ROI file submitted by MCCS and relied on in the removal process. Omitted Plaintiff's rebuttal and key witness contradictions, while

embedding disputed characterizations without challenge. *Illustrates improper reliance on an incomplete and biased record, in violation of neutral review standards under Stone and Brady.*

•　　**Ex. 2.5** (ECF 65-3): Plaintiff's sworn deposition detailing timeline of protected disclosures, retaliatory downgrade, and denial of accommodations. *Supports causal inference and pretext under Brady v. Office of Sergeant at Arms.*

•　　**Ex. 5** (ECF 65-8): Col. Boucher's deposition. Admitted reliance on undisclosed materials post-record closure and no independent factual review. *Violates neutral adjudicator and independent judgment standards under Withrow v. Larkin.*

•　　**Ex. 37** (ECF 65-40): Final removal decision omits findings, legal reasoning, or reference to the hearing officer report. *Confirms structural due process violation under Loudermill* and *Stone.*

Notably, several exhibits—including the full 392-page IG Report—were withheld from Plaintiff until years later through litigation, undermining any claim of complete record review.

**Full Exhibit Cross-Reference Table**

| Exhibit | ECF No. | Description |
|---|---|---|
| Ex. 1 | ECF 65-1 | 2019 "Outstanding" Performance Evaluation |
| Ex. 2 | ECF 65-2 | Plaintiff's Chronological Declaration |
| Ex. 2.5 | ECF 65-3 | Plaintiff's Deposition Testimony |
| Ex. 3 | ECF 65-4 | Iwaniec Deposition (Bias & Conflict) |
| Ex. 3.5 | ECF 65-5 | DOJ Reference Supporting Plaintiff |
| Ex. 3.6 | ECF 65-6 | Iwaniec Declaration (March 2016, Post-Termination)* |
| Ex. 4 | ECF 65-7 | Johnston Deposition – Retaliatory |

| | | Performance Downgrade, Missed Evaluation Window** |
|---|---|---|
| Ex. 5 | ECF 65-8 | Boucher Deposition – Relied on Undisclosed Material, No Independent Review |
| Ex. 6 | ECF 65-9 | Saldana Deposition – Admitted Proposing Termination Without Evidence, Despite Conflict and Prior EEO Involvement |
| Ex. 7 | ECF 65-10 | Ray Statement – Corroborated Retaliation and Procedural Irregularities Ignored by MCCS |
| Ex. 9 | ECF 65-45 | Partial IG Report; 392+ Pages Withheld Until Litigation |
| Ex. 10 | ECF 65-12 | Formal Appeal – Retaliation Allegations & Procedural Challenges |
| Ex. 13 | ECF 65-15 | Niedwiescki Letter – Minor Discipline for Comparator |
| Ex. 14 | ECF 65-16 | ROI – MCCS's Key Investigation File |
| Ex. 14.1 | ECF 65-17 | Gardiner Letter – Comparator Discipline Was Specific and Substantiated *** |
| Ex. 15 | ECF 65-18 | Holsopple Letter – Minor Discipline for Comparator |
| Ex. 18 | ECF 65-21 | Plaintiff's Motion to Amend Complaint |

| | | |
|---|---|---|
| Ex. 19 | ECF 65-22 | Staff Meeting Notes – Plaintiff Disclosed Recusal |
| Ex. 20 | ECF 65-23 | Tashema Haynes Declaration – MCCS Insider Corroborated Retaliation and Bias |
| Ex. 21 | ECF 65-24 | EEO Complaint – Formal Allegations of Retaliation, Discrimination, and Due Process Violations |
| Ex. 22 | ECF 65-25 | Contemporaneous Facebook Messages with HQ Official Detailing Real-Time Retaliatory Impact, Procedural Breakdown, and Management Admissions Pre-Termination |
| Ex. 23 | ECF 65-26 | Formal Request During Proposal – MCCS Ignored Plaintiff's Timely Demand for Legal Citations and Evidence |
| Ex. 24 | ECF 65-27 | Email Record Detailing Denied Access to Evidence & Proposed Settlement During Appeal |
| Ex. 25 | ECF 65-28 | Settlement Email Chain – MCCS Offered Coercive Terms While Withholding Evidence |
| Ex. 26 | ECF 65-29 | Disparate Settlement – MCCS Offered Inferior Terms Compared to |

| | | |
|---|---|---|
| | | Similarly Situated Employees |
| Ex. 27 | ECF 65-30 | HR Warning of Unequal Discipline— MCCS Ignored Internal Alert |
| Ex. 28 | ECF 65-31 | MCCS Proposal to Terminate |
| Ex. 29 | ECF 65-32 | Investigator Pressured HQ After-the-Fact Using Omitted Policy to Frame Misconduct |
| Ex. 32 | ECF 65-35 | Hearing Officer Email – Manning Named Legal Advisor Despite Prior Endorsement of Termination Investigation |
| Ex. 33 | ECF 65-36 | Original MCCS "Statement of Matters" Sent to Hearing Officer |
| Ex. 34 | ECF 65-37 | Plaintiff's Rebuttal to MCCS's Original Statement of Matters Submission |
| Ex. 35 | ECF 65-38 | MCCS's Final "Statement of Matters" Sent Only to Boucher, the Deciding Official— Distorts Record Post-Rebuttal and Bypasses Neutral Review |
| Ex. 37 | ECF 65-40 | Final Decision by Col. Boucher—No Legal Analysis, Relied on Post-Record Materials Without Plaintiff Access or Rebuttal |
| Ex. 38 | ECF 65-41 | EEO Complaint – Protected Class |

