# United States Court of Appeals for the District of Columbia Circuit

JAWAN N. TARQUINII,

*Plaintiff-Appellant*,

v.

JOHN PHELAN, SECRETARY, US DEPARTMENT OF THE NAVY,

*Defendant-Appellee*,

BEN HARRIS,

*Court-Appointed Amicus Curiae in Support of Appellant.*

On Appeal from the United States District Court for the District of Columbia, No. 1:21-cv-01567-RC (Hon. Rudolph Contreras)

## OPENING BRIEF OF COURT-APPOINTED AMICUS CURIAE IN SUPPORT OF APPELLANT

Roman Martinez
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

July 9, 2025

Ben Harris
  *Counsel of Record*
Alexandra Mary O'Keefe
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
ben.harris@lw.com
alexandra.okeefe@lw.com

*Court-Appointed Amicus Curiae in Support of Appellant*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A. Parties and Amici

Appellant Jawan N. Tarquinii was plaintiff in the case below.

John Phelan, Secretary, United States Department of the Navy is Appellee in this appeal.

Appellee Carlos Del Toro, Secretary, United States Department of the Navy was terminated in this appeal.

Thomas W. Harker, Acting Secretary, United States Department of the Navy was defendant in the case below.

Ben Harris is Court-Appointed Amicus Curiae in support of Appellant in this appeal.

There were no other parties, intervenors, or amici before the district court, and no amici have appeared in this Court.

## B. Ruling Under Review

The final judgment under review are the Order and Memorandum Opinion Granting Defendant's Motion for Summary Judgment (Sept. 26, 2024), JA1986-2040.

**C. Related Cases**

This case has not been previously before this Court.

/s/ Ben Harris
Ben Harris

*Court-Appointed Amicus Curiae*
*in Support of Appellant*

**TABLE OF CONTENTS**

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

TABLE OF AUTHORITIES ........................................................................v

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION...........................................................4

ISSUES PRESENTED................................................................................4

STATEMENT OF THE CASE....................................................................5

      A.      Factual Background.................................................................5

      B.      Tarquinii's Allegations Of Discrimination ...........................10

      C.      Title VII And The District Court's Order Granting Summary
           Judgment .............................................................................11

STANDARD OF REVIEW .......................................................................15

SUMMARY OF ARGUMENT .................................................................16

ARGUMENT .............................................................................................19

I.     THE RECORD EVIDENCE SUPPORTS A MOTIVATING
      FACTOR THEORY OF LIABILITY UNDER TITLE VII..........................19

      A.      Title VII Recognizes A Motivating Factor Theory Of Liability,
           To Which The Traditional *McDonnell Douglas* Framework
           Does Not Apply.....................................................................20

      B.      The Record Evidence Supports A Motivating Factor Theory Of
           Discrimination.....................................................................27

           1.     The Record Evidence Shows That Tarquinii's
                Supervisors Harbored Discriminatory Animus ......28

           2.     A Reasonable Jury Could Conclude That Discriminatory
                Animus "Motivated" Tarquinii's Termination ........31

C. The District Court's Failure To Consider A Motivating Factor Theory Warrants Reversal..................................................36

II. THE DISTRICT COURT'S BUT-FOR DISCRIMINATION AND RETALIATION ANALYSIS WAS FLAWED ..............................................40

A. The District Court Imposed A Standard Inconsistent With Title VII's Text ...................................................................41

B. The District Court Wrongly Discounted Discriminatory Comments And Actions By The Relevant Decisionmakers ...............46

CONCLUSION ...................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ajisefinni v. KPMG LLP,*
17 F. Supp. 3d 28 (D.D.C. 2014)........................................................51

*Aka v. Washington Hospital Center,*
156 F.3d 1284 (D.C. Cir. 1998)..............................................44, 47, 52

*Ames v. Ohio Department of Youth Services,*
605 U.S. __, 145 S. Ct. 1540 (2025).....................................12, 22, 46

*Babb v. Wilkie,*
589 U.S. 399 (2020)..............................................................................31

*Baloch v. Kempthorne,*
550 F.3d 1191 (D.C. Cir. 2008).............................................................20

*\* Bart v. Golub Corp.,*
96 F.4th 566 (2d Cir. 2024) ...............................12, 17, 21, 26, 33-36, 38, 41-42

*\* Bostock v. Clayton County,*
590 U.S. 644 (2020)...............3, 11-12, 16, 18, 20, 22-23, 27, 37, 40-41, 45-46

*Brady v. Office of the Sergeant at Arms,*
520 F.3d 490 (D.C. Cir. 2008)...............................................................44

*Breiterman v. United States Capitol Police,*
15 F.4th 1166 (D.C. Cir. 2021)...............................................................15

*Brown v. District of Columbia,*
798 F. App'x 677 (D.C. Cir. 2020)..........................................................42

*DeJesus v. WP Co.,*
841 F.3d 527 (D.C. Cir. 2016).........................................................30, 32

*Desert Palace, Inc. v. Costa,*
539 U.S. 90 (2003)................................................................................23

\* Authorities upon which *amicus* chiefly relies are marked with asterisks.

*Diamond v. Colonial Life & Accident Insurance Co.*,
416 F.3d 310 (4th Cir. 2005) ......................................................................25

*Dominguez-Curry v. Nevada Transportation Department*,
424 F.3d 1027 (9th Cir. 2005) ....................................................................36

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
104 F.4th 287 (D.C. Cir. 2024) ...................................................................41

*Elliott v. Acosta*,
291 F. Supp. 3d 50 (D.D.C. 2018) ...............................................................53

*Ercegovich v. Goodyear Tire & Rubber Co.*,
154 F.3d 344 (6th Cir. 1998) ......................................................................32

*Fogg v. Gonzalez*,
492 F.3d 447 (D.C. Cir. 2007) ..............................................................21, 26

*Ginger v. District of Columbia*,
527 F.3d 1340 (D.C. Cir. 2008) ............................................................23, 42

*Gray v. Poole*,
275 F.3d 1113 (D.C. Cir. 2002) ..................................................................39

*Gross v. FBL Financial Services, Inc.*,
557 U.S. 167 (2009) .....................................................................................35

*Haughton v. District of Columbia*,
819 F. App'x 1 (D.C. Cir. 2020) ..................................................................43

*Henry v. Wyeth Pharmaceuticals, Inc.*,
616 F.3d 134 (2d Cir. 2010) ........................................................................47

*Holcomb v. Powell*,
433 F.3d 889 (D.C. Cir. 2006) .....................................................................47

*Hudson v. American Federation of Government Employees*,
No. 21-7133, 2022 WL 15798719 (D.C. Cir. Oct. 28, 2022)......................42

*International Brotherhood of Teamsters v. United States*,
431 U.S. 324 (1977)......................................................................................28

*Iyoha v. Architect of the Capitol,*
 927 F.3d 561 (D.C. Cir. 2019)................................................................48

*Jackson v. Office of the Mayor of the District of Columbia,*
 911 F.3d 1167 (D.C. Cir. 2018)...........................................................39

*Kersey v. Washington Metropolitan Area Transit Authority,*
 586 F.3d 13 (D.C. Cir. 2009)...............................................................47

*Khan v. Holder,*
 37 F. Supp. 3d 213 (D.D.C. 2014).......................................................53

*King v. Aramark Services Inc.,*
 96 F.4th 546 (2d Cir. 2024) ....................................................28, 29, 30

*Lopez v. Postal Regulatory Commission,*
 709 F. App'x 13 (D.C. Cir. 2017).........................................................39

*Makky v. Chertoff,*
 541 F.3d 205 (3d Cir. 2008) ................................................................35

\* *Mayorga v. Merdon,*
 928 F.3d 84 (D.C. Cir. 2019).................................. 21, 24, 27, 37, 42-43, 48

*McDonnell Douglas Corp. v. Green,*
 411 U.S. 792 (1973)...........................................................12, 18, 24, 45

*McGinest v. GTE Service Corp.,*
 360 F.3d 1103 (9th Cir. 2004) .............................................................25

*Meritor Savings Bank, FSB v. Vinson,*
 477 U.S. 57 (1986)..........................................................................28, 30

*Miller v. Time-Warner Communications, Inc.,*
 No. 97 Civ. 7286, 1999 WL 440781 (S.D.N.Y. June 29, 1999) ........................51

\* *Morris v. McCarthy,*
 825 F.3d 658 (D.C. Cir. 2016).......................................32-33, 35, 48, 50-51, 53

\* *Ponce v. Billington,*
 679 F.3d 840 (D.C. Cir. 2012) .................2, 11-12, 16, 20-23, 26, 31, 37, 38, 42

*Potter v. District of Columbia,*
  126 F.4th 720 (D.C. Cir. 2025)..................................................................46

*Price Waterhouse v. Hopkins,*
  490 U.S. 228 (1989)................................................................21, 27, 38

*Quigg v. Thomas County School District,*
  814 F.3d 1227 (11th Cir. 2016) ..................................................24, 25

\* *Rachid v. Jack in the Box, Inc.,*
  376 F.3d 305 (5th Cir. 2004) ........................................25, 34, 35, 36

*Richardson v. United States,*
  193 F.3d 545 (D.C. Cir. 1999)................................................................38

*Rose v. New York City Board of Education,*
  257 F.3d 156 (2d Cir. 2001) ........................................................23, 36

*Ryder v. Westinghouse Electric Corp.,*
  128 F.3d 128 (3d Cir. 1997) ................................................................47

*Schnitzler v. United States,*
  761 F.3d 33 (D.C. Cir. 2014)................................................................39

*Smith v. Xerox Corp.,*
  602 F.3d 320 (5th Cir. 2010) ................................................................38

*Stegall v. Citadel Broadcasting Co.,*
  350 F.3d 1061 (9th Cir. 2003)................................................................38

*Stoe v. Barr,*
  960 F.3d 627 (D.C. Cir. 2020)................................................................28

*Texas Department of Community Affairs v. Burdine,*
  450 U.S. 248 (1981)........................................................................45, 46

*United States v. Sellers,*
  906 F.3d 848 (9th Cir. 2018) ................................................................46