| | | Discrimination & Retaliation Filing |
|---|---|---|
| Ex. 41 | ECF 65-44 | False Federal Reference – MCCS Misrepresented Plaintiff's Performance Post-Termination |
| — | ECF 56 | Plaintiff's Opposition to Defendant's Motion for Extension – Never Ruled Upon Before Record Closed |
| — | ECF 65 | Plaintiff's Opposition to Summary Judgment |
| — | ECF 65-46 | Plaintiff's Statement of Genuine Disputes – Response to MCCS's Undisputed Facts |

See detailed analysis of Ex. 3.6, Ex. 4, Ex. 14.1 below.

Collectively, these exhibits do more than document procedural irregularities—they establish a clear and unrebutted pattern of retaliatory motive, discriminatory animus, and systemic denial of fair process. MCCS's justifications were not only inconsistent, but timed to follow Plaintiff's protected disclosures, disability-related requests, and EEO activity. That causal sequence—paired with undisclosed evidence, conflicted decisionmakers, and pretextual reasoning—satisfies the standard for reversal under Title VII, the Rehabilitation Act, and controlling D.C. Circuit authority.

**\* Note on Ex. 3.6:** This declaration, dated March 6, 2016, was **submitted by Director John Iwaniec after Plaintiff's termination was finalized and directly to Col. Boucher** as part of MCCS's "Statement of Matters." It was one of the enclosures Boucher relied upon during the appeal process—**after the official record had closed** and **without notice or disclosure to Plaintiff** —constituting a clear *ex parte* submission and violation of due process. This material was not part of the administrative record, not subject to adversarial review, and never presented before the neutral hearing officer.

**The submission of this document directly to the final decisionmaker—outside of Plaintiff's knowledge—constitutes an ex parte communication** in violation of due process. It is cited among the March 14 enclosures referenced in Ex. 37 (Final Decision, 21 Mar 2016; Ref: J - "MCCS Response to Appeal of 14 Mar 16" (Ex. 35), and formed part of the record used by Col. Boucher to deny Plaintiff's appeal.

Key issues from the declaration include:

• **Line #5**: Iwaniec admits he conferred with Johnston before initiating the proposal to remove—coordinating with another actor who held direct prior involvement, in a manner Plaintiff could neither contest nor rebut.

• **Line #11**: He retroactively reframes the so-called "six-month rule" as misconduct. Yet the IG Report includes no mention of this issue, and the actions in question were carried out under then-valid HQ guidance. This reasoning—introduced only after removal—mischaracterizes conduct MCCS had previously accepted and exposes the reliance on **new, post hoc allegations** outside the evidentiary record.

• **Line #13**: Iwaniec confirms he discussed the removal decision directly with Saldana and considered information not included in the IG file. This represents **inappropriate, off-record influence** that directly undermines the requirement for a neutral process.

• **Lines #14–15**: He offers internally conflicting statements. First, he claims not to recall whether Plaintiff informed him of her decision to recuse from matters involving her husband and brother. Then, in the very next sentence, he assumes she did—and asserts that it wouldn't have mattered. This inconsistency further undermines his credibility and the fairness of the adjudicative process.

**This declaration not only reflects retroactive justification—it was also used to influence the outcome of the appeal without Plaintiff's knowledge or a chance to respond.** That structure violates the core due process protections articulated in *Stone v. FDIC*, *Withrow v. Larkin*, *Brady v. Office of Sergeant at Arms*, and *Cleveland Bd. of Educ. v. Loudermill*. The impact is not harmless: **Boucher's final decision (Ex. 37) relied on this and other undisclosed materials**, bypassing neutral review and functionally nullifying Plaintiff's right to a fair appeal.

** <u>Note on Ex. 4:</u> MCCS's stated performance concerns were contradicted by internal testimony showing the actions were driven by retaliation, not merit. Johnston admitted the performance improvement plan was triggered by internal HR

investigations—not by Plaintiff's actual performance. He also acknowledged a 30-day grace period for mid-year evaluations, which MCCS exceeded in her case, contradicting claims of timely and fair appraisal. These statements directly support Plaintiff's retaliation argument and reveal procedural manipulation tied to protected activity.

     \*\*\* **<u>Note on Ex. 14.1</u>:** Unlike Plaintiff, comparator Gardiner received a written summary clearly identifying which actions supported the alleged charge, demonstrating procedural consistency and specificity. In Plaintiff's case, MCCS failed to cite any clear policy violation or articulate how her conduct supported the stated charges—reinforcing the inconsistency and retaliatory treatment in violation of due process.