*Walker v. Johnson,*
  798 F.3d 1085 (D.C. Cir. 2015)........................................................30, 31, 45

*Wheeler v. Georgetown University Hospital,*
    812 F.3d 1109 (D.C. Cir. 2016) .................................................................15, 30

*White v. Baxter Healthcare Corp.,*
    533 F.3d 381 (6th Cir. 2008) ....................................................................25, 26

\* *Yelling v. St. Vincent's Health System,*
    82 F.4th 1329 (11th Cir. 2023) ...............................17, 23, 31, 35, 42

## STATUTES

28 U.S.C. § 1291 ..............................................................................................4

28 U.S.C. § 1331 ..............................................................................................4

42 U.S.C. § 2000e-2(a) ........................................................2, 16, 18, 20, 22, 40

42 U.S.C. § 2000e-2(a)(1) ............................................................11, 20, 22, 41

42 U.S.C. § 2000e-2(m) ...............................2, 11, 16-17, 21-22, 24, 27, 36

42 U.S.C. § 2000e-5(g)(2)(B) .....................................................................23

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) ......................................................................................15

# INTRODUCTION

This case concerns the proper application of the summary judgment standard to evaluate discrimination claims under Title VII. Appellant Jawan Tarquinii is a Black woman who worked for the United States Navy as the Chief of Human Resources at the Marine Corps Air Station in Iwakuni, Japan. Throughout her employment, from 2013 to 2015, Tarquinii's supervisors subjected her to an unrelenting course of discrimination based on both her sex and her race. They repeatedly referred to "that time of month," asked her to be less "emotional" following accusations that she was "bossy," and treated her as inferior to her male, white colleagues. One supervisor indulged in sexual innuendos, prodded Tarquinii to lose weight, and discussed his prior experience dating Black women. Although Tarquinii repeatedly asked her supervisors to stop—expressly telling them that their behavior was inappropriate and discriminatory—they refused.

In mid-2015, an investigation showed that Tarquinii had improperly influenced the hiring of her husband and her brother at the Air Station. After receiving the investigative report in November 2015, both of Tarquinii's supervisors made the decision to terminate her employment. The sex-based and race-based comments and treatment Tarquinii endured at Iwakuni continued up to her termination in November 2015.

1

Tarquinii sued under Title VII, alleging that her supervisors had terminated her for discriminatory and retaliatory reasons. She set forth record evidence documenting the extensive mistreatment she experienced at Iwakuni, including the derogatory comments, disparate treatment, and sexually harassing conduct by her supervisors that continued up to her termination in November 2015. But the district court granted summary judgment to the Navy, finding that the Navy had proffered a nondiscriminatory rationale for its decision and that Tarquinii had failed to show that "the real reason" for her termination was discrimination. JA2007.

The district court's decision was flawed in two fundamental ways. First, the court ignored ample record evidence substantiating a motivating factor theory of discrimination. Title VII allows a plaintiff to establish liability *either* by showing that discrimination was a but-for cause of an adverse employment action, *or* by showing that discrimination was a motivating factor animating such an action. *See* 42 U.S.C. § 2000e-2(a), (m); *Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012). The latter route does not require a plaintiff to show that discrimination was the but-for cause of an adverse employment action. Where, as here, a reasonable jury can conclude that discriminatory animus played a part in motivating an adverse employment decision, Title VII imposes liability. The district court failed to consider whether the record could support such a claim. And the evidence supports a motivating factor theory of discrimination.

Second, the district court misunderstood the legal standard in evaluating Tarquinii's claim that discrimination was the but-for cause of her termination. As the district court saw it, it fell on Tarquinii to show that discriminatory animus was "the real reason" for the Navy's decision to terminate her employment. JA2007. That standard is too exacting: Title VII requires only that a plaintiff show that discrimination is *one* but-for cause of an adverse employment action, not that it is "the real reason" for an employer's decision. *See Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). By failing even to recognize that Title VII's but-for causation standard recognizes the possibility of multiple but-for causes, the district court imposed too high a standard at summary judgment.

Even under the district court's erroneous test, the court wrongly discounted the ample record evidence establishing discriminatory pretext, reasoning that the sex-based and race-based mistreatment and comments by Tarquinii's supervisors were too attenuated from the adverse employment action. As the court saw it, the statements were too temporally distant from the termination decision and bore no nexus to the supervisors' decision to fire Tarquinii. That was error. Evidence of discriminatory animus continued up to the same month of Tarquinii's termination. And the record shows that the supervisors who made the key decision to terminate Tarquinii were the same supervisors who acted with discriminatory animus

throughout her employment. That is enough to establish a nexus at the summary judgment stage.

The record evidence before the district court documented a pervasive and severe pattern of discriminatory misconduct carried out by the key decisionmakers who later made the call to terminate Tarquinii's employment. Whether the decision to terminate Tarquinii flowed from discriminatory animus is a jury question. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291, as the district court issued a final order disposing of all claims in the case. JA1986.

## ISSUES PRESENTED

1. Whether the record supports a motivating factor theory of discrimination, and whether the district court erred by failing to consider such a theory in granting summary judgment.

2. Whether the district court erred in analyzing Tarquinii's but-for discrimination theory at summary judgment.

## STATEMENT OF THE CASE

### A.    Factual Background

Appellant Jawan Noel Tarquinii is a Black woman who identifies as a Catholic.  JA605.  From July 2013 until November 2015, Tarquinii worked at the Marine Corps Air Station in Iwakuni, Japan.  JA168, 246.  Tarquinii first served as the Deputy Director for Marine Corps Community Services, and she was then promoted to serve as the Chief of Human Resources.  JA270-72.  Throughout her employment at Iwakuni, Tarquinii had two supervisors.  JA1897-98.  Her first-line (immediate) supervisor was Robert Johnston, the Deputy Director of the Station.  JA1897.  Her second-line supervisor was John Iwaniec, the Station's Director.  *Id.* Both Iwaniec and Johnston were aware of Tarquinii's status as a Black woman.  JA299-300; JA289-90.  And both Iwaniec and Johnston are white men.  JA299, JA289.

During her time at Iwakuni, Iwaniec and Johnston treated Tarquinii differently from her male colleagues.  JA605.  "[M]ultiple times each month," Iwaniec would ask Tarquinii whether it was "that time of month."  JA606.  And although Iwaniec was "lenient with" Tarquinii's "Caucasian male counterparts" and "never got frustrated or raised his voice" with them, he often did so with Tarquinii.  JA607.  Iwaniec "yelled at and belittled" Tarquinii, JA610, but did not "criticize[], belittle[], [or] reprimand[]" the "Caucasian male employees" at the Iwakuni, JA611.  Iwaniec

5

also referred to another Black female employee "as a 'bitch'" when she was hired for a role that had been sought after by a white female contender.  JA607; *see also* JA621.

Throughout 2014 and 2015, Iwaniec "made inappropriate physical contact and inappropriate remarks" to Tarquinii, JA611—comments that he "never made" to Tarquinii's "male Caucasian counterparts," JA613; *see also* JA611-16.  He referred to Tarquinii as "sweetheart" and, on multiple occasions, told her that he "love[d]" her.  JA611.  He "frequently commented on [Tarquinii's] appearance and made suggestive gestures" in her presence.  *Id.*  He would "often sit in a chair with his legs wide open" during meetings, "push[ing] his hips forward provocatively." *Id.*; *see also* JA613 (Iwaniec repeatedly "attempted to hug" Tarquinii, but she "always backed away").  Iwaniec "made sexual innuendos and borderline propositions," JA611, commenting on Tarquinii's "physical appearance," including her hair style, eyes, and clothing, *id.*; *see also* JA612 (noting Tarquinii's "clothes," including "how the color of [her] dress and shirts made [her] eyes look" and that they "fit [her] well").

Tarquinii's weight proved to be a particularly engaging topic for Iwaniec.  In February 2015—the same year that he decided to terminate Tarquinii's employment—Iwaniec "made inappropriate comments" regarding Tarquinii's weight.  JA612.  He told Tarquinii that she had "a very attractive face, and if [she]

only lost weight," she would be "'drop dead gorgeous.'" JA612. In March, Iwaniec said to Tarquinii that she should start using "the health and wellness program" at Iwakuni because it would help her "lose weight and would make [her] much more attractive." JA612. And he implied that Tarquinii might be a romantic interest, given that he had dated "many 'Black' girls in the past." JA612. Iwaniec asked Tarquinii what her plans were on the weekend, and whether she liked to drink. JA614. He asked her why she did not join other "members of the command" at an "after hour affair . . . in which only chiefs were invited," saying that it "was a shame" she did "not want to attend." JA614.

Tarquinii told Iwaniec that his comments made her "very uncomfortable," "were inappropriate," and were "discriminatory." JA612, 620. In the spring of 2015, Tarquinii "confronted Iwaniec about his inappropriate behavior" and told "Johnston that it made [her] uncomfortable." JA615. Tarquinii "specifically told Iwaniec that [she] was concerned he favored his male direct reports over [her] and over other minorities." JA620. In May 2015, she told both Iwaniec and Johnston that "Iwaniec needed to maintain a professional distance and stop touching other employees," a request that made him "visibly angry." JA616.

But Iwaniec did not let up. In June 2015, just five months before terminating Tarquinii, Iwaniec told Tarquinii that "it looked like [she] was losing a lot of weight and that [she] should keep it up because it made [her] clothes 'fit better.'" JA613.

And in August 2015, three months before he terminated Tarquinii, Iwaniec told her that she "was 'melting' due to [her] weight loss," and that she "need[ed] to keep it up." JA613 (brackets in original).

During Tarquinii's employment, Johnston—like Iwaniec—"treated [Tarquinii] differently than" the "male Caucasian employees" at Iwakuni. JA605. He "frequently instructed" her to "alter [her] tone, to appear less 'emotional' in [her] conversations with others, and to avoid acting as if it was 'that time of month.'" JA606. He referenced Tarquinii being "bossy" at a company picnic and admonished her not to be "emotional" when talking to another employee. JA627. And although Johnston knew about Iwaniec's treatment of Tarquinii, he "did nothing to stop the harassment and statements." JA613.

The record also contains evidence that Iwaniec and Johnston treated Tarquinii differently than her white colleagues. JA605. They "frequently required [Tarquinii] to apologize to [her] white male counterparts and treated [her] as an inferior to them." JA606. Although Tarquinii was forced to apologize to four male white colleagues, even though she "had done nothing wrong," "no other male . . . , Caucasian employees were required to do this." *Id.* And Tarquinii was asked to "alter [her] tone," while her white male colleagues were not. *Id.*; *see also* JA628 ("The other male Caucasian employees were never required to alter their tone, demeanor, or apologize to others . . . ."). Iwaniec was "always lenient" with

Tarquinii's white male counterparts, but got "frustrated" and "raised his voice" with Tarquinii. JA607. Tarquinii told Iwaniec that he was treating Black employees less favorably than their white counterparts, thereby setting up "minority female[s] to fail." JA621.

In July 2015, the Navy began investigating Tarquinii after it received several complaints that she had engaged in nepotism while working at Iwakuni. The complaints alleged that Tarquinii had been inappropriately involved in the hiring of her husband, Bruno Tarquinii, and her brother, Jacob Franklin. JA72. Carl Hodges, the Inspector General Investigator for Marine Corps Installations Pacific, and Carlos Saldana, the Chief of Human Resources at Okinawa, were detailed from Okinawa to Iwakuni to investigate the allegations. JA73. Saldana and Hodges interviewed witnesses and collected statements as part of their investigation, and in October 2015, they completed their report. *Id.* The report substantiated allegations that Tarquinii had participated in the hiring of her husband and brother in violation of ethics rules. JA73-78.

Johnston reviewed the report when it was finished. JA78. He then proposed terminating Tarquinii's employment and, on November 10, 2015, "issued a Notification of Proposal to Terminate Employment . . . to Tarquinii." JA78-79. Iwaniec also reviewed the report and issued a "Notification of Termination of Employment" on November 23, 2015. JA80. Both Johnston and Iwaniec stated that

they based their termination decisions on the investigative report.  JA78, 80.

### B.   Tarquinii's Allegations Of Discrimination

Tarquinii initiated EEO counseling in December 2015.  JA89.  The next month, she unsuccessfully appealed her termination decision within the chain of command.  JA82-88.  In April 2016, Tarquinii filed a formal EEO complaint, JA89-90, which she twice amended, JA90-91; JA467-96.  The complaint alleged that the Navy discriminated against Tarquinii due to her race, gender, and/or religion when it terminated her employment in November 2015.[1]  Tarquinii also alleged that the Navy had discriminated against her based on disability, that it retaliated against her for engaging in protected activity by terminating her employment, and that it retaliated against her by subsequently interfering with her employment opportunities at the United States Department of Justice, the Navy, and the Government Publishing Office.  JA469.

The EEO process extended for several years, culminating in a January 2021 decision by an Administrative Judge finding that Tarquinii had not been the victim of discrimination or retaliation, and denying other requests she had subsequently made for additional relief based on an alleged hostile work environment and the denial of reasonable accommodations. JA2401-03.  The agency issued its final order

---

[1]   In December 2014, Iwaniec questioned whether Tarquinii was "a real Catholic," and told her that she "can't call [herself] a Catholic" because she "went to church only during certain holidays."  JA622.

in February 2021.  JA548-52.

### C. Title VII And The District Court's Order Granting Summary Judgment

That same month, Tarquinii filed this lawsuit, alleging discrimination and retaliation under Title VII and the Rehabilitation Act of 1973.  JA11.  Although Tarquinii was represented by counsel before the agency, Tarquinii proceeded *pro se* in the district court.  JA29; JA1992.

**1.**  As relevant here, Title VII renders it an "unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).  There are two paths to liability under Title VII.  *Ponce*, 679 F.3d at 844.  The first route is under § 2000e-2(a):  A plaintiff can argue that their employer took an adverse employment action "because of" a protected characteristic, meaning that the protected characteristic was a but-for cause of the employment action.  *Bostock*, 590 U.S. at 657.  The second route turns on an additional statutory provision of Title VII, which provides that "an unlawful employment practice is established when . . . race, color, religion, sex, or national origin was a motivating factor for any employment practice."  42 U.S.C. § 2000e-2(m).  This motivating factor theory of liability is "more forgiving," *Bostock*, 590 U.S. at 656, and it allows a plaintiff to establish liability even when "unable" to prove a but-for causation theory, *Ponce*, 679 F.3d at 844.

When a plaintiff proceeds under the first route by advancing a but-for causation theory of liability, courts typically apply the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ponce*, 679 F.3d at 844. The *McDonnell Douglas* framework has three steps: (1) the plaintiff must make out a prima facie case of discrimination, (2) the employer then must "'articulate some legitimate, nondiscriminatory reason for the'" employment action, and (3) the employee must then have the opportunity to "show that the stated justification 'was in fact pretext' for discrimination." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. __, 145 S. Ct. 1540, 1545 (2025) (citations omitted).

Because the traditional *McDonnell Douglas* framework demands that a plaintiff show "pretext," it does not apply to the motivating factor theory of proving Title VII liability described above, which does not require such a showing. *See, e.g.*, *Bart v. Golub Corp.*, 96 F.4th 566, 573-74 (2d Cir. 2024). And even when a plaintiff proceeds under the first, but-for causation theory of liability, a plaintiff need not show that discrimination is the *only* explanation for the adverse employment action—after all, there can be multiple but-for causes of a single event. *Bostock*, 590 U.S. at 656.

**2.** In September 2024, the district court granted summary judgment to the Navy. JA1986; JA1987. The court did not address whether Tarquinii could prevail under the motivating factor theory of Title VII liability. Instead, the court invoked

the traditional *McDonnell Douglas* framework and considered only whether Tarquinii had shown that the Navy terminated her "because of" her protected characteristics. JA2001-04.

The court reasoned that the Navy had offered a legitimate, nondiscriminatory reason to justify its termination of Tarquinii, explaining that the "investigation itself was not conducted with any discriminatory or retaliatory animus." JA2005. The district court recounted the investigation's findings that Tarquinii had improperly participated in the hiring of her husband and improperly advocated in hiring her brother. *Id.* The court credited Johnston's declaration that "he had issued the proposal of termination" because of the investigative report's findings. JA2006. And the district court likewise credited Iwaniec's conclusion that the "evidentiary record" established by the investigative report showed wrongdoing on the part of Tarquinii, warranting her termination. *Id.* As a result, the district court was "left to determine whether a reasonable jury could find that the Agency's explanation [was] pretextual." JA2007. As the court saw it, to move past summary judgment, Tarquinii needed to show that a jury could find "that discrimination or retaliation was *the real reason* for the Agency's conduct." *Id.* (emphasis added).

The district court found that Tarquinii's evidence of pretext fell short. It first rejected Tarquinii's argument that "procedural irregularities" in the investigation were evidence of pretext. JA2007-08. It likewise rejected the notion that Iwaniec

had given "inconsistent reasons for her termination." JA2008. And the district court concluded that it was "irrelevant" whether the investigative report was "accurate because—so long as" Tarquinii's supervisors "relied on that report in good faith," her supervisors' decision to terminate her was "based on her supervisors' belief that" Tarquinii "had engaged in misconduct." JA2008-09.

As for the record evidence documenting that Tarquinii's "supervisor[s] previously made sexually and religiously inappropriate remarks toward her," the district court dismissed such remarks as "isolated." JA2010. "[T]he isolated comments appear to have been made a significant amount of time before" the termination, as the district court saw it, "and the remarks appear to have no connection with Tarquinii's termination." *Id.* Regarding Tarquinii's evidence that she was forced to apologize to other employees when her supervisors did not require her white colleagues to do the same, the district court faulted Tarquinii for failing to "explain when this occurred during her tenure . . . or how making her apologize and telling her to appear soft spoken was connected to her termination." JA2011. "Even if" her supervisors harbored "'racial or religious animus,'" the district court reasoned, there existed no "'nexus'" between such animus and Tarquinii's termination "given that Tarquinii's supervisors terminated her due to the investigation report." *Id.* (citation omitted). The court dismissed evidence of retaliation for similar reasons. *Id.* And the court explained that Tarquinii's evidence

14

that other employees at Iwakuni had been disciplined less severely for similar conduct was inadequate to overcome summary judgment. JA2013-18.

In addition to granting summary judgment to the Navy as to Tarquinii's discrimination and retaliation claims, the district court also rejected claims regarding a hostile work environment, due process, reasonable accommodation, and any claims regarding a poor performance review Tarquinii had received in 2015. JA1997-99, 2027-40.[2]

## STANDARD OF REVIEW

The Court reviews a district court's grant of summary judgment *de novo*. *Breiterman v. United States Capitol Police*, 15 F.4th 1166, 1172 (D.C. Cir. 2021). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court evaluating a motion for summary judgment must "view[] the evidence in the light most favorable to the non-movant and draw[] all reasonable inferences accordingly." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016).

---

[2] Both Tarquinii and the Navy subsequently moved for summary reversal and summary affirmance, respectively. This Court granted in part and denied in part the Navy's motion for summary affirmance, leaving only Tarquinii's discrimination and retaliation claims as issues on appeal. *See* Order 1 (Mar. 6, 2025), Doc. No. 2104289.

**SUMMARY OF ARGUMENT**

The district court wrongly granted summary judgment to the Navy. This Court should reverse.

**I.** Title VII provides two paths to establishing liability. *See supra* at 11-12; *Ponce*, 679 F.3d at 844. First, a plaintiff may show that discrimination was a but-for cause of an adverse employment action. *See* 42 U.S.C. § 2000e-2(a). A court assessing this theory must ask if the employer would have made a different choice if not for the plaintiff's protected characteristic. If the answer to that question is yes, a plaintiff has shown that their protected characteristic was a but-for cause of an adverse employment action. *See Bostock*, 590 U.S. at 656. Second, even where a plaintiff cannot show that discrimination was a but-for cause, she can nevertheless establish liability under Title VII by showing that her protected characteristic played a motivating factor in the adverse employment decision. *See* 42 U.S.C. § 2000e-2(m). This standard is "more forgiving"—sex, race, or a similar impermissible consideration need only play a part in the employer's calculus, and need not act as a "but-for cause of the employer's challenged decision." *Bostock*, 590 U.S. at 657.

Courts traditionally apply the *McDonnell Douglas* burden shifting framework to assess but-for discrimination claims under the first route to liability outlined above. Relevant here, step three of that framework—which follows once an

employer has proffered a nondiscriminatory rationale justifying an adverse employment decision—asks whether the plaintiff has shown the employer's rationale is pretextual. But when it comes to the motivating factor theory of liability, the traditional *McDonnell Douglas* test does not apply. *See, e.g.*, *Bart*, 96 F.4th at 573-74. That is because a plaintiff need not show that the employer's decision is pretextual and can instead establish liability simply by showing that a protected characteristic "contributed in some way to" the adverse employment action. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1339 (11th Cir. 2023).

The district court overlooked the motivating factor route to establishing liability under Title VII. It did not cite that statutory path to liability, nor did it analyze Tarquinii's claims under its more forgiving standard. And the record evidence supports that protected characteristics played a motivating role in Tarquinii's termination: Tarquinii's supervisors exhibited persistent discriminatory animus based on her sex and race throughout her employment at the Navy, continuing through her termination in 2015. Although the Navy proffered a nondiscriminatory nepotism-based rationale to justify its decision to terminate Tarquinii's employment, that does not defeat Tarquinii's discrimination claim. 42 U.S.C. § 2000e-2(m) (establishing liability even where "other factors" are at play). A reasonable jury could decide—based on the discriminatory comments and conduct

17

evinced by Iwaniec and Johnston—that discriminatory animus contributed in some way to Tarquinii's termination, even if the alleged nepotism was also a factor.

**II.** The district court also erred in analyzing Tarquinii's claims under the first route of Title VII liability outlined above—that but for her race and sex, she would not have been terminated. As the district court saw it, for Tarquinii to prevail at summary judgment, she needed to show that either discrimination or retaliation was "the real reason" why she was terminated. JA2007. That standard is too stringent. Title VII imposes liability where an employer acts "because of" an individual's protected characteristic. 42 U.S.C. § 2000e-2(a). The "because of" requirement enshrines a straightforward but-for test. *Bostock*, 590 U.S. at 656. *McDonnell Douglas* does not demand that a plaintiff identify the one "true" reason for an adverse employment action. *See* 411 U.S. at 804. And as *Bostock* explained, there can be "multiple but-for causes" of a given event. 590 U.S. at 656. The district court's framework made no room for the existence of multiple causes, and instead required Tarquinii to show that "the real reason" for the Navy's action was discriminatory. Nor did the district court even cite but-for causation as an applicable standard. In short, the legal framework the district court imposed is at odds with both Title VII's text and caselaw construing it.

Even under its erroneous legal test, the district court wrongly discounted the ample record evidence establishing discriminatory pretext. Without analyzing the

discriminatory comments and conduct in the summary judgment record, the district court concluded that any evidence of discriminatory intent was isolated and too attenuated from the decision to terminate Tarquinii. That was error. Tarquinii's supervisors evinced discriminatory intent throughout her employment, including up to the same month that she was terminated. And because the key decisionmakers who terminated Tarquinii also exhibited pervasive animus based on her protected characteristics, a reasonable jury could conclude that, but for Tarquinii's protected traits, she would not have been terminated. The district court's grant of summary judgment to the Navy should be overturned for this reason, as well.

## ARGUMENT

### I. THE RECORD EVIDENCE SUPPORTS A MOTIVATING FACTOR THEORY OF LIABILITY UNDER TITLE VII

The district court failed to consider whether Tarquinii could establish liability premised on a motivating factor theory of liability under Title VII. Here, the summary judgment record contains evidence that would allow a reasonable jury to conclude that the Navy's decision to terminate Tarquinii was motivated—at least in part—by discriminatory animus. Both Iwaniec and Johnston were the key decisionmakers who made the call to terminate Tarquinii's employment. And the evidence, viewed in the light most favorable to Tarquinii, shows that Iwaniec and Johnston subjected Tarquinii to sex-based discrimination through harassing comments and conduct and treated Tarquinii differently than her white peers. Given

the voluminous evidence of discriminatory animus on the part of the key decisionmakers who terminated Tarquinii, a reasonable jury could conclude that impermissible considerations played a role in the Navy's decision to terminate her employment. The district court's failure to consider this meritorious theory warrants reversal.

**A. Title VII Recognizes A Motivating Factor Theory Of Liability, To Which The Traditional *McDonnell Douglas* Framework Does Not Apply**

**1.** Title VII deems it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "[T]he two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

As explained above, *supra* at 11-12, this Court has recognized that Title VII "provides two separate ways for plaintiffs to establish liability." *Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012). First, a plaintiff may show that they were subject to an adverse employment action "because of" their protected characteristic, 42 U.S.C. § 2000e-2(a), which entails a but-for causation inquiry, *Bostock v.*

*Clayton*, 590 U.S. 644, 656 (2020); *see also Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019). Second, a plaintiff may instead pursue a motivating factor theory of liability, in which the "complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).[3] Under this motivating factor theory, evidence that a protected characteristic played a motivating role in an employment practice "establishe[s]," *id.*, "an unlawful employment practice" under Section 2000e-2(a). *See Fogg v. Gonzalez*, 492 F.3d 447, 451 (D.C. Cir. 2007) (citing the motivating factor route of establishing liability under Title VII). "[A] plaintiff may proceed under both theories simultaneously." *Ponce*, 679 F.3d at 845.

A plaintiff pursuing the first theory of liability contends that the employer acted "because of" the plaintiff's protected characteristic by showing that but for the employer's illicit motive, the employer would not have taken an adverse

---

[3] In *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989) (plurality opinion), a plurality of the Supreme Court recognized that an employer could be held liable under Title VII when it acted with mixed motives. *Price Waterhouse* explained that once a plaintiff shows that an employer acted in part based on an illicit motive, an employer may avoid liability by showing that it would have made "the same decision even if it had not" considered the employee's protected characteristic. *Id.* at 244-45. Congress responded to *Price Waterhouse* by amending Title VII in 1991 to add what is now Section 2000e-2(m)—Title VII now recognizes the motivating factor theory of liability and provides employers with only a limited affirmative defense. *See Bart v. Golub Corp.*, 96 F.4th 566, 571-72 (2d Cir. 2024) (recounting the history).

employment action. 42 U.S.C. § 2000e-2(a)(1) & notes (emphasis added); *see Ponce*, 679 F.3d at 844. This Circuit has acknowledged that "direct evidence of an employer's discriminatory motives is often elusive," so "a plaintiff typically establishes but-for causation using the familiar pretext framework" articulated by the Supreme Court in *McDonnell Douglas*. *Ponce*, 679 F.3d at 844. As outlined above, the *McDonnell Douglas* burden-shifting framework has three steps: (1) the plaintiff establishes a prime facie case, (2) the burden shifts to the employer to articulate a "nondiscriminatory" rationale, and (3) the burden shifts back to the employee to show that the employer's nondiscriminatory rationale "'was in fact pretext' for discrimination." *Ames*, 145 S. Ct. at 1545 (2025) (citations omitted). But a plaintiff need not show that consideration of a protected characteristic was the *only* cause of an adverse employment action: Title VII imposes only a but-for causation test, and a single event can have "multiple" but-for causes. *Bostock*, 590 U.S. at 656.

A motivating factor theory works differently. Rather than require proof that an employer acted adversely "because of" a plaintiff's protected characteristic, 42 U.S.C. § 2000e-2(a), the plaintiff can instead establish liability by showing that a protected characteristic "was a motivating factor" for an adverse action, *id.* § 2000e-2(m). This standard is "more forgiving," and it provides for liability under Title VII "even if [a protected characteristic] *wasn't* a but-for cause of the

employer's challenged decision." *Bostock*, 590 U.S. at 657. As this Court has recognized, Section 2000e-2(m) "allows a plaintiff unable to establish that a protected characteristic was the but-for cause of an adverse employment action to prevail by showing that unlawful discrimination was 'a factor motivating the adverse action.'" *Ponce*, 679 F.3d at 844 (quoting *Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008)).

A plaintiff may prevail under a motivating factor theory using either direct or circumstantial evidence that a protected characteristic motivated an employment practice. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100-01 (2003).[4] The evidence need only show "that a protected consideration contributed *in some way* to the outcome—even if it ultimately changed nothing." *Yelling*, 82 F.4th at 1339 (emphasis added); *see also Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 162

---

[4] Where a plaintiff pursues a mixed-motive theory, "the employer has a limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff." *Desert Palace*, 539 U.S. at 94. If an employer "demonstrates" that the employer "would have taken the same action in the absence of the impermissible motivating factor," 42 U.S.C. § 2000e-5(g)(2)(B), then "[t]he available remedies include only declaratory relief, certain types of injunctive relief, and attorney's fees and costs," *Desert Palace*, 539 U.S. at 94. In her complaint, Tarquinii sought "appropriate remedies, pecuniary and non-pecuniary, including but not limited" to a neutral letter of reference, compensatory damages, and attorney's fees. JA28-29. This Court need not decide which of Tarquinii's remedies are permissible under Section 2000e-5(g)(2)(B) at this stage of the case.

(2d Cir. 2001) (jury must be able to find that an adverse action "was motivated, at least in part, by a forbidden factor").

**2.** Where the record evidence supports a motivating factor theory of liability, the traditional *McDonnell Douglas* framework—which asks at step three whether the plaintiff has shown that an employer's proffered justification is mere "pretext," 411 U.S. at 804—does not apply. That is because, as this Court has explained, "pretext" refers to a "'single-motive' . . . theory of discrimination." *Mayorga*, 928 F.3d at 89. A motivating factor theory, however, does not require that a plaintiff show that discrimination was the employer's sole motive—it requires only that the plaintiff "demonstrate[]" that a protected characteristic "was a motivating factor for any employment practice, even though other factors *also* motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). The underlying assumption that there can be only one explanation for an employment decision is "fatally inconsistent with the mixed-motive theory of discrimination," which permits a plaintiff to show that an employer "also relied on a forbidden consideration" even if an employee "cannot rebut her employer's proffered reasons for an adverse action." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1237-38 (11th Cir. 2016).

Because a single-motive pretext analysis cannot be squared with a motivating factor theory of liability, many courts have jettisoned *McDonnell Douglas* altogether in analyzing such a theory of liability under Title VII. As the Sixth Circuit has put

it, "the shifting burdens of *McDonnell Douglas* . . . are unnecessary to assist a court in determining whether the plaintiff has produced sufficient evidence to convince a jury of the presence of at least one illegitimate motivation on the part of the defendant." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008). As a result, "the *McDonnell Douglas*[] framework does not apply to [that Circuit's] summary judgment analysis of mixed-motive claims." *Id.* So too in the Fourth, Ninth, and Eleventh Circuits. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 317-18 (4th Cir. 2005); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004); *Quigg*, 814 F.3d at 1237.

Other Circuits have altered the *McDonnell Douglas* framework to accommodate a motivating factor theory at step three of the framework. The Fifth Circuit has "modified" *McDonnell Douglas* such that at the framework's third step—which considers whether the plaintiff can rebut an employer's nondiscriminatory rationale—the plaintiff can show *either* that (1) "'the defendant's reason is not true, but is instead a pretext for discrimination,'" *or* (2) "'that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic.'" *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (citation omitted). The Second Circuit recently adopted a similar approach, changing the *McDonnell Douglas* framework "only at the third step" to accommodate Title VII's motivating factor route to

liability. *Bart v. Golub Corp.*, 96 F.4th 566, 573-74 (2d Cir. 2024). "[A] plaintiff may make *either* a traditional showing of 'pretext'—*i.e.*, that the employer's stated reason was false, and that the sole actual reason was discrimination—*or* a showing that even if the employer's reason is true, discrimination was still a motivating factor in the employment decision." *Id.* at 573-74.

This Court has not clearly articulated the proper approach for evaluating a motivating factor theory of liability at summary judgment. In *Fogg*, this Court suggested that a plaintiff could pursue two different routes. First, a plaintiff can "establish an unlawful employment practice by showing that 'discrimination or retaliation played a "motivating part" or was a "substantial factor" in the employment decision' 'without proving that an impermissible consideration was the sole or but-for motive for the employment action.'" 492 F.3d at 451 (citations omitted). Alternatively, this Court explained that "[a] plaintiff *may also*, of course, use evidence of pretext and the *McDonnell Douglas* framework to prove a mixed-motive case." *Id.* at 451 n.*; *see also Ponce*, 679 F.3d at 844 ("As with but-for causation, a plaintiff *can* use evidence of pretext and the *McDonnell Douglas* framework to prove a mixed-motive case." (emphasis added)); *see also White*, 533 F.3d at 399 (suggesting that *Fogg* "appear[ed]" to have embraced a "middle ground approach"). But more recently, this Court described both but-for and motivating factor theories of liability in the Title VII context, and observed that "[u]nder either

theory, if the record does not contain direct evidence that the employment action 'was caused by prohibited discrimination,' then we turn to the burden-shifting framework of *McDonnell Douglas*." *Mayorga*, 928 F.3d at 89.

Whether a modified version of the *McDonnell Douglas* framework applies in motivating factor cases or whether the framework is inapplicable altogether, what matters for present purposes is that evidence of "pretext" is not required. *Id.*; *see Bostock*, 590 U.S. at 657. Under the plain text of Title VII, all a plaintiff must show to establish liability is that "race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). And it falls on "the District Court" to "decide whether a particular case involves mixed motives." *Price Waterhouse*, 490 U.S. at 247 n.12 (plurality opinion).

## B. The Record Evidence Supports A Motivating Factor Theory Of Discrimination

The record evidence at summary judgment shows that a reasonable jury could conclude that Tarquinii's sex and race were "motivating factor[s]" in the Navy's decision to terminate her employment. 42 U.S.C. § 2000e-2(m). Tarquinii was subject to comments and conduct—from the decisionmakers who terminated her—evincing animus based on her status as a Black woman. And a reasonable jury could find that the discriminatory animus exhibited by Tarquinii's supervisors played a part in their decision to terminate her employment.

**1.** **The Record Evidence Shows That Tarquinii's Supervisors Harbored Discriminatory Animus**

"Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex" in violation of Title VII. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (alteration in original). "[E]vidence of discriminatory statements or attitudes by a decision-maker may support a finding of discrimination, even if the disparaging comments were not made in the context of the contested employment action." *Stoe v. Barr*, 960 F.3d 627, 643 (D.C. Cir. 2020). And where, as here, a supervisor subjects an employee "to an unrelenting course of mistreatment he did not impose on her male colleagues," that constitutes evidence of sex discrimination. *King v. Aramark Servs. Inc.*, 96 F.4th 546, 552 (2d Cir. 2024).

The record evidence shows that Iwaniec discriminated against Tarquinii based on her sex. Iwaniec asked Tarquinii "multiple times each month if it was 'that time of month.'" JA606. He "yelled at and belittled" Tarquinii, JA610, and referred to another Black female employee "as a 'bitch,'" JA607; *see also* JA621. Although Iwaniec was "lenient with" other male employees at Iwakuni and did not critique, belittle, or reprimand them, he did not extend that same grace to Tarquinii, with whom he "got frustrated" and "raised his voice." JA607; *see also* JA611. Iwaniec, in short, "treat[ed] [Tarquinii] less favorably" that her male counterparts. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

28

Beyond belittling Tarquinii, Iwaniec "made inappropriate physical contact and inappropriate remarks" to her throughout her employment and did not subject her male colleagues to the same treatment. JA611, 613. He called Tarquinii "sweetheart," said that he "love[d]" her, and "commented on" her appearance. JA611. When Tarquinii was in meetings with Iwaniec, he would "often sit in a chair with his legs wide open" and "push his hips forward provocatively." JA611. Iwaniec "made sexual innuendos and borderline propositions," commenting that he had dated "many 'Black' girls in the past." JA611-12. He told Tarquinii that she had "a very attractive face, and if [she] only lost weight," she would be "'drop dead gorgeous.'" JA612. As late as August 2015, Iwaniec commented on Tarquinii's weight loss, noting that she was "melting." JA613. By imposing on Tarquinii an "unrelenting course of mistreatment he did not impose on her male colleagues," Iwaniec engaged in sex discrimination. *King*, 96 F.4th at 552.

Johnston likewise evinced discriminatory animus on the basis of Tarquinii's sex. He told Tarquinii to "appear less 'emotional'" when talking to others and stated, like Iwaniec, that Tarquinii should avoid "acting as if it was 'that time of month.'" JA606. He suggested Tarquinii was "bossy," JA627, that she "should not be emotional" and "appear soft spoken" when meeting with another employee, *id.*, and—although he knew about Iwaniec's repeated course of conduct—did nothing to stop any mistreatment of Tarquinii, JA613.

29

These pervasive, sexualized comments and actions constitute sex discrimination under Title VII. The Supreme Court recognized as much 40 years ago when it held that harassment of a subordinate "because of the subordinate's sex" constitutes discrimination. *Meritor Savings Bank*, 477 U.S. at 64. As the Second Circuit explained in *King*, "a reasonable jury could conclude that . . . singling out [Tarquinii] for weight-related remarks and conduct—remarks and conduct that [Iwaniec and Johnston] did not direct toward her male peers—reflected not only a bias against individuals with certain body types, but also a gender-based bias." 96 F.4th at 564.

The record also supports a finding that Tarquinii's supervisors discriminated against her on the basis of her race. Where, as here, the record evidence shows "that others outside the plaintiff's class have been more favorably treated," that is "'[e]specially relevant'" to showing discriminatory intent. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016) (alteration in original) (citation omitted); *see also Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (crediting evidence of "the employer's better treatment of similarly situated employees outside the plaintiff's protected group"). No smoking gun is necessary. Where, for instance, a supervisor is "'edgy' and 'condescending' to" a Black employee, "as compared to his white colleagues," such evidence supports a finding of discrimination. *DeJesus v. WP Co.*, 841 F.3d 527, 536 (D.C. Cir. 2016).

The record evidence supports a finding that both Iwaniec and Johnston treated Tarquinii, who is Black, differently than her white male peers. JA605. Most glaringly, Tarquinii's supervisors forced her to "apologize" to her "white male" colleagues and "treated [her] as an inferior to them." JA606. They did so even though Tarquinii had "done nothing wrong." *Id.* And they never forced any other male white employees to do anything of the sort. *Id.* The record also shows that Tarquinii was asked to alter her "tone," while similar requests were not made of her white male colleagues. JA628. This course of disparate treatment would allow a reasonable jury to conclude that Tarquinii's supervisors discriminated against her on the basis of race by providing "better treatment" to her white colleagues. *Walker*, 798 F.3d at 1092.

**2. A Reasonable Jury Could Conclude That Discriminatory Animus "Motivated" Tarquinii's Termination**

The record evidence could allow a reasonable jury to conclude that "unlawful discrimination was 'a factor motivating'" Tarquinii's termination. *Ponce*, 679 F.3d at 844 (citation omitted).

Discriminatory animus need not *explain* the adverse employment action—it is enough that a protected characteristic "contributed in some way to the outcome." *Yelling*, 82 F.4th at 1339. Liability attaches even if discrimination "ultimately changed nothing." *Id.*; *see also Babb v. Wilkie*, 589 U.S. 399, 406-07 (2020) (discrimination need not "affect the outcome" to play a role in a decision). This

31

Court has credited evidence of "broad-based racial animus" or "bias" that "infected a particular employment decision." *DeJesus*, 841 F.3d at 536. Where the evidence shows that a decisionmaker harbors a "discriminatory attitude . . . targeted directly at the plaintiff" and when comments are part of a "pattern of similar remarks," this Court has held that a Title VII plaintiff can overcome a motion for summary judgment to allow a jury to decide whether discriminatory animus motivated an adverse employment decision. *Morris v. McCarthy*, 825 F.3d 658, 670 (D.C. Cir. 2016). "Discriminatory statements may reflect a cumulative managerial attitude among the defendant-employer's managers that has influenced the decisionmaking process for a considerable time." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998). "Thus, management's consideration of an impermissible factor in one context may support the inference that the impermissible factor entered into the decisionmaking process in another context." *Id.*

*Morris* provides a useful guide. There, the "strongest evidence" of the supervisor's "discriminatory attitude consist[ed] of race-based remarks she allegedly made," including a pattern of remarks denigrating white women at the Environmental Protection Agency. *Morris*, 825 F.3d at 669. The district court discounted the discriminatory statements as being made "too long before" the adverse employment decision and exhibiting only "'stray remarks'" that were "unrelated to [the plaintiff's] suspension." *Id.* This Court reversed: Even when a

32

remark is made "significantly before the relevant employment action," *Morris* instructs, it constitutes "probative evidence of a supervisor's discriminatory attitude, at least when it is targeted directly at the plaintiff or is one of a pattern of similar remarks." *Id.* at 670. The defendant had made "multiple racially biased statements about white employees—including one about" the plaintiff. *Id.* And "[c]onsidered together," the "statements could lead a reasonable juror to find that" that the plaintiff's employer "harbored a discriminatory attitude toward white employees." *Id.*

*Bart* is also on point. There, the plaintiff's supervisor made "generally rude comments" regarding "female coworkers," including the plaintiff. 96 F.4th at 568. In addition, the supervisor "made several remarks to [the plaintiff] expressly indicating gender bias," including his belief that "being a manager was 'too stressful' for women and that women were 'too sensitive to be managers.'" *Id.* (citation omitted). In *Bart*, it was "undisputed" that the employer "ha[d] met its burden of articulating a legitimate, non-discriminatory reason for firing [the plaintiff]." *Id.* at 576. But the Second Circuit nevertheless concluded that the district court had erred in granting summary judgment, because a plaintiff need not dispute an employer's showing of misconduct. *See id.* at 576-77. Instead, it is enough that a plaintiff "*also* produce[] sufficient evidence (which we credit at the summary judgment stage) to show that [the employer] fired [the plaintiff] *in part* due to . . . gender bias." *Id.* at

33

577 (emphases added).  The plaintiff in *Bart* had "adduced competent evidence,
drawing reasonable inferences in her favor, that [her employer]—'the actor most
involved with [her] termination'—harbored gender-based bias against her."  *Id.* at
577 (alteration in original) (citation omitted).

So too in *Rachid*.  There, the plaintiff, Rachid, worked at Jack in the Box,
under the supervision of a man named Patrick Powers.  376 F.3d at 307.  Powers
"continually made . . . comments" about Rachid's age, causing Rachid to "report[]
the[] comments to [the] human resources department" and "even request[] a
transfer."  *Id.* at 307, 315.  Powers subsequently fired Rachid "immediately upon
learning that he had altered time-cards without completing" required forms, which
had been revealed by an internal investigation.  *Id.* at 308.  Applying a motivating
factor analysis, the Fifth Circuit reversed the district court's grant of summary
judgment to Jack in the Box. *Id.* at 316.  There was a "factual question" as to whether
Rachid had in fact violated company policy by altering his time cards.  *Id.* at 315.
But even aside from that, Rachid had presented ample evidence of age
discrimination. *See id.*  "Despite" Jack in the Box's "focus on [the] investigation
and" Rachid's purported violations of "company policy," the Fifth Circuit
emphasized that "it was Powers who terminated Rachid, and it was Powers who
repeatedly made ageist comments to and about Rachid.  Such comments preclude

summary judgment because a rational finder of fact could conclude that age played a role in Powers's decision to terminate Rachid." *Id.* at 315-16.

*Morris*, *Bart*, and *Rachid* favor reversal here. Iwaniec and Johnston made pervasive and severe comments targeted at Tarquinii on the basis of her sex, treated Tarquinii less favorably than her white colleagues, and engaged in actions that prompted Tarquinii to complain about harassment and discrimination in the workplace. The record evidence is sufficient for a factfinder to conclude that both Iwaniec and Johnston harbored a discriminatory "attitude," *Morris*, 825 F.3d at 669, or "bias," *Bart*, 96 F.4th at 577, against Tarquinii on the basis of her sex and race, and that such animus "contributed *in some way*" to Tarquinii's termination. *Yelling*, 82 F.4th at 1339 (emphasis added).

The Navy has offered a nondiscriminatory rationale to support its decision to terminate Tarquinii—specifically, that Tarquinii engaged in nepotism by helping her husband and brother obtain offers of employment. But a motivating factor theory assumes that both "permissible and impermissible considerations" animated an "adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 171 (2009); *see also Makky v. Chertoff*, 541 F.3d 205, 215 (3d Cir. 2008) ("[T]he essence of a mixed-motive theory is the recognition that there may be a legitimate reason, as well as a prohibited reason, for the adverse employment action."). The statute itself says as much, recognizing liability where an protected characteristic is "a motivating

factor, . . . even though other factors also motivated" the decision. 42 U.S.C. § 2000e-2(m). So, although the Navy has proffered a nondiscriminatory rationale to support the decision to terminate Tarquinii's employment, Tarquinii does "not need to 'address' [the Navy's] showing" regarding "the conduct for which it claims it fired her." *Bart*, 96 F.4th at 577.

Instead, a reasonable factfinder could conclude that Tarquinii's supervisors terminated her—at least "in part"—based on their persistent and severe gender-based and race-based bias. *Id.* (citation omitted). The "comments" that Tarquinii's supervisors "made directly to her on more than one occasion," by supervisors "who had enormous influence in the decision-making process"—indeed, who made the decision to terminate her employment—are enough to "allow a jury to find" that Tarquinii's termination "was motivated, at least in part, by a forbidden factor." *Rose*, 257 F.3d 162; *see also Rachid*, 376 F.3d at 315-16 (persistent discriminatory comments enough to show that discriminatory animus "played a role"); *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1041 (9th Cir. 2005) (pattern of remarks sufficient to show that discrimination, "at least in part," explained an adverse employment action).

### C. The District Court's Failure To Consider A Motivating Factor Theory Warrants Reversal

Rather than assess the record evidence under a mixed-motive theory of liability, the district court instead required Tarquinii to satisfy the traditional

*McDonnell Douglas* test for assessing but-for discrimination under Title VII. JA2001-04. As the district court saw it, the question was whether "Tarquinii could prove to a reasonable jury that the Agency's explanations" for her firing "are pretextual." JA2003. The district court repeatedly invoked the requirement that a plaintiff establish *pretext*: "To make such a showing" of liability, "the plaintiff must prove that a reasonable jury could infer that the employer's given explanation was pretextual and that this pretext shielded discriminatory motives." JA2002. To prevail at summary judgment, the district court concluded, Tarquinii was required to show that "the Agency's explanation is pretextual and that discrimination or retaliation was *the real reason* for the Agency's conduct." JA2007 (emphasis added).

The district court's application of the traditional *McDonnell Douglas* factors ignored that Tarquinii could *also* prevail under a motivating factor theory of liability. As explained above, a motivating factor theory does not demand that a Title VII plaintiff establish pretext or one single discriminatory "reason" for an adverse employment decision. *See supra* at 22-24; *Mayorga*, 928 F.3d at 89. Instead, a plaintiff can establish liability premised on a motivating factor theory even when "unable to establish that a protected characteristic was the but-for cause of an adverse employment action." *Ponce*, 679 F.3d at 844; *see also Bostock*, 590 U.S. at 657.

Because the district court overlooked that Tarquinii could prevail under a motivating factor theory, it erred in granting summary judgment to the Navy.

It is no response that Tarquinii did not expressly invoke a motivating factor theory, by name, in her *pro se* filings before the district court. As the Supreme Court has explained, a case need not be "labeled as either a 'pretext' case or a 'mixed-motives' case from the beginning in the District Court; indeed, we expect that plaintiffs will often allege, in the alternative, that their cases are both." *Price Waterhouse*, 490 U.S. at 247 n.12; *see also Ponce*, 679 F.3d at 845 (recognizing that "a plaintiff may proceed under both theories simultaneously"); *Bart*, 96 F.4th at 574 n.2 ("[T]he differences between those types of cases are irrelevant at the summary judgment stage."). It is instead the "District Court" that must "decide whether a particular case involves mixed motives." *Price Waterhouse*, 490 U.S. at 247 n.12 (plurality opinion); *Smith v. Xerox Corp.*, 602 F.3d 320, 333 (5th Cir. 2010) (disclaiming the need for a plaintiff to correctly label a case as either but-for or motivating factor). Even where a plaintiff "does not expressly designate her case a 'mixed motives' case," when "both her brief and the record reveal that it can be construed as one," a district court should analyze both theories. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1071 (9th Cir. 2003).

These considerations are particularly important where, as here, a plaintiff proceeds *pro se*. "Courts must construe *pro se* filings liberally." *Richardson v.*

*United States*, 193 F.3d 545, 548 (D.C. Cir. 1999); *Jackson v. Off. of the Mayor of the Dist. of Columbia*, 911 F.3d 1167, 1169 n.1 (D.C. Cir. 2018) ("constru[ing] [a] Fourteenth Amendment claim as a Fifth Amendment claim"); *Lopez v. Postal Reg. Comm'n*, 709 F. App'x 13, 16 (D.C. Cir. 2017) (excusing *pro se* litigant's failure to sue the correct party); *Schnitzler v. United States*, 761 F.3d 33, 38-39 (D.C. Cir. 2014) (reasoning that *pro se* litigant's filings "sound[ed] in administrative law"); *Gray v. Poole*, 275 F.3d 1113, 1115 (D.C. Cir. 2002) (examining *pro se* litigant's pleadings "to understand the nature and basis" of the "*pro se* claims"). Here, even if this Court concludes that a counseled plaintiff should expressly assert a motivating factor theory at summary judgment, the district court erred by not examining the basis for Tarquinii's allegations and assessing whether she would be able to prevail under a mixed-motive theory.

This Court should reverse the district court's grant of summary judgment and permit Tarquinii to proceed under a motivating factor theory of liability. And even if the Court doubts whether the evidence is sufficient to sustain liability under such a theory, it should—at a minimum—vacate the district court's decision below and allow that court to assess in the first instance whether the summary judgment record can support a motivating factor theory.

## II. THE DISTRICT COURT'S BUT-FOR DISCRIMINATION AND RETALIATION ANALYSIS WAS FLAWED

Aside from the district court's failure to consider whether Tarquinii can prevail on a motivating factor theory of liability under Title VII, the district court also made two errors in its analysis of whether Tarquinii could establish that was terminated "because of" her sex or race. 42 U.S.C. § 2000e-2(a). First, the district court applied the incorrect legal standard, requiring that Tarquinii show that discrimination was "the real reason" for her termination. JA2007. Title VII does not impose such a requirement, nor does *McDonnell Douglas*. Instead, Title VII imposes liability when, in the absence of an employer's consideration of a protected characteristic, the employer would have taken an adverse employment action. *Bostock*, 590 U.S. at 656-57. That is the case here. Second, even under its own formulation of the legal test, the district court wrongly discounted the pervasive pattern of sex- and race-based comments and conduct exhibited by Iwaniec and Johnston as too attenuated from their decision to terminate Tarquinii. The record evidence shows that a reasonable jury could find but-for causation, warranting reversal of the district court's order.

**A.  The District Court Imposed A Standard Inconsistent With Title VII's Text**

**1.** By requiring that Tarquinii show that discrimination or retaliation "was the real reason" for her termination, the district court applied a legal standard inconsistent with the text of Title VII.  JA2007.

As explained above, Title VII renders it "unlawful" for an employer to take an adverse employment action "because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also supra* at 20.  As *Bostock* held, "Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation."  590 U.S. at 656 (citation omitted); *see also Bart*, 96 F.4th at 570.  "That form of causation is established whenever a particular outcome would not have happened 'but for' the purported cause."  *Bostock*, 590 U.S. at 656.  Put differently, "a but-for test directs [a factfinder] to change one thing at a time and see if the outcome changes."  *Id.*

As the Supreme Court has made clear, many "events have multiple but-for causes."  *Id.*  For instance, "if a car accident occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision."  *Id.*  This Court has recognized the same thing, reasoning that "'multiple but-for causes' of an injury do[es] not 'break the chain of causation for any one of them.'"  *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 104 F.4th 287, 296 (D.C. Cir. 2024) (citation omitted).  In

41

other words, under the text of Title VII, the critical question is whether—but for a plaintiff's protected characteristic—the employer would have taken the adverse employment action, *even if* other factors *also* served as but-for causes. *See Bart*, 96 F.4th at 570; *Yelling*, 82 F.4th at 1340.

This Court has not always hewed to the plain text of Title VII. In *Ginger*, this Court explained that under Title VII, "[a] plaintiff may pursue a 'single-motive case,' in which he argues race (or another prohibited criterion) was the *sole reason* for an adverse employment action and the employer's seemingly legitimate justifications are in fact pretextual." 527 F.3d at 1345. That formulation produced confusion, suggesting to district courts that plaintiffs must show discrimination was the "sole reason" for an adverse employment action. *Ponce*, 679 F.3d at 846. *Ponce* subsequently clarified that despite *Ginger*, "nothing in Title VII requires a plaintiff to show that illegal discrimination was the sole cause of an adverse employment action," and this Court "banish[ed] the word 'sole' from [its] Title VII lexicon." *Id.* Still, the "single motive" label has persisted in this Court's caselaw. *Mayorga*, 928 F.3d at 89 (referring to "what we have called a 'single-motive' or 'pretext' theory of discrimination"); *Hudson v. Am. Fed'n of Gov't Emps.*, No. 21-7133, 2022 WL 15798719, at *3 (D.C. Cir. Oct. 28, 2022) (per curiam) (same); *Brown v. Dist. of Columbia*, 798 F. App'x 677, 678 (D.C. Cir. 2020) (same).

The "single motive" label is inconsistent with both Title VII and Supreme Court precedent construing it: Because multiple but-for causes can produce an adverse employment action—and because liability is established where just *one* of those multiple but-for causes is discrimination—the "single-motive" label is a misnomer. A plaintiff need not establish that the employer harbored a single discriminatory motive. Instead, he or she need only prove that discrimination was *one* but-for cause of an adverse employment action. *See Mayorga*, 928 F.3d at 89 (requiring that a plaintiff show "the employer's improper consideration of a protected characteristic was *a* but-for cause of an adverse employment decision" (emphasis added)); *Haughton v. Dist. of Columbia*, 819 F. App'x 1, 2 (D.C. Cir. 2020) ("Under one route, a plaintiff may claim that discrimination based on a protected characteristic was *a but-for cause* of the adverse action . . . .").

The district court applied a more stringent test than Title VII and caselaw applying it demands. According to the district court, "[b]ecause the [Navy] ha[d] offered a legitimate, nondiscriminatory, and nonretaliatory reason for" terminating Tarquinii, "the Court is left to determine whether a reasonable jury could find that the Agency's explanation is pretextual and that discrimination or retaliation was *the real reason* for the Agency's conduct." JA2007 (emphasis added). The district court applied a similar rationale in analyzing Tarquinii's retaliation claim under the same *McDonnell Douglas* framework, requiring that she show that the Navy's "asserted

non-retaliatory reason was not the actual reason" for the adverse employment action. JA2003 (citation omitted). In the district court's view, it fell on Tarquinii at summary judgment to "present sufficient evidence . . . to *overcome*" the Navy's "proffered non-retaliatory reason for terminating her." JA2012 (emphasis added); *see also* JA2011 (finding evidence of discrimination not "sufficient" because Ms. "Tarquinii's supervisors terminated her due to the investigative report" (citation omitted)). In short, the district court required that Tarquinii show that *the* reason for the adverse employment decision was discriminatory.

The district court appeared to draw its "real reason" test from this Court's decision in *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). JA2002. There, this Court said that, under *McDonnell Douglas*, a court must answer the following: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* (citation omitted). But *Brady* does not require that the plaintiff show that *discrimination* is "the real reason." Instead, *Brady* allows a plaintiff to show either that the employer's *nondiscriminatory rationale* "was *not* the actual reason" or that the employer otherwise "intentionally discriminated." 520 F.3d at 494 (emphasis added); *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1295 n.11 (D.C. Cir. 1998) (en banc)

(providing that a plaintiff can either challenge the employer's reason or provide other evidence of discrimination).

True, the governing caselaw in this area is not neat. For instance, this Court has alluded to the "real reason[]" formulation used by the district court, explaining that "[a] plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). But *McDonnell Douglas* does not require that a plaintiff prove one true reason under Title VII's "because of" discrimination test. *See* 411 U.S. at 804. *Texas Department of Community Affairs v. Burdine*, like this Court's decision in *Brady*, also refers to "true reasons," but it does not require that the plaintiff show that discrimination was the true reason—it only allows a plaintiff to *disprove* an employer's stated nondiscriminatory rationale by showing that such a reason was not "its true reason[]." 450 U.S. 248, 253 (1981). And as *Bostock* more recently made clear, all Title VII demands is that a plaintiff show but-for causation—and a single event, the Supreme Court went on, can have "multiple" but-for causes. 590 U.S. at 656.

The district court nowhere acknowledged the but-for causation test enshrined in Title VII's text, nor did it ever use the phrase "but for" in analyzing Tarquinii's claims. Because the district court applied too stringent a standard for assessing Tarquinii's but-for discrimination claim, this Court should—at a minimum—vacate

45

the district court's summary judgment order. *Potter v. Dist. of Columbia*, 126 F.4th 720, 725-27 (D.C. Cir. 2025) (vacating and remanding where "[t]he district court applied the wrong legal framework for assessing civil contempt"); *see also United States v. Sellers*, 906 F.3d 848, 855 (9th Cir. 2018) ("Because the district court applied an incorrect legal standard, we follow our normal practice of remanding to the district court to determine in the first instance whether Sellers has met the standard we outline today.").[5]

## B. The District Court Wrongly Discounted Discriminatory Comments And Actions By The Relevant Decisionmakers

Even under the test applied by the district court, the court engaged in a flawed analysis that wrongly discounted the record evidence establishing discriminatory pretext. Because a reasonable jury could conclude that discriminatory animus was *a* but-for cause of Tarquinii's termination, summary judgment was not appropriate.

---

[5] Properly understood, *McDonnell Douglas* should not apply at summary judgment. As explained above, the traditional *McDonnell Douglas* test does not account for a motivating factor theory of discrimination under Section 2000e-2(m). *Supra* at 24-27. And if this Court concludes that *McDonnell Douglas* requires a plaintiff to show that her employer's one "real reason" for acting is discriminatory, that requirement is inconsistent with the plain text of Title VII and the Supreme Court's decision in *Bostock* construing it. *Supra* at 41-46; *Bostock*, 590 U.S. at 656. Other elements of the *McDonnell Douglas* test require a plaintiff to show more than Federal Rule of Civil Procedure 56 requires, like its demand that a plaintiff "prov[e] by the preponderance of the evidence a prima facie case of discrimination." *Burdine*, 450 U.S. at 252-53. These factors and others make *McDonnell Douglas* inconsistent with Rule 56. *See Ames*, 145 S. Ct. at 1548-55 (Thomas, J., concurring). This Court routinely applies *McDonnell Douglas* at summary judgment, so *amicus* preserves this argument in the event further review becomes necessary.

**1.** This Court has explained that "a plaintiff in a Title VII case is not limited to challenging the employer's explanation; she can also avoid summary judgment by presenting other evidence, direct or circumstantial, that permits an inference of discrimination." *Holcomb v. Powell*, 433 F.3d 889, 899 (D.C. Cir. 2006). "Examples of such evidence include discriminatory statements by the employer, or other attitudes suggesting the decision maker harbors discriminatory animus." *Id.* (citation omitted); *see also Aka*, 156 F.3d at 1289. A similar analysis applies to determine whether a plaintiff has presented sufficient evidence of retaliation for protected activity. *See Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 16-17 (D.C. Cir. 2009).

Courts look to a number of factors to determine whether statements are probative of discriminatory or retaliatory animus, "including the declarant's position in the corporate hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action." *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997); *see also Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149-50 (2d Cir. 2010) (delineating four factors, including (1) "who made the remark," (2) "when the remark was made," (3) "the content of the remark," and (4) "the context in which the remark was made," and noting that "none of these factors should be regarded as dispositive"). As this Court has made clear, a plaintiff is not required to "explain[] how . . . remarks relate to the

decision at issue." *Mayorga*, 928 F.3d at 94. Nor must a statement be made at the same time as an adverse employment decision: When a statement "is targeted directly at the plaintiff or is one of a pattern of similar remarks," it is "probative evidence of a supervisor's discriminatory attitude." *Morris*, 825 F.3d at 670 (recognizing probative value of statement not made "at the time of the" adverse employment action); *see also Iyoha v. Architect of the Capitol*, 927 F.3d 561, 568 (D.C. Cir. 2019) (crediting a "remark removed in time from the challenged employment action").

As described above, the pervasive, severe comments and conduct by Iwaniec and Johnston are probative of discriminatory animus. *Supra* at 28-31. Both Iwaniec and Johnston targeted Tarquinii with comments relating to "that time of the month." JA606. Iwaniec frequently commented on Tarquinii's appearance and weight—comments he did not make to her male peers. JA612-13. And both Iwaniec and Johnston treated Tarquinii differently on account of her race—requiring her to apologize to her white colleagues and using a tone with her that they did not use with other white employees. JA605-07, 621, 628. This "pattern" of comments and conduct, as explained above, is "probative evidence" of a "discriminatory attitude" harbored by both Iwaniec and Johnston. *Morris*, 825 F.3d at 670. And a reasonable jury could conclude based on the record evidence that—but for the discriminatory

actions of Iwaniec and Johnston—Tarquinii would not have been terminated, even if the Navy's nepotism investigation was *also* a but-for cause of her termination.

**2.** The district court failed to document the voluminous evidence evincing discriminatory animus on the part of Tarquinii's supervisors. Instead, the district court discounted the statements and actions for two reasons: (1) "the isolated comments appear to have been made a significant amount of time before [Ms.] Tarquinii's termination," and (2) "the remarks appear to have no connection with Tarquinii's termination." JA2010. The district court erred twice over.

**a.** First, as for the temporal proximity to Tarquinii's termination, the district court explained that Iwaniec's remarks indicating *religious* animus occurred "approximately a year before her termination." JA2011.[6] And, regarding Tarquinii's allegations that Iwaniec and Johnston forced her to apologize to her white peers, the court reasoned that Tarquinii did "not explain when this occurred during her tenure." *Id.*

The district court did not cite the voluminous remarks targeted at Tarquinii on the basis of her sex—remarks that continued up to the same month she was terminated. The record shows that Tarquinii's supervisors exhibited sex-based discrimination throughout her employment and, in particular, through her

---

[6] The record shows that Iwaniec questioned Tarquinii's religious convictions as a Catholic in a remark he made approximately a year before her termination. JA622.

49

termination in November 2015. *See supra* at 5-8, 28-31. In May 2015, six months prior to her termination, Tarquinii told Iwaniec that he "needed to maintain a professional distance and stop touching other employees," which made him "visibly angry." JA616. In June 2015, five months prior to her termination, Iwaniec commented on Tarquinii's weight loss, stating that she "should keep it up" because it made her clothes "'fit better.'" JA613. In August 2015, just three months prior to her termination, Iwaniec told Tarquinii that she "was 'melting'" from her weight loss and that she needed to "'keep it up.'" JA613. And Tarquinii alleges that in November 2015—the same month that she was terminated—Johnston told her to "appear less 'emotional' in [her] conversations with others, and to avoid acting as if it was 'that time of the month.'" JA606. She also alleges that up to that same month, Iwaniec would "sit in a chair with his legs wide open" and "push his hips forward provocatively" during meetings with Tarquinii. JA611.

These allegations directly undermine the district court's reasoning that Tarquinii presented evidence of only "isolated comments" that were made "a significant amount of time" before her termination. JA2010. Instead, the record evidence documents a "pattern" of discriminatory statements made throughout the course of Tarquinii's employment, including up to the month that she was terminated. *Morris*, 825 F.3d at 670. A jury should be allowed to decide whether

this evidence establishes that, but for her supervisors' discriminatory animus, Tarquinii would not have been terminated.

**b.** Second, the district court was wrong to conclude—as a matter of law—that the "remarks appear to have no connection with" the termination of Tarquinii's employment. JA2010. The district court cited *Morris*, noting in a parenthetical that in that case, this Court described "cases where stray remarks were insufficient to create a jury question" and distinguished "cases where [discriminatory] charged statements were 'pervasive[], sever[e],' or where the speaker played a significant role in the adverse action." *Id.* (alterations in original) (citation omitted). But the district court seemingly ignored that, here, the statements were not only "pervasive[]" and "sever[e]," they were also made by the speakers who had a direct "role . . . in the adverse action." *Morris*, 825 F.3d at 670. Iwaniec and Johnston—the same speakers who repeatedly evinced a discriminatory animus toward Tarquinii throughout her employment, including up to November 2015—were the *same actors* who made the decision to terminate her employment. That is enough for a jury to find a "nexus" between their discriminatory remarks and Tarquinii's termination, as the district court has previously recognized. *Ajisefinni v. KPMG LLP*, 17 F. Supp. 3d 28, 44 (D.D.C. 2014) (Contreras, J.) ("Such a nexus can be shown if the remark was made by an individual with the power to influence Plaintiff's termination, and the remark was temporally close in time to the termination."); *see also Miller v.*

*Time-Warner Commc'ns, Inc.*, No. 97 Civ. 7286, 1999 WL 440781, at \*4 (S.D.N.Y. June 29, 1999) ("[O]ffensive remarks are evidence of discrimination in an employment action if they are temporally connected to the employment action and are made by an individual who controlled the action.").

The district court reasoned that Tarquinii, in her *pro se* filings, "concede[d] that" Iwaniec and Johnston based their decision "on the Office of Inspector General's investigation report." JA2011. But Tarquinii made no such "concession." Instead, in her statement of undisputed facts, Tarquinii explained that "[t]he November 23, 2015 removal action was solely based on the OIG ('IG') Investigative report issued in October 2015." JA582. What Tarquinii clearly meant is that the only basis the Navy expressly offered for terminating her was the investigative report, not that the report fully and accurately stated the true grounds for her termination. Treating Tarquinii's *pro se* statement as a binding legal concession proves far too much: If Tarquinii believed that the only possible explanation for her termination was the investigation, she would not have pursued EEO counseling and this lawsuit to begin with. More fundamentally, a plaintiff need not negate the nondiscriminatory rationale offered by the defendant to get past summary judgment, and can instead "avoid summary judgment (and prevail at trial) by presenting other evidence, either direct or circumstantial, that permits an inference of discrimination." *Aka*, 156 F.3d at 1295 n.11.

The district court invoked both *Khan v. Holder*, 37 F. Supp. 3d 213 (D.D.C. 2014) and *Elliott v. Acosta*, 291 F. Supp. 3d 50 (D.D.C. 2018), to assert that any discriminatory animus harbored by Iwaniec and Johnston bore no causal "nexus" to the decision to terminate Tarquinii. JA2011-12. But each case is readily distinguishable. In *Khan*, the district court acknowledged comments that it found "completely inappropriate and unacceptable," but explained that the speaker who made them "was not the person who made the employment decisions that adversely affected [the] plaintiff." 37 F. Supp. 3d at 230. So too in *Elliott*, where the alleged discriminatory remarks were made by a speaker who did not have decisionmaking authority. *See* 291 F. Supp. 3d at 60-61. Here, by contrast, the supervisors who evinced discriminatory animus—Iwaniec and Johnston—were the same actors who made the decision to terminate Tarquinii. *Cf. Morris*, 825 F.3d at 670 (distinguishing cases based on the "role of the speaker in the adverse action").[7]

---

[7] The district court also erroneously discounted certain comparator evidence showing that Iwaniec and Johnston treated Tarquinii more harshly than her white, male peers. For instance, Gary Holsopple, another supervisee of Iwaniec and Johnston, "oversaw several employees who failed to properly supervise children in the Child Development Center," engaged in "negligence and false reporting," "fail[ed] to properly respond to sexual harassment claims," exhibited "gross negligence in performing his duties," and "cover[ed] up . . . sexual harassment." JA588-89. Holsopple was "ultimately able to keep his job." JA588. Without documenting the full scope of Holsopple's misconduct, the district court wrongly characterized it as "financial misconduct" and found it "different from" and not "'comparabl[y] serious[]'" to "the nepotism that Tarquinii was found to have

53

In short, the district court largely ignored extensive evidence regarding the pervasive and severe sex-based and race-based discrimination Tarquinii endured while employed at Iwakuni. The very actors who exhibited discriminatory animus were the same actors who made the adverse employment decision. And evidence of discrimination continued throughout Tarquinii's employment, including through November 2015—the same month in which she was terminated. Under these circumstances, a reasonable jury could conclude that, but for the discriminatory animus exhibited by Iwaniec and Johnston, Tarquinii would not have been terminated. Tarquinii should have a fair chance to persuade that jury to see the facts her way.

---

engaged in." JA2014-15 (citation omitted). And the district court incorrectly stated that Iwaniec and Johnston lacked supervisory authority over Holsopple, JA2015-16—they were, as the record shows, his direct supervisors, JA206. This comparator evidence only underscores that a reasonable jury could find that discrimination was a but-for cause of Tarquinii's termination.

# CONCLUSION

This Court should reverse the district court's order granting summary judgment to the Navy and remand for further proceedings.

Dated: July 9, 2025

Roman Martinez
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

Respectfully submitted,

*/s/ Ben Harris*

Ben Harris
   *Counsel of Record*
Alexandra Mary O'Keefe
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
ben.harris@lw.com
alexandra.okeefe@lw.com

*Court-Appointed Amicus Curiae in Support of Appellant*

**CERTIFICATE OF COMPLIANCE**

This brief complies with Federal Rule of Appellate Procedure 32(f) and (g), and D.C. Cir. Rule 32(e)(2), because it contains 12,658 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word and Times New Roman 14-point font.

July 9, 2025

*/s/ Ben Harris*
Ben Harris